# Exhibit 9

**From:** Howard, James [email redacted]
**Sent:** Thursday, May 07, 2015 12:26 AM
**To:** WorldClassPatentQuality
**Subject:** Askeladden LLC's Comments on the Office's Efforts to Enhance Patent Quality

Dear Sir or Madam,

Please find, attached hereto, a letter from Mr. Sean Reilly, on behalf of Askeladden L.L.C., providing comments on the Office's efforts to enhance patent quality.

Best regards,

**Jim Howard**
Vice President and Associate General Counsel

**The Clearing House Payments Company L.L.C.** | Office 336.769.5424 | Cell 336.671.1754

This e-mail may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.



**By Email**
WorldClassPatentQuality[at]uspto.gov

May 6, 2015

Michael Cygan
Senior Legal Advisor
Office of Patent Legal Administration
Office of the Deputy Commissioner for Patent Examination Policy
Mail Stop Comments -- Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Re:  Comments on Enhancing Patent Quality in Response to 80 Fed. Reg. 6475

Dear Mr. Cygan:

    I write on behalf of Askeladden, L.L.C., to support the Office's ongoing efforts to improve patent quality.  Askeladden respectfully submits these comments in response to the Office's Request for Comments on Enhancing Patent Quality (80 Fed. Reg. 6475).

    Askeladden is an education, information, and advocacy organization dedicated to improving the understanding, use, and reliability of patents in financial services and elsewhere. It is a wholly owned subsidiary of The Clearing House Payments Company L.L.C.  Established in 1853, The Clearing House is the nation's oldest banking association and payments company.

    Askeladden and the financial services industry have a strong interest in improving patent quality.  Members of the financial services industry are customers of the Office that frequently seek patent protection for their important innovations.

    Historically, examiners have not had sufficient access to prior art relating to the financial services industry.  In particular, because certain technologies utilized by banks and other financial services providers were not regularly patented or publicized, the prior art databases available to examiners would not contain information important for the examination of applications that could later be asserted against the industry.

    Through its Patent Quality Initiative, Askeladden is proactively working to help address this problem.  For example, Askeladden is working to strengthen and support the patent examination process by making pertinent financial services prior art more easily accessible and by providing educational briefings on the evolution of technology in financial services.

May 6, 2015
Page 2

Askeladden believes that it is critical to patent quality to make the most relevant prior art available during examination and therefore strongly supports the Office's initiatives that will further assist in doing so.

With these considerations in mind, Askeladden proposes the following specific improvements aimed toward improving patent quality.

### IMPROVE THE PRIMARY SEARCH TOOL UTILIZED BY EXAMINERS

Because access to the best prior art is critical to patent quality, the search tools provided to examiners must enable them to efficiently identify and review the most relevant prior art. However, the current EAST system only provides a common interface for efficiently searching patents, published applications, and limited other documents. Examiners must separately access other databases that are currently available to them. To permit examiners to efficiently identify and review the most relevant prior art, the library of prior art available to them should be expanded, and a single primary search interface – whether it be through advancements to EAST or an entirely new system – should be provided to facilitate searching the entire library of prior art at once. In addition, as the library of prior art continues to grow, it is critical that proven modern search algorithms and techniques are implemented to enable examiners to efficiently identify the best art, and to ensure examiners are not overwhelmed with references that they cannot reasonably consider.

First, to ensure patent quality, it is necessary that examiners have access to as much of the full universe of prior art as is practical. Especially in certain art groups, NPL references reflect advances in technology that may not be captured in patents and published patent applications. Thus, NPL references can often provide the most relevant prior art. These NPL resources need to be available and easy for examiners to access as they construct their prior art searches. Accordingly, to the extent possible, the Office should integrate key NPL sources into the prior art library accessed through a single primary search interface. For example, contents of major commercial NPL databases should be incorporated into the library of prior art. Also, prior art submitted to the Office by applicants and third parties (*e.g.,* in an IDS or through a preissuance submission) should also be incorporated.

