Exhibit 20

American Bar Association
www.supremecourtpreview.org

No. 13-896

IN THE

# Supreme Court of the United States

◆◆

COMMIL USA, LLC,

*Petitioner,*

—v.—

CISCO SYSTEMS, INC.,

*Respondent.*

———

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## BRIEF OF *AMICUS CURIAE* ASKELADDEN L.L.C. IN SUPPORT OF RESPONDENT

KEVIN J. CULLIGAN
  *Counsel of Record*
JOHN P. HANISH
JONATHAN A. AUERBACH
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
kculligan@goodwinprocter.com
(212) 813-8800

*Attorneys for Amicus Curiae
  Askeladden L.L.C.*

i

## TABLE OF CONTENTS

PAGE

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

INTEREST OF *AMICUS CURIAE* . . . . . . . . .   1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . .   5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

   I.  Commil's argument contravenes
this Court's holding in *Global-Tech*
and improperly calls for a notice
letter standard for the intent
required for induced infringement
under 35 U.S.C. § 271(b) . . . . . . . . . . .   8

  II.  Allowing evidence of a good-faith
belief in invalidity and non-
infringement to negate induced
infringement promotes patent
quality and helps to level the
playing field in actions asserting
weak patents . . . . . . . . . . . . . . . . . . . . . . . .   14

      A.  An accused infringer's good-
faith belief of non-infringement
is often coupled with a good-
faith belief in invalidity . . . . . . . .   14

      B.  Financial services institutions
would be harmed if this Court
adopts Commil's notice letter
standard for the intent required
for induced infringement under
35 U.S.C. § 271(b) . . . . . . . . . . . . . .   16

ii

PAGE

    C.  Commil's and amici's predictions
about the negative effects of the
Federal Circuit's opinion in
*Commil* are unfounded . . . . . . . . . .   21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

iii

## TABLE OF AUTHORITIES

**Cases:** PAGE(S)

*Automated Transaction LLC v. New York*
    *Cmty. Bank*, No. 12-cv-3070-JS-ARL,
    2013 U.S. Dist. LEXIS 34872
    (E.D.N.Y. Mar. 13, 2013) ................ 18

*Bose Corp. v. SDI Techs., Inc.*,
    558 F. App'x 1012 (Fed. Cir. 2014) ..... 23

*Commil USA, LLC v. Cisco Sys., Inc.*,
    720 F.3d 1361 (Fed. Cir. 2013)8, 9, 21, 24

*Ecolab, Inc. v. FMC Corp.*,
    569 F.3d 1335, *amended on reh'g in part*,
    366 F. App'x 154 (Fed. Cir. 2009)....... 15

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011) .................*passim*

*In re Innovatio IP Ventures, LLC*,
    *Patent Litigation*, No. 1:11-cv-9308,
    D.I. 431 (N.D. Ill. Oct. 1, 2012) .......... 25

*Intellectual Ventures I LLC*
    *v. Bank of America Corp.*,
    No. 3:13-cv-358-RJC-DSC,
    2014 U.S. Dist. LEXIS 28132
    (W.D.N.C. Mar. 5, 2014) ................. 18

*Kinetic Concepts, Inc. v.*
    *Blue Sky Med. Grp., Inc.*,
    554 F.3d 1010 (Fed. Cir. 2009).......... 15

*Maxim Integrated Prods., Inc.*
    *v. Bank of America Corp.*,
    No. 4:12-cv-617-RAS, D.I. 1
    (E.D. Tex. Filed Oct. 1, 2012)...........18, 19

iv

PAGE(S)

*Renaissance Learning, Inc.*
  *v. Walker Digital, LLC*,
  No. 3:11-cv-166-BBC, D.I. 1-1
  (W.D. Wis. Mar. 4, 2011) ................ 17

*VirnetX, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014).......... 24

*Wolf Run Hollow, LLC v.*
  *Bank of America Corp.*,
  No. 13-cv-8406, D.I. 1
  (N.D. Ill. Nov. 21, 2013) ................ 17

### Statutes:

35 U.S.C. § 271(b) ........................*passim*

35 U.S.C. § 298 ............................. 13

### Other Authorities:

Executive Office of the President,
  *Patent Assertion and U.S. Innovation*
  (June 2013), http://www.whitehouse.
  gov/sites/default/files/docs/
  patent_report.pdf ....................... 14

FTC, *Prepared Statement of the Federal
  Trade Commission on Discussion Draft
  of Patent Demand Letter Legislation
  Before the Subcommittee on Commerce,
  Manufacturing, and Trade*, 2
  (May 22, 2014), *available at*
  http://www.ftc.gov/system/files/
  documents/public_statements/
  310821/140522patentdemandltrs.pdf ... 13

v

PAGE(S)

John Mullin, *Wi-Fi Patent Troll Hit with Racketeering Suit Emerges Unscathed*, Ars Technica (Feb. 13, 2013, 10:05 AM), http://arstechnica.com/tech-policy/ 2013/02/wi-fi-patent-troll-hit-with-novel-anti-racketeering-charges-emerges-unscathed ...................... 25