Additionally, the Office should develop a prior art submission interface that would allow the public to upload non-duplicative NPL references into the prior art library accessible by the examiners' primary search interface. Further, instead of requiring examiners to access separate databases, the primary search tool interface should also provide access to machine translations of foreign references. Such improvements to the Office's search tool will assist examiners in identifying the most relevant prior art and thus improve the quality of the overall prosecution process.

Second, the Office should implement modern search algorithms into its search tools. The Request for Comments seeks input on new tools for pre-examination searches that use keywords, stemming, concept-semantic, natural language, and relational word searching. (80 Fed. Reg. 6479). The best versions of these search algorithms should also be available in the primary search interface for examiners to utilize when performing their own prior art searches during examination.

May 6, 2015
Page 3

Additionally, the Office should employ modern algorithms that rank search results by relevance so that examiners can quickly locate the most relevant search results and understand how those results were identified. This information will allow examiners to consider the most relevant references first, or to determine that the search is not adequate and needs to be adjusted because the prior art in the results list are not on point.

### CONTINUE TO ENHANCE EXAMINER EDUCATION

Examiners that are well educated on the technology and on the law are the most important asset for enhancing patent quality. Even when provided with the most relevant prior art, examiners who are not properly trained and educated will not be capable of consistently issuing high quality patents.

The Office has recently taken significant steps towards ensuring optimal examiner education on both technical and legal issues. Askeladden applauds that work and encourages the continued expansion of examiner education programs. For example, Askeladden is coordinating guest lecturers on technology relevant to the financial services industry. Askeladden believes that this improved educational program has been highly valuable.

Likewise, education as to the application of the law can be especially important for examiners in certain art units. For example, examiners in art units that tend to receive numerous applications claiming alleged inventions prone to abstract ideas need to be well-educated on how to apply 35 U.S.C. § 101. The Office's 2014 Interim Guidance on Patent Subject Matter Eligibility is a very useful educational tool in this regard, because it provides specific examples to the examiners and instructs them how to apply § 101 to those examples. Going forward, we hope that the Office will continue to provide examiners with additional examples, based on the decisions of the U.S. Court of Appeals for the Federal Circuit relevant to this important legal issue. Section 101 jurisprudence continues to evolve rapidly, and it is important that examiners receive timely updates to the guidance that reflect the current state of the law. The Office should generate similar materials to assist examiners with application of other legal issues.

### INCREASE THE CREDIT AND AMOUNT OF TIME ALLOTTED TO EXAMINERS TO REVIEW PRIOR ART FOLLOWING AN UNUSUALLY LARGE OR LATE-SUBMITTED IDS

One factor that contributes to understanding patent claim scope is the prior art of record listed on the face of the issued patent, as the examiner is presumed to have determined that the claims are patentable over that list of art. However, current processes fail to provide sufficient time and credit for examiners to sufficiently review each reference on a very large or late-submitted information disclosure statement (IDS). Given examiners' workload and pressure to reduce pendency of applications, without allocation of sufficient time and credit it is impractical for examiners to perform more than a cursory review of the references listed on such an IDS. Without a thorough review of the contents of an IDS, patents will issue that are invalid over the cited prior art listed on the face of each patent.

The patent examiner "count system" is the methodology used by the Office for determining the time a patent examiner has to complete a patent examination and how much credit is given to the examiner for each stage of an examination for performance evaluation purposes. The Office made significant changes to the count system in 2010 in an attempt to

Askeladden L.L.C. is a subsidiary of The Clearing House Payments Company L.L.C.

May 6, 2015
Page 4

incentivize examiners to perform quality work at the beginning of the examination process and to increase the amount of time examiners have for examining patent applications overall.  Under this system, examiners receive varying amounts of credit for issuing office actions on the merits, conducting applicant interviews, and other activities.

Under the current count system, however, examiners are not separately given credit (or specifically allotted time) to review information disclosure statements (IDS).  This is true even where an IDS is extremely large or is submitted after the examiner has allowed the claims.  Thus, in certain circumstances, the current count system renders it impractical for examiners to devote sufficient time for review of references cited in an IDS and, in turn, can lead to the issuance of patent claims that are not novel or non-obvious over the prior art cited in that IDS.