John R. Allison, et al., *Patent Quality and Settlement Among Repeat Patent Litigants*, 99 Geo. L.J. 677 (2011) ....... 12

Josh Lerner, *The Litigation of Financial Innovations*, 53 J. L. & Econ. 807 (2010) .................................... 21

Nelson D. Schwartz & Louise Story, *Surge of Computer Selling After Apparent Glitch Sends Stocks Plunging*, N.Y. Times, May 6, 2010, *available at* http://www.nytimes.com/2010/05/07/ business/economy/07trade.html ........ 20

Thomas S. Kim & Michael D. Stein, *Patent Value: Increased Interest Extends Beyond "Trolls,"* Legal Intelligencer, May 23, 2005 ...... 4

USPTO, *I Got a Letter . . .* , http://www.uspto. gov/patents-maintaining-patent/patent-litigation/i-got-letter .................... 13

## INTEREST OF *AMICUS CURIAE*

Askeladden L.L.C. is an education, information and advocacy organization dedicated to improving the understanding, use, reliability and quality of patents pertinent to financial services and related industries.[1] Askeladden seeks to improve the U.S. patent system by, among other things, submitting amicus curiae briefs on important legal issues.

Askeladden is a wholly owned subsidiary of The Clearing House Payments Company L.L.C. Established in 1853, The Clearing House is the oldest banking association and payments company in the United States. It is owned by the world's largest commercial banks, which collectively hold more than half of all deposits in the United States and employ more than one million people in the United States and more than two million people worldwide. The Clearing House clears almost $2 trillion each day, representing nearly half of all automated clearing house, funds transfer and check-image payments made in the United States. Its affiliate, The Clearing House Association L.L.C., is a nonpartisan advocacy organization that represents the interests of its owner banks by promoting and developing policies to support a safe, sound and competitive banking system.

---

[1] Pursuant to Supreme Court Rule 37.6, Askeladden affirms that no counsel for a party authored this amicus brief in whole or in part, no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than Askeladden or its counsel made such a monetary contribution. Askeladden sought and obtained consent to the filing of this amicus brief from both of the parties.

2

Askeladden recognizes that a strong patent system is vital to continued innovation in the United States, and many member banks hold patents of their own relating to financial products and services. Askeladden and members of The Clearing House also recognize, however, that widespread attempts to exploit weak patents by some patent holders contravene the spirit, if not the letter, of the patent laws, and constitute an abuse of our patent system and our courts.

This Court should reject Commil's argument that the standard for determining the intent required to prove liability for inducing patent infringement should be changed so that a good-faith belief that an asserted patent is invalid would no longer be a defense to a claim that a party has induced others to infringe. Such a change would be antithetical to the role that patents play in promoting innovation. Although valid patent rights promote innovation, invalid patents stifle innovation and competition. The Federal Circuit's observation in this case that a good-faith belief that an asserted patent is invalid is a defense to a charge of inducing patent infringement is consistent with and serves the twin goals of promoting respect among parties for the patent rights of competitors, while preventing invalid patents that do not promote innovation (because they are not novel or relate to unpatentable subject matter) from smothering the legitimate activities of other participants in the marketplace, including financial services institutions.

The change demanded by Commil would further burden financial services institutions and the courts with specious claims of patent infringement brought by legions of holders of low-quality

3

patents whose principal business is to buy or otherwise acquire dubious patents for the sole purpose of asserting them in dozens and sometimes hundreds of abusive notice and demand letters and infringement actions against companies that use a product or business method that is somehow related, however tenuously or remotely. Those abusive patent holders then settle their claims by granting fully paid-up non-exclusive licenses for nuisance amounts to avoid a determination of invalidity or non-infringement.[2] If a target of a demand letter does not agree to license the patent, the patent holder ordinarily commences an action alleging patent infringe- ment, hoping to quickly extract a settlement from

---

[2] A large and growing number of the patent holders that harm the patent and judicial systems and undermine incentives to innovate by engaging in abusive licensing campaigns carried out by distributing indiscriminate generic demand letters and asserting weak and invalid patents to extract settlement payments fall within the scope of the term "non-practicing entities" or "NPEs". The patent holders that abuse patents and whose conduct is the concern of this amicus brief should not be confused with universities or other public and private research foundations and institutions that do not commercialize their inventions, but conduct, or have others conduct on their behalf, legitimate licensing programs. Some operating companies also abuse the patent and court systems through the indiscriminate assertion of weak patents to extract settlements from accused infringers that for practical reasons decide to settle rather than incur the costs, distractions and risks associated with expensive litigation. Askeladden's focus here is on the abusive behavior—whether it is the assertion of an invalid patent, the overbroad applica- tion of the claims of a patent for purposes of claiming infringement and then settling for nuisance amounts to avoid challenges of such specious theories, or engaging in abusive demand or notice letter campaigns—rather than the particular status of the patent holder.