One such circumstance is when an applicant identifies an unusually large number of prior art references in an IDS.  This can occur for several reasons.  One example is where an issued patent related to the application is the subject of litigation and an applicant submits all of the prior art identified during the litigation to the examiner.  Another example of a circumstance where this can occur is when a foreign patent office in a related application identifies a large number of prior art references.  Another example is when an applicant purposely engages in submitting large amounts of prior art, even art of questionable materiality, in an IDS during prosecution to gain a perceived advantage if the application issues as a patent and is later litigated.  The submission of references of questionable materiality effectively obfuscates those references in an IDS that are most relevant.

Whatever the reason, where an unusually large number of references are submitted in an IDS, especially if many of those references are lengthy and/or technically complex, it is not practical for examiners to perform an adequate review of all of those references given the lack of sufficient time and credit.

Another circumstance in which it is impractical under the current system for examiners to carefully review all references submitted in an IDS is where that IDS is submitted after the examiner has already issued a notice of allowance, as permitted by 37 C.F.R. § 1.97(d).  In such cases, the current system provides no additional time or credit for an examiner to thoroughly review the references identified, and there is a perception that examiners frequently do not closely review the references in these circumstances.  This appears to be recognized by the Office at some level, as the current Quick Path Information Disclosure Statement Pilot Program (QPIDS) provides examiners with an additional 3 hours of non-production time to review an IDS when it is submitted on the same day as payment of the issue fee or after payment of the issue fee.  (*See* QPIDS Pilot Memorandum of Understanding between the USPTO and POPA, May 8, 2012).  However, outside of that particular circumstance, examiners are given no additional time to review such late-submitted art.

Because examiners are required under 37 C.F.R. § 1.97 to review each piece of prior art cited in a timely submitted IDS, they are sometimes placed in the untenable position of indicating that they have reviewed prior art that they did not have sufficient time to review.  This, in turn, results not only in the issuance of the patent without full consideration of the cited art, but also has ramifications in litigation.  Such references will be listed on the face of the issued patent as cited during prosecution, however, enabling a patent plaintiff to make the

AskMeWorld L.L.C. is a subsidiary of The Clearing House Payments Company L.L.C.

May 6, 2015
Page 5

possibly counterfactual argument during litigation that the Office endorsed the patent claims' validity over each piece of prior art after careful consideration. Then, the plaintiff will seek to use the examiner's indication that he or she reviewed the references as evidence that those references do not render the issued patent invalid.

To ensure that examiners are able to review large or late-submitted IDS submissions, Askeladden suggests that the Office revise the count system to give examiners additional time to review prior art where circumstances warrant it. The specific amount of time provided would vary based on the seniority of the examiner and the art unit.

### ENHANCE THE OFFICE'S EXISTING PATENT QUALITY IMPROVEMENT PROGRAMS: IMPROVED PREISSUANCE SUBMISSION PROCESS

As discussed in the Request for Comments, the Office has already implemented, or is in the process of implementing, a number of programs and initiatives to help improve patent quality. (80 Fed. Reg. 6477-78). Askeladden fully supports the Office in these projects. Below, we suggest a specific improvement to one of those existing Patent Quality Initiative Programs, the preissuance submission process.

The Office has already improved the electronic user interface to make it easier for third parties to make preissuance submissions. (80 Fed. Reg. 6478). We support the Office's efforts to improve the electronic user interface for preissuance submissions.

However, under current rules, third parties may not submit prior art because there is a perception that examiners may have insufficient bandwidth to fully consider submitted references for same reasons discussed above with respect to large or late-submitted IDSs. Accordingly, Askeladden suggests that the Office revise the count system to give examiners additional time to review prior art submitted through the preissuance submission process where necessary to ensure examiners have sufficient time to consider such submissions.

### INSTITUTE NEW PATENT QUALITY IMPROVEMENT PROGRAMS

In an effort to continue to enhance patent quality, the Office has also made six new proposals with the goal of improving examiner work product, existing quality metrics, and the customer experience. (Fed. Reg. 6478-80). These proposals were discussed at the two-day Quality Summit on March 25-26, 2015. Askeladden provides the following suggestions to improve upon some of them.