4

the accused infringer by offering the possibility of a settlement priced in a way that seems attractive given the high costs and risks associated with patent litigation. Some abusive patent holders forgo notice letters and simply file an infringement action to extract settlement payments. *See* Thomas S. Kim & Michael D. Stein, *Patent Value: Increased Interest Extends Beyond "Trolls,"* Legal Intelligencer, May 23, 2005 (describing entities that extract profits by offering a target entity an option of purchasing a license or facing litigation).

If Commil persuades this Court to remove the scienter required for a finding of inducing infringement under 35 U.S.C. § 271(b), there will be a greater incentive for abusive patent holders to assert questionable claims of induced infringement against members of the financial services industry. Those companies are particularly vulnerable targets for inducement claims because they necessarily are involved and engage in extensive relationships and transactions among banks, brokerage firms, customers, depositories, data processors, market-data vendors, exchanges and clearing entities. If financial services institutions are unable to avoid liability for inducing infringement by offering evidence of a good-faith belief in invalidity, they will become even more vulnerable to abusive patent holders asserting questionable patents in an attempt to extract quick settlements from parties that understandably want to avoid the very substantial costs that must be incurred to defend against even a single patent infringement action. Any person with a financial interest in the global economy—in other words, everyone—shares in the wasteful costs associated with abusive demand letter

5

campaigns and specious patent infringement actions.

Askeladden's interest is to ensure that participants in the financial services industry continue to have the fair opportunity to defend themselves against questionable claims of inducing patent infringement that current law allows. That fair opportunity includes the ability to present evidence of a good-faith belief in the invalidity of the asserted patent or their own non-infringement as proof that they did not act with "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).

## SUMMARY OF ARGUMENT

Commil asks this Court to hold that a party accused of inducing infringement should be prohibited from introducing evidence of its good-faith belief in the invalidity of an asserted patent to negate the element of intent required to establish inducement of infringement under 35 U.S.C. § 271(b). Commil's attempt to fashion a new standard—one that would find scienter whenever the alleged infringer fails to accede to the demands in a mere notice letter—runs squarely into this Court's holding in *Global-Tech* that "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *See Global-Tech*, 131 S. Ct. at 2068. Commil further overreaches by arguing for the first time in its brief that a party accused of inducing infringement also should be prohibited from introducing evidence of its good-faith belief that the accused induced acts do not infringe the

6

asserted patent to negate a finding of induced infringement. Commil did not present that second question in its petition, and its argument should be rejected not only because it would constitute a substantial and unfounded change in the patent law, but also on the separate ground that it is improper to raise a new issue for the first time in its brief on the merits.

A decision by this Court in favor of Commil would have deleterious consequences for the financial services industry. The financial services industry is highly dependent on technical innovation and has been marked by the rapid application of technological advances in connection with its provision of products and services. The financial services industry has seen monumental growth in the past 50 years, in part due to those technological advances, which allow transactions to be processed reliably and rapidly. Today, nearly half of all United States households invest in the markets and nearly three-quarters of all households use online banking or bill-paying services. Patent quality, the issuance and enforcement of valid patents and the invalidation of improperly-issued patents is as important to the financial services industry as it is to any other business endeavor.

The financial services industry is particularly vulnerable for practical economic reasons to assertions of patent infringement fabricated by abusive patent holders alleging induced infringement of weak patents. Because financial markets operate across borders, an actual or threatened disruption of any part of the financial services industry as a consequence of a patent dispute in

7

the United States can have global implications. If the patent dispute involving induced infringement is based on anything less than purposeful conduct by members of the industry, the cost to society of potential disruption cannot be justified. Preventing banks and other financial services entities from proving their good-faith belief that asserted patents are invalid (or that the allegedly induced acts do not infringe) to negate the intent required for inducing infringement would further incentivize some abusive patent holders to continue and even escalate the harassment of members of the financial services industry.

Parties that own or control patents already enjoy a significant advantage in patent infringement disputes because patents are presumed by law to be valid. Commil's proposed standard for the intent requirement of 35 U.S.C. § 271(b)—mere knowledge of the patent and its "potential applicability" to the defendant's activities—would typically be satisfied by simple "notice letters" that many abusive patent holders commonly dump indiscriminately on large numbers of accused infringers. Commil's "notice letter standard" would unfairly tilt the playing field further in favor of such patent holders. Alleged infringers in the financial services sector would be deprived of an important defense and therefore be more likely to enter into settlement agreements that require a nuisance payment for a license under a weak patent simply to avoid a greater cost of defending the claim for infringement and the small, but often unacceptable risk of a catastrophic disruption to their services that would result from an injunction or an award of damages. This Court should not change the law on which financial services

8

companies have placed justified and important reliance.