### EXCELLENCE IN WORK PRODUCT

#### 1. Automated Pre-Examination Search

Under the current system, an examiner may request an automated pre-examination search conducted on the PLUS system to identify potentially relevant U.S. patents and U.S. patent application publications. The Office is exploring new tools to improve the pre-examination search capability. (80 Fed. Reg. 6479).

The Office should focus on improving its search tools to ensure that examiners identify and review the most relevant prior art. As discussed previously, the goal is to find better art, not just more art. We recognize that the examiners need time to carefully consider prior art references, and should not be overwhelmed by more, cumulative references. The following

Askeladden L.L.C. is a subsidiary of The Clearing House Payments Company L.L.C.

6

May 6, 2015
Page 6

specific suggestions for the pre-examination search are aimed at improving the search tools in a similar manner as described above for the primary search tool to obtain better search results.

- Implement modern keyword, stemming, concept-semantic, relational, and natural language word searching capabilities that also ranks the most relevant search results and shows why those references have been identified as the most relevant
- Automatically pull key terms from the specification and the claims as filed
- Execute the pre-examination search on the full library of prior art discussed above
- Allow examiners and the public access to the improved search database to duplicate and refine the search

Additionally, examiners should not be expected in every case to review every reference identified through the automated pre-examination search, because the results may not be relevant.  Any search results should only be considered art of record and listed on the face of the issued patent if it has actually been reviewed by the examiner and determined to be material.

### 2.   Clarity of the Record

The Office is focused on initiatives to enhance the clarity and completeness of the official record.  (80 Fed. Reg. 6479).  Askeladden commends the Office for recognizing the importance of a clear official patent record so that the public is apprised of the patent boundaries.  A clear record serves the important function of putting the public on notice regarding the scope of the claimed invention.

Under the current regime, applicants can communicate in interviews that their claims are narrow during prosecution to avoid prior art rejections, but in some cases a plaintiff may later assert that the claims are broad during litigation.  It is sometimes apparent from looking at the file history that the examiners have not considered the full scope of the claims as they are being argued during litigation.  However, often the file histories do not have clear statements regarding the reasons for allowance over the prior art or the scope of the claims that a defendant can cite to a jury to explain this inconsistency.

Askeladden supports efforts to provide more detail in the reasons for allowance.  This allows the applicant to have clarity on the scope of the claims being considered during prosecution so that, if the examiner has not fully appreciated their scope, the applicant has the opportunity to discuss the scope of the claims with the examiner before the patent is granted.  Additionally, providing detailed reasons for allowance allows future courts and defendants to understand the scope of the invention as it was understood by the examiner during prosecution and to identify any inconsistencies between the perceived scope of the claims during prosecution and the allegations made during subsequent litigation.

### EXCELLENCE IN MEASURING PATENT QUALITY

### 3.   Review and Improve Examination Quality Metrics

A final area of importance to improving patent quality is in measuring and tracking the quality of the examination over time to determine the success of implemented patent quality initiatives and Office training programs, as well as to identify problem areas to be addressed.  (80 Fed. Reg. 6479).  For example, the Office should seek to track the consistency and quality of initial § 101 rejections to help determine if the 2014 Interim Eligibility Guidance is working effectively, or whether a different approach to examiner training should be considered.

Askeladden L.L.C. is a subsidiary of The Clearing House Payments Company L.L.C.

May 6, 2015
Page 7

However, Askeladden cautions against developing metrics that are too burdensome or that would otherwise impede examiners from efficiently performing their examination activities.

\* \* \*

     As stated above, Askeladden wishes to thank the Office for its diligent efforts in improving patent quality and for the initiatives it is currently undertaking to make additional improvements. Askeladden remains committed to working towards these goals together with the Office.

                    Respectfully,

                    Sean Reilly
                    General Counsel
                    Askeladden L.L.C.

Askeladden L.L.C. is a subsidiary of The Clearing House Payments Company L.L.C.

8