## ARGUMENT

I. **Commil's argument contravenes this Court's holding in *Global-Tech* and improperly calls for a notice letter standard for the intent required for induced infringement under 35 U.S.C. § 271(b).**

1. The Federal Circuit held "that evidence of an accused inducer's good-faith belief of invalidity may negate the requisite intent for induced infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368-69 (Fed. Cir. 2013). Commil urges this Court to overturn that holding and adopt a new standard for the intent required to establish induced infringement that would merely require the alleged infringer to have "knowledge of the patent and knowledge of the patent's potential applicability to the defendant's activities." Commil Br. at 21. This Court should affirm because the Federal Circuit's holding is consistent with this Court's holding in *Global-Tech* that "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." 131 S. Ct. at 2068. The Federal Circuit correctly explained that "one could be aware of a patent and induce another to perform the steps of the patent claim, but have a good-faith belief that the patent is not valid. Under those circumstances, it can hardly be said that the alleged inducer intended to induce infringement. Thus, a good-faith belief of invalidity is evidence that may negate the specific intent to

9

encourage another's infringement, which is
required for induced infringement." *Commil USA,
LLC*, 720 F.3d at 1368. The Federal Circuit
reasoned that its holding followed and was
consistent with the holding and reasoning of
*Global-Tech* because "evidence [of a good-faith
belief of invalidity] should be considered by the
fact-finder in determining whether an accused
party knew 'that the induced acts constituted
patent infringement.'" *Id.* at 1368-69 (citing
*Global-Tech*, 131 S. Ct. at 2068). That reasoning
also is consonant with common sense because it is
not possible to infringe an invalid patent claim.
*Id.* at 1368 ("It is axiomatic that one cannot
infringe an invalid patent.").

Commil, unable to distinguish the Federal
Circuit's holding from the holding and reasoning
in *Global-Tech*, instead asserts that the Court's
holding in *Global-Tech* was not a holding, and
that "knowledge that the induced acts constitute
patent infringement" is not required to satisfy the
scienter requirement of Section 271(b). If Commil
persuades the Court to ignore *Global-Tech* and
remove the scienter currently required under
Section 271(b) to prohibit all good-faith belief
(invalidity *and* non-infringement) defenses,
abusive patent holders will be further emboldened
to threaten financial services institutions and
companies in other industries with specious
lawsuits based on spurious allegations of induced
infringement. The result would cost those com-
panies very large amounts of money and would
add to the strain that increased infringement
litigation based on the assertion of weak patents
already has placed on the nation's courts. This
Court explicitly held in *Global-Tech* that "induced

10

infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." 131 S. Ct. at 2068. Commil now twists those words to fashion a new standard for scienter under Section 271(b), a standard that is satisfied if the accused infringer simply is aware of a patent and the patent's "potential applicability" to its conduct. That is not what *Global-Tech* held and that is not what Section 271(b) requires. There is no support in law or reason for Commil's argument that "knowledge of the patent and knowledge of the patent's potential applicability to the defendant's activity [is] sufficient to satisfy the intent requirement" under *Global-Tech*. Commil Br. at 21. *Global-Tech* requires not just notice of the "potential applicability" of a patent, but proof that a party knows that the "induced acts constitute patent infringement." *Global-Tech*, 131 S. Ct. at 2068. A standard that can be satisfied with a boilerplate notice letter is no standard or constraint at all.

Commil's proposed new standard would require only that an accused infringer receive from the patent holder a notice letter that identifies the asserted patent and contains a vague allegation of infringement and nothing more. There is no meaningful distinction between an accused infringer having knowledge of a patent's "potential applicability" or "potential relevance" and an accused infringer receiving a notice letter from the patentee that suggests a patent is potentially relevant to the accused party's activities. Commil does not argue otherwise. Commil Br. at 14 ("[*Global-Tech* and the cases upon which it relied] show that for indirect infringement, the patentee must only prove that

11

the defendant knew of the patent, knew of the patent's potential applicability to its conduct (*e.g.*, through a notice letter), and intended that their customers engage in the activity at issue.").

Receipt of a notice letter from a patent owner should not, by itself, be sufficient to satisfy the scienter requirement of 35 U.S.C. § 271(b). Providing notice of the "potential applicability" of a patent is not the same thing as establishing that a party knows that the "induced acts constitute patent infringement." *Global-Tech*, 131 S. Ct. at 2068. Abusive patent holders that assert weak patents routinely blanket large numbers of targets with generic letters asserting induced infringement that obviously are not tailored to the specific acts allegedly induced by the party accused of indirect infringement. It cannot fairly be argued that those generic letters impart knowledge to the accused indirect infringer that the specific acts it may induce constitute infringement of the asserted patent or patents.[3] That is especially true when patent holders stretch the meaning of a patent claim so broadly (to assert infringement against dozens or hundreds of parties) that they cannot help but also sweep the prior art within the scope of the claim, thereby rendering it invalid.

If Commil's proposed standard is adopted, an accused infringer that receives a vague, generic

_____

    [3]   If Commil has its way, a patent holder could send a notice letter in bad faith that would be sufficient to impart to the accused infringer "knowledge" sufficient to support a finding of the intent required under Section 271(b) for induced infringement, while the party that receives that bad faith letter would be prohibited from offering evidence of its own good-faith belief that it is not inducing infringement or that the asserted patent is invalid.

12

notice letter would be unable to defend itself against a claim of inducing infringement by negating intent under Section 271(b), and would be faced with what amounts to a Hobson's choice: pay the price of peace or change its successful product or method or engage in costly and often protracted litigation.

2. The government's position that Section 271(b) should be construed to "require only knowledge of the patent [and] knowledge that the patentee views the induced acts as infringing", U.S. Br. at 17, also ignores this Court's express holding in *Global-Tech,* a case in which the government chose not to participate. The government's argument should be rejected for the additional reason that it effectively eliminates any scienter requirement under Section 271(b)—if a patent holder sends a demand letter to an accused infringer, the patent holder necessarily views the acts allegedly induced by the accused infringer to be infringing a valid patent. Under the government's view, patent holders could obviate a defense of a good-faith belief of non-infringement and a defense of a good-faith belief that the asserted patent is invalid simply by continuing to send the same vague, generic notice and demand letters that they now send to dozens or hundreds of accused infringers. The government's view is especially troubling in light of the poor results abusive patent owners obtain when their weak patents are litigated to a determination on the merits. John R. Allison, et al., *Patent Quality and Settlement Among Repeat Patent Litigants*, 99 Geo. L.J. 677, 694 (2011) (finding a win rate of 8% for parties that engage in abusive patent litigation compared to 40% for other entities).

13

Contrary to the government's argument, removing the scienter requirement for induced infringement is inconsistent with the provisions of 35 U.S.C. § 298. Section 298 provides that "the failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent." Section 298 does not bar a party accused of inducing infringement from presenting evidence that it *did* obtain advice of counsel to prove that it did not intend to induce infringement.

It is very surprising that the government asks this Court to roll back the protection for accused infringers to nothing more than a notice letter standard, when the government *itself* has been warning about the harmful effects associated with the proliferation of demand letters sent by abusive patent holders. The Solicitor General's client, the Patent and Trademark Office; his boss, the President; and the Federal Trade Commission all have issued such warnings in recent years. FTC, *Prepared Statement of the Federal Trade Commission on Discussion Draft of Patent Demand Letter Legislation Before the Sub-committee on Commerce, Manufacturing, and Trade*, 2 (May 22, 2014), *available at* http://www.ftc.gov/system/files/documents/public_statements/310821/140522patentdemandltrs.pdf.; USPTO, *I Got a Letter . . .* , http://www.uspto.gov/patents-maintaining-patent/patent-litigation/i-got-letter (last visited Feb. 25, 2015); Executive Office of the President, *Patent Assertion and U.S.*

14

*Innovation* (June 2013), http://www.whitehouse.gov/sites/default/files/docs/patent_report.pdf. The government's repeated warnings are correct and its newly proposed standard accordingly should be rejected.

## II. Allowing evidence of a good-faith belief in invalidity and non-infringement to negate induced infringement promotes patent quality and helps to level the playing field in actions asserting weak patents.

### A. An accused infringer's good-faith belief of non-infringement often is coupled with a good-faith belief in invalidity.

When a financial services institution receives a notice or demand letter from a patent holder that alleges induced infringement, it often appears that if the claims of the asserted patent are construed narrowly in accordance with relevant evidence, then they do not cover the accused products or conduct, and that if the claims are given their broadest possible construction, then they are invalid in view of the prior art. The accused infringer accordingly has a good-faith belief that the asserted patent claims are either not infringed or invalid, but cannot be certain which of those outcomes will be reached by a court when it construes the asserted claims of the patent-in-suit. Commil's argument that a party accused of inducing infringement should be precluded from offering evidence of a good-faith belief in invalidity would unfairly prevent the accused infringer from offering a good-faith belief in invalidity as a defense in the event that the claim later is construed broadly and held to cover

15

the accused product or conduct. Such a result would contravene Federal Circuit precedent recognizing that good-faith beliefs in non-infringement and invalidity together establish that there was no intent to infringe a valid claim, and can be shown to negate intent to induce infringement. *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1024-1025 (Fed. Cir. 2009) ("Richard Weston testified that he thought that because the [accused product] simply performed the [prior art] method, which was in the public domain, KCI's patents could pose no barrier to Blue Sky entering the market. KCI may be correct that 'practicing the prior art' is not a defense to patent infringement. . . . However, it does not follow that a defendant's belief that it can freely practice inventions found in the public domain cannot support a jury's finding that the intent required for induced infringement was lacking." (citation omitted)); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1351*, amended on reh'g in part*, 366 F. App'x 154 (Fed. Cir. 2009) ("Dr. Cords's testimony also supports the conclusion that Ecolab personnel reasonably believed that the '676 patent did not cover [the accused product] because [the accused product] contains the same combination of antimicrobial agents disclosed in the prior art Oakes patent.").

If this Court adopts Commil's argument that evidence of a good-faith belief in invalidity should not be available as a defense to a charge of inducing infringement even though a good-faith belief in non-infringement is available as a defense, it would stand existing precedent on its head and limit and weaken the ability of financial services institutions to defend against the constant

16

barrage of infringement claims asserted by patent
holders wielding weak patents and vague, non-
specific allegations of induced infringement.

**B.   Financial services institutions would
be harmed if this Court adopts
Commil's notice letter standard for
the intent required for induced
infringement under 35 U.S.C. § 271(b).**

The problems raised by Commil's proposed new
"notice letter" standard would affect a wide range
of businesses and companies, not just high-tech
companies like Cisco. A decision by this Court in
favor of Commil would significantly harm the
financial services industry, which depends on
technological innovation and rapid commercial-
ization of technological advances, and has a
substantial interest in promoting patent quality
because the patent system, when performing
properly, promotes technological innovation.
Commil's attempt to remove or restrict an
important defense to induced infringement of
weak patents would frustrate the financial
services industry's objective of improving patent
quality.

The defenses of good-faith beliefs in invalidity
and non-infringement are of practical importance
to multiple business sectors. Although the high-
tech sector is troubled by assertions of induced
infringement of weak patents and the pharma-
ceutical and biotechnology industries are not
immune to such suits, the financial services
industry is particularly vulnerable. Holders of
weak patents frequently blanket dozens and
sometimes hundreds of companies in the financial
services industry with form notice letters, often

17

attaching a generic infringement chart in an attempt to demonstrate that the products or conduct of the particular accused infringer induces infringement by others. Often, the letters and claim charts are exactly the same for each recipient—only the name of the recipient has been changed.[4] *Renaissance Learning, Inc. v. Walker Digital, LLC*, No. 3:11-cv-166-BBC, D.I. 1-1 (W.D. Wis. Mar. 4, 2011) (demand letter from IP Navigation Group stating that "[a]n analysis of [Renaissance's] products shows that your company makes, uses, or sells products or services that would benefit from a license to certain of our client's patents" without identifying the patent or client).

If Commil persuades this Court to adopt its proposed notice letter standard for scienter under Section 271(b) with respect to induced infringement, the already brazen and abusive notice letter practices of many patent holders will be further encouraged to the detriment of financial services institutions and other businesses at significant cost. That harm is not illusory—inducement claims serve as powerful tools to extract settlement payments because financial services

---

[4]    The phenomenon of boilerplate allegations of infringement by abusive patent holders extends even to the preparation of pleadings. One patent holder failed to fully revise its form complaint and filed a complaint in the Northern District of Illinois alleging that jurisdiction and venue were proper in the Central District of California. *See* Compl. at ¶¶ 5-7, *Wolf Run Hollow, LLC v. Bank of America Corp.*, No. 13-cv-8406, D.I. 1 (N.D. Ill. Nov. 21, 2013). That same patent holder had previously filed 31 actions for alleged infringement of the same patent against 111 defendants in courts across the country, but had not actually litigated a single action.

18

institutions have millions of customers that collectively complete millions of transactions, and a royalty demand of even very small amounts per transaction provides the patent holder with an opportunity to assert a claim for damages, that if awarded, would have a substantial impact on the financial services business.[5]

A recent case is instructive about the potential harm that financial services institutions will face if the level of intent required to induce infringement is reduced to Commil's proposed notice letter standard. In 2012, Maxim Integrated Products, Inc. sent generic notice letters to many targets and subsequently sued a host of financial services institutions asserting induced infringement of numerous patents that it claimed covered mobile phone banking applications. *See, e.g.*, Compl. at ¶¶ 23-24, *Maxim Integrated Prods., Inc. v. Bank of America Corp.*, No. 4:12-cv-617-RAS, D.I. 1

---

[5]    Financial services institutions occasionally successfully challenge claims of induced infringement that are inadequately pled. *Intellectual Ventures I LLC v. Bank of America Corp.*, No. 3:13-cv-358-RJC-DSC, 2014 U.S. Dist. LEXIS 28132, at *7 (W.D.N.C. Mar. 5, 2014) ("To survive a motion to dismiss for an induced infringement claim, Plaintiffs' complaint should have alleged facts that plausibly demonstrated that Defendant not only intended their customers to infringe the asserted patent, but also knew that the customers' acts constituted infringement. Instead, Plaintiffs merely argued that Defendants advertised the accused products on its website. This argument fails to mention any facts that demonstrate that Defendants specifically intended for their customers to infringe the asserted patent."); *Automated Transaction LLC v. New York Cmty. Bank*, No. 12-cv-3070-JS-ARL, 2013 U.S. Dist. LEXIS 34872, at *15-16 (E.D.N.Y. Mar. 13, 2013) (dismissing an induced infringement claim as insufficient under Rule 8).

19

(E.D. Tex. Oct. 1, 2012).[6] One such claim was directed to a system that included a series of different modules capable of performing secure data transfers between each module. Maxim argued that one of the modules should be construed to be a mobile phone. *See id.* at D.I. 1-1 (U.S. Patent No. 5,940,510), claim 1 ("a first portable module[,] . . . a portable module reader that can be placed in communication with said first portable module[,] . . . a secure micro-controller based module in electronic communi-cation with said portable module reader, . . . said combination of said portable module reader and said secure microcontroller performing secure data transfers with said first portable module."). The entities accused of directly infringing the claimed system were the customers of the financial services institutions, not the financial services institutions themselves. To prevail on its claims of induced infringement, Maxim had to prove that the financial services institutions induced their customers to infringe. The accused financial services institutions faced enormous risks litigating the case on the merits because Maxim's claims implicated millions of financial transactions and huge sums of potential alleged damages. Depriving the financial services institu-

---

[6]    Maxim is an operating company and the patents at issue in the *Maxim* case originated in connection with the development of a product called the "iButton," a small steel fob that contained basic internal circuitry designed to store and transfer data, such as digital money for a train fare. For its allegations of infringement, Maxim expanded the claim scope of those patents to cover banking and shopping applications on mobile telephones and other handheld devices, even though those accused products do not in any way compete with the iButton.

20

tions of a defense to Maxim's claims of induced infringement based on their good-faith beliefs about the invalidity of Maxim's patents simply because Maxim sent generic notice letters to a host of financial services targets would encourage entities like Maxim to continue sending generic notice letters to large numbers of targets. If Commil prevails, abusive patent holders will be further encouraged to extract settlements based on assertions of induced infringement that are vague at best, and the financial services institutions will be further pressured to pay the price of peace demanded by unscrupulous patent holders rather than shoulder the cost and expense of costly, uncertain litigation and risk the prospect of paying enormous and crippling damages.

The global financial services industry relies on its business methods to handle an extraordinary volume of transactions quickly, reliably and cost-effectively. When there is a disruption in the financial system, the effect is instantaneous, deleterious and potentially profound. The impact of a technological disruption was dramatically displayed in May 2010 when a computer error caused the markets to drop precipitously in a very short period. Nelson D. Schwartz & Louise Story, *Surge of Computer Selling After Apparent Glitch Sends Stocks Plunging*, N.Y. Times, May 6, 2010, *available at* http://www.nytimes.com/2010/05/07/business/economy/07trade.html. The havoc that the threat of an injunction based on a questionable theory of patent liability could wreak on the financial markets is not difficult to imagine. The financial services industry asks only that it be equitably and properly enabled to defend itself against claims of inducing infringement by

21

allowing accused inducers to present evidence
to prove their good-faith belief in the non-
infringement and invalidity of an asserted patent.[7]

### C. Commil's and amici's predictions about the negative effects of the Federal Circuit's opinion in *Commil* are unfounded.

1. Commil and amici construct a long list of
potential unintended consequences of the Federal
Circuit's holding. Those fears are not warranted,
however, because a recent Federal Circuit
opinion demonstrates that defendants cannot negate a
showing of scienter just by showing that they
asked a lawyer to review the asserted patents.

In its amicus brief, the Biotechnology Industry
Organization ("BIO") argues that "[t]he Federal

---

[7]   Financial services institutions are especially
attractive targets for vague allegations of infringement by
owners of weak patents because they provide products and
services to millions of customers, which thus implicates
millions of potential transactions in a damages calculation
base if a patent can be broadly read on those transactions. A
recent study by Professor Lerner at Harvard University,
published in The University of Chicago's Journal of Law &
Economics, found that due to infringement actions filed by
patent assertion entities, patents directed to financial services
are 27-39 times more likely to be asserted in litigation than
patents generally. Josh Lerner, *The Litigation of Financial
Innovations*, 53 J. L. & Econ. 807, 808 (2010). The rate of
litigation of patents directed to financial services is more
than an order of magnitude higher than that of patents
directed to pharmaceuticals, which have the second highest
rate of litigation per patent. *Id.* The rate of litigation for
patents directed to financial services also was far greater
than the rate for patents directed to biotechnology, which
was an emerging industry in the same period that patents
for financial services became prevalent. *Id.*

22

Circuit's rule . . . creates a perverse incentive for accused infringers to obtain exculpatory opinions of counsel or develop other forms of exculpatory evidence that might be used later to show a good-faith belief of invalidity." BIO Br. at 16. BIO's assertion that such an incentive is perverse is inconsistent with the policy of encouraging competitors to respect the patent rights of others – contrary to BIO's assertion, it is a good thing to encourage companies to seek advice of counsel with respect to patents about which they are provided notice. It is entirely sensible for a financial services institution to seek advice of counsel about the validity of a patent identified in a notice or demand letter for several reasons. The products at issue are often vital to the competitive functioning of the organization, such as the financial services institution's website or mobile telephone applications. The accused financial services institution of course needs to understand the threat posed by a patent holder to the financial institution's business, and whether the financial institution could be liable for millions of dollars in damages. Because financial services institutions receive many notice and demand letters from patent holders, and especially as a consequence of the very broad scope that patent holders often ascribe to the claims of the patents they assert, it often is not feasible or practical to conduct a wholesale investigation into the question whether a financial institution's products and conduct actually infringe all of the numerous claims of the multiple patents asserted by ubiquitous abusive patent holders because such an analysis is a disruptive and very labor-intensive endeavor that diverts resources from day-to-day

23

business activities. As a first step in reacting to the receipt of many demand letters, it makes practical sense to seek advice of counsel about the validity of the patents in question, which is far less disruptive and requires far less investigation into the inner workings of the financial institution's products and methods. If advice of counsel suggests that the asserted patents should be held invalid, the financial institution could choose to respond to the demand letter by pointing out that the patent is likely to be held invalid, which might encourage the patent holder to lower the price of its demanded license or withdraw its assertion of infringement. Good-faith reliance on the advice of counsel in any event could be advanced by the accused infringer as a defense if the patent holder presses its claims and actually litigates the case on the merits.

The Federal Circuit's recent non-precedential opinion in *Bose Corp. v. SDI Techs., Inc.* undercuts Commil's argument that being allowed to offer evidence of a good-faith belief in invalidity would weaken patent rights. In *Bose*, the Federal Circuit found that simply obtaining a competent opinion of counsel was not enough to establish a good-faith belief in invalidity sufficient to rebut an intent to induce infringement. It ruled that an accused infringer also needs to show that it "exercised reasonable and good-faith adherence to the analysis and advice therein." 558 F. App'x 1012, 1024 (Fed. Cir. 2014) (quoting *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed. Cir. 1983) (internal quotations omitted)). The Federal Circuit explained that "such a party must prove good-faith reliance on the opinion of counsel" because "[u]pon receipt of an opinion, it is

24

possible that a party may choose to ignore the opinion, or disagree with it, or be indifferent to it, among a wide range of reactions to having the opinion in hand." *Id.* The Federal Circuit concluded that "although SDI is credited with the receipt of an invalidity opinion of counsel the competence of which is not challenged, unquestionable proof of good-faith reliance is necessary to support a summary judgment of no indirect infringement." *Id.* Contrary to the suggestion of Commil's amici, a party cannot immunize itself against a charge of inducing infringement simply by obtaining a competent opinion of counsel.[8]

2. Commil predicts that if the Federal Circuit's decision is affirmed, patent holders will have no choice other than to bring infringement actions against downstream customers because they will

_____

[8]   In another post-*Commil* opinion, the Federal Circuit held that, notwithstanding its decision in *Commil*, it was not an abuse of discretion for a trial court to exclude evidence of the initiation of a re-examination of the asserted patents offered in support of a defense predicated on a good-faith belief in invalidity. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1324-25 (Fed. Cir. 2014) ("[I]n this case we need not decide whether our opinion in *Commil* justifies reliance on reexamination evidence to establish a good faith belief of invalidity. Instead, we conclude that, regardless of the evidence's relevance to a fact at issue at trial, the district court would still not have abused its discretion in finding that the probative value was substantially outweighed by the risk of unfair prejudice to the patentee, confusion with invalidity (on the merits), or misleading the jury, thereby justifying exclusion under Federal Rule of Evidence 403."). Commil's assertion that under the Federal Circuit's holding accused infringers need only file petitions for post-grant review to avoid liability for induced infringement should be discounted accordingly.

25

no longer be able to obtain relief by way of induced infringement claims against product manufacturers. Commil Br. at 42-43. According to Commil, providing a remedy for indirect infringement in Sections 271(b) and (c) "allows patent owners to seek their remedy from the real party in interest rather than dragging a large number of customers who simply use the defendant's products into patent litigation." Commil Br. at 34. Commil ignores, however, that patent holders have been suing such customers in droves before the Federal Circuit's opinion in this case, and fails to account for its acknowledgement of such an action in its brief. Commil Br. at 33; Am. Compl., *In re Innovatio IP Ventures, LLC, Patent Litigation*, No. 1:11-cv-9308, D.I. 431 (N.D. Ill. Oct. 1, 2012).[9] Commil should not pretend that its appeal is about protecting downstream customers from patent litigation because those customers were already and still will be the target of patent holders like Commil without regard to the Court's ruling in this case.

---

[9]   Innovatio's strategy was to sue hundreds of small technology end-users for four- or five-figure settlement amounts based on their use of WiFi. *See* John Mullin, *Wi-Fi Patent Troll Hit with Racketeering Suit Emerges Unscathed*, Ars Technica (Feb. 13, 2013, 10:05 AM), http://arstechnica.com/tech-policy/2013/02/wi-fi-patent-troll-hit-with-novel-anti-racketeering-charges-emerges-unscathed (noting that Innovatio has sued hundreds of businesses and has reportedly sent more than 8000 letters demanding license fees generally in the range of $2,300-$5,000, instead of challenging a WiFi router manufacturer like Cisco).

26

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted,

KEVIN J. CULLIGAN
   *Counsel of Record*
JOHN P. HANISH
JONATHAN A. AUERBACH
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
kculligan@goodwinprocter.com
(212) 813-8800

*Attorneys for Amicus Curiae*
   *Askeladden L.L.C.*

February 26, 2015