# Exhibit 24

# Comprehensive Legislative History of the Leahy-Smith America Invents Act

*Compiled, Edited, And Abridged by*

**Patrick A. Doody**

Pillsbury Winthrop Shaw Pittman

1650 Tysons Boulevard

McLean, VA 22102

703.770.7755

patrick.doody@pillsburylaw.com



**www.pillsburylaw.com** | © 2012 Pillsbury Winthrop Shaw Pittman LLP. All rights reserved.

pillsbury

# COMPREHENSIVE LEGISLATIVE HISTORY OF THE LEAHY-SMITH

# AMERICA INVENTS ACT

# COMPILED, EDITED, AND ABRIDGED

By

Patrick A. Doody
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
McLean, VA 22102
(703) 770-7755
patrick.doody@pillsburylaw.com

© 2012  by Pillsbury Winthrop Shaw Pittman LLP.  Unauthorized reproduction is prohibited.
All rights reserved.

**Editor's Notes**:

This comprehensive legislative history is provided for the purpose of researching the legislative history of the Leahy-Smith America Invents Act, (AIA) signed into law on September 16, 2012, in an effort to gain a better understanding of the intent of Congress in enacting the law.  The AIA was the culmination of years of Congressional hearings and legislative debate.  The portions of the legislative history provided herein are those relevant to the language that has been included in the AIA.  Portions of the legislative history and debate that do not pertain to the AIA have been redacted.  Congressional hearings are not included insofar as they reflect the opinions of interested parties other than Congress, and consequently, would not necessarily reflect the intent of Congress in passing the AIA.

Recipients of this comprehensive legislative history are not authorized to download, save, and/or print a copy.  Except as expressly authorized above or otherwise by Pillsbury Winthrop Shaw Pittman, you may not distribute, sell, modify this document, or create derivative works based on this document in whole or in part.

pillsbury

## TABLE OF CONTENTS

| Item | Page No. |
|---|---|
| Berman Introduction of Patent Reform Act of 2007 (153 Cong. Rec. E773-E775) | 1 |
| PATENT REFORM ACT OF 2007 | 5 |
| THE PATENT REFORM ACT OF 2007   (Senate Report 110-259) | 131 |
| Senator Kyle Speech on S 3600 – 154 Cong. Rec. S9982-S9993 | 214 |
| Senate Debate 2-28-2011 (157 Cong. Rec. S936-S953) | 242 |
| Senate Debate – 157 Cong. Rec. S1030-S1044 | 256 |
| Senate Debate – 157 Cong. Rec. S1034-S1051 | 270 |
| Senate Debate (Menendez) – 157 Cong. Rec. S1052-S1053 | 303 |
| Senate Debate (Schumer) – 157 Cong. Rec. S1053-S1054 | 307 |
| Senate Debate – 157 Cong. Rec. S1089-S1114 | 310 |
| Senate Debate (Kyl) – 157 Cong. Rec. S1174-S1175 | 365 |
| Senate Debate – 157 Cong. Rec. S1175-S1185 | 370 |
| Senate Debate – 157 Cong. Rec. S1204-S1213 | 393 |
| Senate Debate – 157 Cong. Rec. S1323-S1326 | 409 |
| Senate Debate – 157 Cong. Rec. S1348-S1352 | 418 |
| Senate Debate – 157 Cong. Rec. S1357-S1358 | 426 |
| Senate Debate – 157 Cong. Rec. S1360-S1394 | 428 |
| Leahy-Hatch – 157 Cong. Rec. S1496-S1497 | 483 |
| House Report 112-98 – 112th Congress – To Accompany HR 1249 | 485 |
| Leahy Chamber Letter – 157 Cong. Rec. S3768 | 533 |
| House Debate – 157 Cong. Rec. H4420-H4452 | 535 |
| Pence Extension – 157 Cong. Rec. – E1174-E1175 – June 22, 2011 | 573 |
| Smith and Weldon Speeches – 157 Cong. Rec. – E1177-E1180 – June 22, 2011 | 575 |
| Smith Extension Remarks – 157 Cong. Rec. E1182-E1185 | 585 |
| Moran Extension Remarks – 157 Cong. Rec. E1189-E1190 | 596 |
| West Extension Remarks – 157 Cong. Rec. E1191 | 598 |
| House Floor Debate – 157 Cong. Rec. H4480-H4505 | 601 |
| Van Hollen Extension Remarks – 157 Cong. Rec. E1206 | 653 |
| Waxman Extension Remarks – 157 Cong. Rec. E1208 | 654 |
| Smith Extension Remarks – 157 Cong. Rec. E1219 | 656 |

pillsbury

Kyl Remarks – 157 Cong. Rec. S5319-S5321 ........................................................... 657

Senate Debate – 157 Cong. Rec. S5322-S5328 ....................................................... 663

Senate Debate – 157 Cong. Rec. S5353-S5356 ....................................................... 667

Senate Debate – 157 Cong. Rec. S5356-S5357 ....................................................... 672

Senate Debate – 157 Cong. Rec. S5370-S5378 ....................................................... 675

Senate Debate – 157 Cong. Rec. S5402-S5443 ....................................................... 691

Conyers Extension Remarks Regarding effective date of Section 37 – 157 Cong.
    Rec. E1940 ...................................................................................................... 790

pillsbury

\2\See 35 U.S.C.  Sec. 101.

\3\See Perspectives on Patents: Post-Grant Review Procedures and Other Litigation Reforms: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 68-97 (2006) (statement of Nathan P.  Myhrvold, Chief Executive Officer, Intellectual Ventures); Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 112-114 (2005) (statement of Dean Kamen, President, DEKA Research and Development Corp.).

Congress has not enacted comprehensive patent law reform in more than 50 years.\4\ The object of the patent law today must remain true to the constitutional command, but its form needs to change, both to correct flaws in the system that have become unbearable, and to accommodate changes in the economy and the litigation practices in the patent realm.  The need to update our patent laws has been meticulously documented in six hearings before the Senate Judiciary Committee, in addition to reports written by the Federal Trade Commission and the National Academy of Sciences,\5\ hearings before the House of Representatives Judiciary Committee's Subcommittee on the Internet, Intellectual Property, and the Courts, and a plethora of academic commentary.\6\

\4\The last major revision of the patent laws was the Patent Act of 1952, P.L. 82-593.

\5\The National Academy of Science (NAS) and the Federal Trade Commission (FTC) conducted multi-year studies on the patent system and its need for reform.  See Committee on Intellectual Prop.  Rights, National Research Council, A Patent System for the 21st Century (2004) (hereinafter "NAS Report"); and Federal Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy (2003) (hereinafter "FTC Report").

\6\See, e.g., Mark A.  Lemley & Carl Shapiro, Patent Holdup and Royalty Stacking, 85 Tex.  L. Rev. 1991 (2007); Donald S.  Chisum, Reforming Patent Law Reform, 4 J.  Marshall Rev.  Intell. Prop.  L. 336 (2005); Gerald J.  Mossinghoff, The First-to-Invent Rule in the U.S.  Patent System Has Provided No Advantage to Small Entities, 87 JPTOS 514 (2005); Joseph Farrell & Robert P. Merges, Incentives to Challenge and Defend Patents: Why Litigation Won't Reliably Fix Patent Office Errors and Why Administrative Patent Review Might Help, 19 Berkeley Tech.  L.J. 943, 958 (2004); see also Adam B.  Jaffe & Josh Lerner, Innovation and Its Discontents: How Our Broken Patent System is Endangering Innovation and Progress, and What to Do About It (2004); Kevin G.  Rivette & David Kline, Rembrandts in the Attic, Unlocking the Hidden Value of Patents (2000).

The growing impetus towards modernizing and improving the patent system has found expression not only in Congress, but in the other branches of government as well, with the Supreme Court taking up an ever-increasing number of patent cases,\7\ and the United States Patent and Trademark Office (USPTO) addressing itself to regulatory changes through rulemaking. \8\ The voices heard in this debate are too numerous to list, but include representatives from all those who use, administer, study, teach, benefit from, report on, or are affected by the patent system: small inventors, academics, universities, government agencies, corporations, non-profit organizations, industry organizations, bar associations, and members of the general public.  The proposed changes have been far-reaching and hardly uniform, but they

pillsbury

have focused Congressional attention on three major areas of concern: (i) appropriate procedures for prosecuting, and standards for allowing, patents; (ii) increasing rates, costs, and uncertainty in patent litigation,\9\ and (iii) inconsistencies between the U.S. patent system and the other major patent systems throughout the industrialized world which disadvantage U.S. patent holders.

\7\See Microsoft Corp. v. AT&T Corp., 127 S. Ct. 1746 (2007) (holding copying computer software overseas does not constitute infringement under 35 U.S.C. Sec. 271(f)); KSR Int'l Co. v. Teleflex, Inc., 127 S. Ct. 1727 (2007) (rejecting the United States Court of Appeals for the Federal Circuit's "teaching-suggestion-motivation" test for obviousness, and reaffirming that the four factor inquiry set forth in Graham v. John Deere applied); eBay, Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837 (2006) (rejecting the Federal Circuit's test for determining permanent injunctions in patent cases, and explaining the traditional four part equitable test applied). In each of these cases, the Supreme Court reversed the Federal Circuit and changed the legal standard that the Federal Circuit had been applying. In addition, while the Committee Report was being prepared, the Federal Circuit decided two cases rejecting claims as unpatentable under Sec. 101 of title 35. See In re Comiskey, 499 F.3d 1365 (Fed. Cir. 2007) and In re Nuijten, 500 F.3d 1346 (Fed. Cir. 2007). In Comiskey, the Federal Circuit significantly restricted the patentability of business methods, severely narrowing the Federal Circuit's controversial 1998 decision in State Street Bank. See State Street Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d 1368 (Fed. Cir. 1998), cert denied, 525 U.S. 1093 (1999).

\8\Changes to Practice for Continuing Applications, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications; Final Rule, 72 Fed. Reg. 46716 (Aug. 21, 2007).

\9\The NAS reported that the number of patent litigations doubled between 1988 and 2001, from 1200 to nearly 2400. See NAS Report at 32. See also PricewaterhouseCoopers, 2006 Patent and Trademark Damages Study (2006) at 3 ("[I]n the past 15 years, the number of patent infringement cases filed increased every year, from 1,171 in 1991 to 3,075 in 2004.")

First, questions have been raised regarding whether the current scope of what is patentable is too broad, and whether the current standard for obtaining a patent is too low in practice. Many have questioned whether the current USPTO patent examination system is capable of handling the growing number,\10\ and increased complexity, of patent applications. In particular, questions have been repeatedly raised about how--and how much--the USPTO is funded, and about whether patent fees reflect the work necessary to ensure the issuance of high quality patents. A related concern focuses on whether patent applicants are bearing their burden of responsibility in searching the current state of the art and preparing and filing high quality applications.

\10\USPTO annual reports indicate that in fiscal year 1952 (when the current patent statute was enacted), the USPTO received approximately 60,000 patent applications. In stark contrast, last year (FY 2006) the USPTO received over 440,000 applications, more than seven times the number in 1952. In addition, the 2006 filings increased 8% from the prior year. Although these numbers are a testament to the tremendous innovation in our country, they also raise the question of whether the USPTO is equipped to handle such large numbers of applications.

pillsbury

Second, in recent years the cost and uncertainty of patent litigation has escalated, leading many to believe that it is an unbearable drag on the innovation that the patent system is supposed to foster.  Patent holders can often sue an alleged infringer anywhere they wish in the United States.  They may allege damages that are not always commensurate with the value of their inventions, and then often argue that these sums should be tripled based on alleged acts of willful infringement by the accused infringer.  There are also troubling, plaintiff- focused litigation concerns, including that the doctrine of inequitable conduct needs improvements and codification.\11\ Patent litigations typically take several years to complete, if appealed may be remanded more than once, and can cost several million dollars.\12\ In addition, litigation concerns can encourage unreasonable posturing during licensing negotiations, as well as premature settlements simply to avoid the high cost and uncertainty of patent litigation.  Moreover, currently, there is no viable, inexpensive, quick administrative alternative for resolving patent validity issues.

\11\See, e.g., Perspectives on Patents: Post-Grant Review Procedures and Other Litigation Reforms: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 63 (2006) (statement of Philip S.  Johnson, Chief Patent Counsel, Johnson & Johnson); Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 30 (2005) (statement of David Beier, Senior Vice President of Global Government Affairs, Amgen); Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 45-71 (2005) (statement of Robert A.  Armitage, Senior Vice President and General Patent Counsel, Eli Lilly and Company); Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 137-145 (2005) (statement of Richard C.  Levin, President, Yale University).  However, the testimony was not uniform as to whether inequitable conduct needed to be reformed, and if so how to do so.  See, e.g., Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 86-102 (2005) (statement of Christine Siwik, Partner, Rakoczy Molino Mazzochi Siwik LLP, on behalf of Barr Laboratories, Inc.); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Property of the Senate Comm. on the Judiciary, 109th Cong. 157-170 (2005) (statement of Mark Lemley, Professor, Stanford Law School).

\12\Where more than $25 million is at stake, the median litigation cost is $4 million for each party.  See NAS Report at 38 (citing American Intellectual Property Law Association survey results).  See also AIPLA Report of the Economic Survey 2007 at 25-26 (noting that the figure is now $5 million for such cases).

Third, because business and competition are increasingly global, many patent applicants filing in the United States often seek patents in other countries for their inventions as well.  Yet the United States' patent system differs from every other patent system in the world in one major respect--it awards patents to the "first to invent," while every other patent system uses a "first to file" rule.\13\ As a result, U.S. patent applicants who also file abroad are forced to navigate through two different patent filing systems, adding cost and uncertainty to their package of patent rights.

pillsbury

\13\See R.  Carl Moy, 2 Moy's Walker on Patents Sec. 8:36 (4th ed. 2007); Gerald J. Mossinghoff, The U.S.  First-to-Invent System Has Provided No Advantages to Small Entities, 84 JPTOS 425 (2002).

The purpose of the Patent Reform Act of 2007, as reported by the Senate Judiciary Committee, is to ensure that the patent system in the 21st century accurately reflects the 18th century Constitutional imperative while ensuring that it does not unduly hinder innovation.  Congress must promote innovation through the enticement to inventors of temporally limited monopolies on their inventions, and it must do so for the ultimate benefit of the public.  The legislation is designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.  If the United States is to maintain its competitive edge in the global economy, it needs a system that will support and reward all innovators with high quality patents.  The time has come for Congress to reconsider the 50 year old patent statute and how it is currently being applied.  The Committee has heard from numerous interested parties and, given the complex nature of patent law as well as the often conflicting interests involved, has tried to consider all of those concerns and produce a balanced set of changes that will move the patent system into the 21st century.  Moreover, and in response to various concerns raised before the Committee, the bill as originally introduced has been significantly modified to reflect a more balanced, modest approach.

Summary of Changes

The Patent Reform Act of 2007 has three primary goals: (i) to improve patent quality and the patent application process; (ii) to improve and clarify several aspects of patent litigation, including the creation of a less expensive, more expeditious administrative alternative to litigating patent validity issues; and (iii) to make the United States' patent system, where it is useful to do so, more consistent with patent systems throughout the rest of the industrialized world.

In general, the numbered sections of the Act do the following:
(1) title the Act the Patent Reform Act of 2007;
(2) change the system to a "first-inventor-to-file" system;
(3) make it simpler for patent applicants to file and prosecute their applications;
(4) codify and clarify the standard for calculating reasonable royalty damage awards, as well as awards for willful infringement;
(5) create a relatively efficient and inexpensive administrative system for resolution of patent validity issues before the USPTO;
(6) establish the Patent Trial and Appeal Board;
(7) provide for eventual publication of all applications and enhance the utility of third parties' submissions of relevant information regarding filed applications;
(8) improve venue in patent cases and provide for appeals of claim construction orders when warranted;
(9) give the USPTO the ability to set its fees;
(10) remove the residency restriction for judges on the United States Court of Appeals for the Federal Circuit;
(11) authorize USPTO to require patent searches with explanations when a patent application is filed;

pillsbury

(12) codify and improve the doctrine of inequitable conduct;
(13) give the Director of the USPTO discretion to accept late filings in certain instances;
(14) limit patent liability for institutions implementing the "Check 21" program;
(15) end USPTO "fee diversion";
(16) make necessary technical amendments; and
(17) set the effective date of the Act.

SECTION 1: SHORT TITLE; TABLE OF CONTENTS

This section provides that the Act may be cited as the "Patent Reform Act of 2007."  It also provides a table of contents for the Act.

SECTION 2: RIGHT OF THE FIRST INVENTOR TO FILE

First inventor to file; grace period; and prior art Background

Every industrialized nation other than the United States uses a patent priority system commonly referred to as "first- to-file."  In a first-to-file system, when more than one application claiming the same invention is filed, the priority of a right to a patent is given to the earlier-filed application.  The United States, by contrast, currently uses a "first-to-invent" system, in which priority is established through a proceeding to determine which applicant actually invented the claimed invention first.  Differences between the two systems arise in large part from the date that is most relevant to each respective system.  In a first-to-file system, the filing date of the application is most relevant;\14\ the filing date of an application is an objective date, simple to determine, for it is listed on the face of the patent.  In contrast, in a first-to-invent system, the date the invention claimed in the application was actually invented is the determinative date.  Unlike the objective date of filing, the date someone invents something is often uncertain, and, when disputed, typically requires corroborating evidence as part of an adjudication.

\14\Wherever the term "filing date" is used herein, it is meant to also include, where appropriate, the effective filing date, i.e., the earliest date the claim in an application claims priority.

There are three significant, practical differences between the two systems.  The first concerns the rare instance in which two different people file patent applications for the same invention.  In a first-to-file system, the application with the earlier filing date prevails and will be awarded the patent, if one issues.  In the first-to-invent system, a lengthy, complex and costly administrative proceeding (called an "interference proceeding") must be conducted to determine who actually invented first.\15\ Interference proceedings can take years to complete (even if there is no appeal to the United States Court of Appeals for the Federal Circuit), cost hundreds of thousands of dollars, and require extensive discovery.\16\ In addition, since it is always possible an applicant could be involved in an interference proceeding, U.S. patent holders must maintain extensive recording and document retention systems in case they are later required to prove the very day they invented the claimed invention.

\15\See 35 U.S.C.  Sec. 135.

\16\See, e.g., Robert W. Pritchard, The Future is Now--The Case for Patent Harmonization, 20 N.C. J. Int'l L. & Com. Reg. 291, 313 (1995).

pillsbury

The second difference involves prior art.  A patent will not issue if the invention is not new,\17\ or if it would have been obvious to someone in the relevant area of technology (commonly referred to as "a person of ordinary skill in the art").\18\ A patent issuing office will examine all prior art--that is, all relevant information that existed before the patented invention--to determine whether an invention is indeed new and not obvious.  Traditionally, the most common form of prior art has been other patents and printed publications.  In the first- to-file system, prior art includes all art that exists prior to the filing date--again, an objective inquiry.  In contrast, in a first-to-invent system, prior art is measured from the more uncertain date of invention.\19\

\17\35 U.S.C. Sec. 102.

\18\35 U.S.C. Sec. 103.

\19\Even in the first-to-invent system, the filing date is significant.  See, e.g., 35 U.S.C.  Sec. 102(b).  In addition, the filing date is often the date used until it becomes necessary to prove an earlier date of invention.  However, in a first-to-invent system, the date of invention may ultimately be relied on by the patentee in his attempt to prove he is entitled to a patent.  See, e.g., 35 U.S.C.  Sec. 102 (a) and (g).

Third, in some first-to-file systems, prior art can include the inventor's own disclosure of his invention prior to the filing date of his application.  Such systems typically do not provide the inventor any grace period during which time he is allowed to publish his invention without fear of it later being used against him as prior art.  That is, if an inventor publishes the invention in an academic journal, that publication may act as prior art and bar the inventor's own later-filed application.  Thus, inventors in first-to-file systems must generally keep their inventions secret prior to filing applications for them, thereby sacrificing a significant part of one of the benefits of the patent system--disclosure of inventions.  Although some first-to-file systems do provide the inventor some sort of grace period, others do not.\20\ In contrast, the United States' first-to-invent system provides the inventor a grace period of one year, during which an inventor's prior disclosure of the invention cannot be used as prior art against the inventor's application.\21\

\20\Countries with first-to-file systems that also provide for some form of grace period include Japan (6 months), Canada (1 year) and Australia (1 year).  In contrast, the European Patent Office (EPO) has a first-to-file system with no grace period (sometimes referred to as an "absolute novelty" requirement).  See John A. O'Brien & Carl B.  Wischhusen, Fundamentals of Patent Prosecution 2007: A Boot Camp for Claim Drafting & Amendment Writing, Taking Invention Disclosures, 906 PLI/Pat 9, 37 (2007); Michael S.  Mireles, Jr., States As Innovation System Laboratories: California, Patents, And Stem Cell Technology, 28 Cardozo L. Rev. 1133, 1174 (2006).

\21\See 35 U.S.C. 102(b); see also R. Carl Moy, 2 Moy's Walker on Patents Sec. 8:199 (4th ed. 2007).

The Committee heard from universities and small inventors, in particular, about the importance of maintaining that grace period in our system.\22\ They argued that the grace period affords the necessary time to prepare and file applications, and in some instances, to obtain the necessary funding that enables the inventor to prepare adequately the application.  In addition, the grace

period benefits the public by encouraging early disclosure of new inventions, regardless of whether an application may later be filed for a patent on it.

\22\See, e.g., Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Property of the Senate Comm. on the Judiciary, 109th Cong. 74-75 (2005) (statement of Charles E.  Phelps, Provost, University of Rochester, on behalf of the Association of American Universities); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Property of the Senate Comm. on the Judiciary, 109th Cong. 89-105 (2005) (statement of Carl Gulbrandsen, Managing Director, Wisconsin Alumni Research Foundation (WARF)); Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Property of the Senate Comm. on the Judiciary, 109th Cong. 146-155 (2005) (statement of William Parker, Diffraction, Ltd.).

The first-to-file system is used in every patent system, other than the United States,\23\ because it has the advantages of simplicity, efficiency and predictability. A first-to-file system avoids costly interference proceedings, provides better notice to the public, simplifies the prior art scheme that may preclude a patent from issuing, and provides more certainty to the patent system. In addition, a first-to-file system encourages the prompt filing of patent applications.

\23\The Philippines, which was the only other country in the world to have a first-to-invent system, switched to a first-to-file system almost ten years ago. See Gerald J. Mossinghoff, The U.S. First- Invent System Has Provided No Advantages to Small Entities, 84 JPTOS 425 n.1 (2002).

Numerous organizations, institutions, and companies have advocated the U.S. adopt a first-to-file system similar to those used in the rest of the world.\24\ The NAS made a similar recommendation after an extensive study of the patent system.\25\ When the United States' patent system was first adopted, inventors did not typically file in other countries.

It is now common for inventors and companies to file for protection in several countries at the same time.\26\ Thus United States applicants, who also want to file abroad, are forced to follow and comply with two different filing systems.

Maintaining a filing system so different from the rest of the world disadvantages United States' applicants, the majority of which also file in other countries.\27\ A change is long overdue.\28\

\24\See, e.g., Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 64 (2005) (statement of Gerald J. Mossinghoff, Former Assistant Secretary of Commerce and Commissioner of Patents and Trademarks); Perspectives on Patents:

Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 45-47 (2005) (statement of Q. Todd Dickinson, Former Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 132-153 (2005) (statement of Jeffrey P. Kushan, Partner, Sidley Austin Brown & Wood, LLP); Patent

pillsbury

over old modes or devices, if any, that had been used for working out similar results; 10. Nature of patented invention; character of commercial embodiment of it as owned and produced by licensor; and benefits to those who have used invention; 11. Extent to which infringer has made use of invention; and any evidence probative of value of that use; 12. Portion of profit or of selling price that may be customary in particular business or in comparable businesses to allow for use of invention or analogous invention; 13. Portion of realized profit that should be credited to invention as distinguished from non-patented elements, manufacturing process, business risks, or significant features or improvements added by infringer; 14. Opinion testimony of qualified experts; and 15. Amount that a licensor (such as patentee) and a licensee (such as infringer) would have agreed upon (at time infringement began) if both had been reasonably and voluntarily trying to reach agreement. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970).

\47\A recent study has shown that, since 1980, there has been a steady shift from bench trials to jury trials in patent cases, and that juries typically award more than five times the damages awarded in bench trials. See PricewaterhouseCoopers, 2007 Patent and Trademark Damages Study (2007) at 14.

No doubt several alarming cases, which have captured the attention of the public and the Congress, represent the tip of the iceberg; these, not surprisingly, involve out-sized damages awards.\48\ Leaving aside the ultimate, and appropriate, results in these cases, the purpose of this legislation is not to rectify judicial errors, nor is it to alter dramatically the substance of the standards by which a reasonable royalty may be calculated, but rather to bring clarity and guidance to the application of the law of damages.

\48\See The Patent Reform Act of 2007: Hearing Before the Subcomm. on the Courts, the Internet, and Intellectual Prop. of the House Comm. on the Judiciary, 110th Cong.  (2007) (statement of John R. Thomas, Professor, Georgetown University Law Center).

Long past is the day in which the typical invention is a sui generis creation; today's patents are often combinations, and many products comprise dozens, if not hundreds or even thousands of patents, and the infringed patent may well be one smaller part of a much larger whole. Once infringement is proven, the patent holder is entitled to compensation for the use of the invention.\49\ But if juries award damages based on the value of the entire product, and not simply on the infringement--a danger exacerbated in some cases by overly expansive claim drafting--then damages awards will be disproportionate to the harm.

\49\See 35 U.S.C. Sec. 284.

The current damage statute is vague and provides little guidance to judges or juries determining the proper damage award, particularly when the award is based on the reasonable royalty standard.\50\ Given that damages are typically just one of many issues in a patent trial, and given that the jury typically has 15 different factors to consider just to determine a reasonable royalty, commentators have correctly questioned whether juries are being properly advised on the evidence and factors to consider when determining damages.\51\

pillsbury

dissemination of the information contained therein, as well as allowing competitors to make decisions based on what is attempting to be patented.

\113\Both the NAS and the FTC advocated for the publication of all applications and the elimination of the exception. See NAS Report at 128 (explaining that publication of all applications would promote the disclosure purpose of the patent system and minimize the uncertainty associated with submarine patents); FTC Report at 15-16 "Recommendation 7: Enact Legislation to Require Publication of All Patent Applications 18 Months After Filing," (explaining that publication of domestically filed applications will increase business certainty, promote rational planning, and reduce the problem of unanticipated "submarine patents" used to hold up competitors for unanticipated royalties); see also Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 137-145 (2005) (statement of Richard C. Levin, President, Yale University).

Third party submissions

Background

After an application is published, members of the public-- most likely, a competitor or someone else familiar with the patented invention's field--may realize they have information relevant to a pending application. The relevant information may include prior art that would prohibit the pending application from issuing as a patent. Current USPTO rules permit the submission of such prior art by third parties only if it is in the form of a patent or publication,\114\ and the submitter is precluded from explaining why the prior art was submitted or what its relevancy to the application might be.\115\ Such restrictions decrease the value of the information to the examiner and may, as a result, deter such submissions.\116\

\114\See 35 C.F.R. Sec. 1.99.

\115\See 35 C.F.R. Sec. 1.99(d) ("A submission under this section shall not include any explanation of the patents or publications, or any other information.").

\116\See Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 167-179 (2005) (statement of David Simon, Chief Patent Counsel, Intel Corporation).

Discussion of changes

Section 7 of the Act improves the process by which third parties submit relevant information to the USPTO by permitting those third parties to make statements concerning the relevance of the patents, patent applications, and other printed publications they bring to the USPTO's attention.

SECTION 8: VENUE AND JURISDICTION

Venue

Background Venue statutes generally place restrictions on where a plaintiff may sue a defendant. A specific venue provision has existed for patent cases since 1897.\117\ Yet, Federal Circuit

**pillsbury**

decisions have virtually eliminated any meaningful distinction between the patent venue provision and general venue.\118\ In VE Holding, the Federal Circuit held that despite the specific patent venue statute, the expanded jurisdiction under the general venue statute also applied to corporate defendants in patent infringement cases.\119\ As a result, the Federal Circuit held that venue for a corporate defendant in a patent infringement case was proper wherever personal jurisdiction existed. Four years later, in Beverly Hills Fan Co., the Federal Circuit held that personal jurisdiction for a patent defendant essentially exists wherever an infringing product is made, used or sold.\120\ The effect of these decisions is that venue for a patent infringement defendant is proper wherever an alleged infringing product can be found. To compound matters, the Federal Circuit applied a different set of standards in patent cases that were brought pursuant to the declaratory judgment act.\121\

\117\28 U.S.C. Sec. 1400.

\118\See, e.g., VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574 (Fed. Cir. 1990).

\119\See VE Holding, 917 F.2d at 1580.

\120\See Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed. Cir. 1994).

\121\See VE Holding, 917 F.2d at 1583.

Since most patented products are sold nationally, a patent holder can often bring a patent infringement action in any one of the 94 judicial districts in the United States. The judicial weakening of the patent venue statute has reportedly led to forum shopping in patent infringement suits. A comprehensive study revealed that approximately half of the patent infringement cases are filed in only 10 of the districts, many of which have no significant relation to either the plaintiff or the defendant.\122\ A report issued last year indicates this pattern has continued and may even become more concentrated.\123\

\122\See Kimberly A. Moore, Forum Shopping in Patent Cases: Does Geographic Choice Affect Innovation?, 79 N.C. L. Rev. 889 (2001).

\123\See Roderick R. McKelvie, Forum Selection In Patent Litigation: A Traffic Report, 19 NO. 8 Intell. Prop. & Tech. L.J. 1, 1 (2007).

Venue exists to ensure the case is brought where the defendant has more than minimum contacts in the forum the plaintiff has chosen.\124\ Moreover, judicial resources are best spent in locations where the evidence and witnesses are located. If a venue is chosen that has little or no relation to the defendant's business, it can cause significant hardship to the defendant and increase already expensive litigation costs.

In addition, court dockets can become backlogged where a disproportionate number of patent cases are brought in a small number of districts.\125\

\124\See 17 Moore's Federal Practice Sec. 110.01[5][a] (3d ed. 1997).

pillsbury

\125\See McKelvie, Forum Selection In Patent Litigation: A Traffic Report, 19 NO. 8 Intell. Prop. & Tech. L.J. at 3.

Discussion of changes

As with other provisions in the Act, the venue language was changed considerably during the Committee process. The initial language worked a modest change to the venue statute in that patent infringement suits could be brought only in the judicial district where (i) either party resided (which for a corporation is its principal place of business or its state of incorporation), or (ii) where the defendant had committed acts of infringement and had a regular and established place of business.

Amendments during the mark-ups made significant revisions.\126\ Section 8 of the Committee-passed bill limits the plaintiff-based venue available to certain plaintiffs in patent cases, namely individual inventors, institutions of higher education, and technology-transfer non-profit organizations affiliated with such institutions. The Committee also determined that the same venue rules shall apply for both patent declaratory judgment cases and patent infringement cases.

\126\See Transcript of Proceedings of Business Meeting of the Senate Committee on the Judiciary, 110th Cong., 1st Sess. 4 (June 21, 2007); Transcript of Proceedings of Business Meeting of the Senate Committee on the Judiciary, 110th Cong., 1st Sess. 5-7, 14-17, 19-20, 51-63 (July 12, 2007); Transcript of Proceedings of Business Meeting of the Senate Committee on the Judiciary, 110th Cong., 1st Sess. 2, 12 (July 19, 2007).

Also, under the changes worked in the Act, parties will not be permitted to manufacture venue. Thus, for example, a company cannot establish venue in a given State simply by incorporating there. Section 1400 of title 28 is amended to provide that defendants in patent cases may be sued where the defendant has its principal place of business, or where it is incorporated or formed. They may also be sued where substantial acts of infringement occur, but only if the defendant also has a regular and established, substantial physical facility in that district, which the defendant controls, and which constitutes a substantial portion of the defendant's overall operations in the district. A foreign defendant that has a U.S subsidiary may only be sued where its primary U.S. subsidiary is located, or its principal place of business in the U.S. is incorporated or formed.\127\

\127\28 U.S.C. Sec. 1391(d) shall continue to determine venue for a foreign defendant that does not have a subsidiary in the United States.

The Committee is sensitive to the unique position of universities, non-profit organizations and truly small inventors, for which certain venue restrictions could prove burdensome. Revised section 1400 therefore creates an exception, permitting these parties to file their patent infringement or declaratory judgment actions in the district where they reside.

Section 1400 also provides for limited requests for transfer of venue where the court deems it appropriate.

Interlocutory appeals of claim construction orders

pillsbury

Background

In many patent infringement cases, the proper meaning of a patent claim (referred to as "claim construction") is a vital, threshold determination. A finding of patent infringement will often turn on the proper interpretation of the patent claims, which may also determine the patent's validity.\128\ A decade ago, the Supreme Court held in Markman v. Westview Instruments, Inc.,\129\ that district court judges, not juries, should determine the proper meaning of a patent claim. Shortly thereafter, the Federal Circuit in Cybor Corp. v. FAS Technologies, Inc.,\130\ held that the standard of review of claim construction decisions by the district court was de novo, giving no deference to the district court judges that made those determinations. Determining the proper meaning of the claims is vital to the outcome of most patent cases, and should occur early in the litigation to avoid unnecessary costs.\131\ Moreover, since the Federal Circuit would review such decisions without giving deference to the district court, its view of the proper claim construction is paramount.\132\

\128\See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293 (Fed. Cir. 2006) (reversing the district court's claim construction and remanding for a second time for the district court to determine whether the newly construed claim was anticipated by the prior art).

\129\517 U.S. 370 (1996).

\130\138 F.3d 1448 (Fed. Cir. 1998) (en banc).

\131\See Patent Reform: The Future of American Innovation: Hearing on S. 1145 Before the Senate Comm. on the Judiciary, 110th Cong. 289-291 (2007) (statement of John A. Squires, Esq., Chief Intellectual Property Counsel, Goldman, Sachs & Co.); Perspectives on Patents: Post- Grant Review Procedures and Other Litigation Reforms: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 34 (2006) (statement of Andrew Cadel, Managing Director and Chief Intellectual Property Counsel, JP Morgan Chase);

Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 68-78 (2005) (statement of Jonathan Band, Counsel, on behalf of Visa and the Financial Services Roundtable); see also Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1475-77 (Fed. Cir. 1998) (en banc)

(dissenting opinion of Rader, J.).

\132\See Patent Reform: The Future of American Innovation: Hearing on S. 1145 Before the Senate Comm. on the Judiciary, 110th Cong. 289-290 (2007) (statement of John A. Squires, Esq., Chief Intellectual Property Counsel, Goldman, Sachs & Co.); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. 68-78 (2005) (statement of Jonathan Band, Counsel, on behalf of Visa and the Financial Services Roundtable).

Following these decisions, many district courts began holding separate claim construction hearings, which became known as "Markman" hearings. District courts often then issue Markman claim construction decisions.\133\ In certain cases, parties requested, and district judges certified, Markman decisions for interlocutory appeal to the Federal Circuit. The parties,

pillsbury

and the district courts, understood the importance of having a claim construction decision early in the process and, because of de novo review, that the Federal Circuit would have to rule on construction before the parties could accurately assess their liabilities. The Federal Circuit, however, refused to take most such requests.\134\ As a result, full trials often had to be held before an appeal could be taken of the claim construction issue.\135\

\133\See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1479 (Fed. Cir. 1998) (en banc) ("Although the district courts have extended themselves, and so-called 'Markman hearings' are common, this has not been accompanied by interlocutory review of the trial judge's claim interpretation. The Federal Circuit has thus far declined all such certified questions.").

\134\See V. Ajay Singh, Interlocutory Appeals In Patent Cases Under 28 U.S.C. Sec. 1292(C)(2): Are They Still Justified And Are They Implemented Correctly?, Duke L.J. Vol. 55, 179, 196 (2005) ("the Federal Circuit has thus far refused to hear permissive appeals related to claim construction").

\135\Unfortunately, there are also examples where the Federal Circuit has had to hear multiple district court claim construction related appeals, and has remanded the case back to the district court several times based on new claim construction theories. See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293 (Fed. Cir. 2006) (a 10-year litigation that has to date already had two appeals, and the case is remanded back for a likely third district court decision, and possible third appeal).

Numerous studies have shown that the Federal Circuit's reversal rate of district court claim construction decisions is unusually high.\136\ District court decisions may place several claim terms in dispute, and reversal by the Federal Circuit as to the meaning of just one claim term may require that the case be remanded to the district court for further proceedings.\137\

The Committee heard that the manner claim construction determinations are currently reviewed increases litigation costs, decreases certainty and predictability, and can prolong settlement discussions.\138\

\136\See, e.g., Paul M. Schoenhard, Reversing the Reversal Rate:

Using Real Property Principles to Guide Federal Circuit Patent Jurisdiction, 17 Fordham Intel. Prop. Media & Ent. L.J. 299, 303 (2007) (citing several studies of Federal Circuit reversal rates of claim construction decisions, ranging from 33% to over 50%). Although the exact number is subject to debate, it is safe to say the number is relatively high, especially as compared to traditional reversal rates.

This is not entirely surprising since current Federal Circuit precedent encourages the parties to contest the meaning of several different claim terms both before the district court and the Federal Circuit. For example, it is not uncommon for a party to appeal (or cross appeal) the meaning of several terms, and if the Federal Circuit disagrees as to just one, it is likely the case will need to be remanded to the district court.

\137\See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1474 n. 2 (Fed. Cir. 1998) (opinion by Rader, J. dissenting, "In the words of United States District Court Judge Roderick McKelvie:

pillsbury

'[I]n spite of a trial judge's ruling on the meaning of disputed words in a claim, should a three-judge panel of the Federal Circuit disagree, the entire case could be remanded for retrial on [a] different [claim interpretation]'', citing Elf Atochem North Am., Inc. v. Libbey-Owens- Ford Co., 894 F.Supp. 844, 857, 37 USPQ2d 1065, 1075 (D. Del. 1995)).

\138\See Patent Reform: The Future of American Innovation: Hearing on S. 1145 Before the Senate Comm. on the Judiciary, 110th Cong. 289-291 (2007) (statement of John A. Squires, Esq., Chief Intellectual Property Counsel, Goldman, Sachs & Co.).

Discussion of changes

Section 8 of the Act amends subsection (c)(2) of section 1292 of title 28, giving district court judges discretion to certify Markman claim construction orders for interlocutory review. When such orders are certified, the Federal Circuit must decide the appeal.

The Committee intends to transfer the discretion from the Federal Circuit to the district court judge as to whether--and when--a claim construction order should be decided on appeal.

The district court judges are in the best position to know when the evidence adduced, and the arguments marshaled by the litigants, have brought the case to a point at which a decision by the appellate court on claim construction could best promote resolution of the case. As a case management tool, the Committee is confident that the interlocutory appeal of a Markman decision could be both useful and effective. The district court also has the discretion to stay the case pending the appeal.

Venue for the USPTO

Background

In 1999, as part of the American Inventors Protection Act (AIPA), Congress established that as a general matter the venue of the USPTO is the district where it resides.\139\ The USPTO currently resides in the Eastern District of Virginia. However,

Congress inadvertently failed to make this change uniform throughout the entire patent statute, so that certain sections of the patent statute (and one section of the trademark statute) continue to allow challenge of USPTO decisions to be brought in the District of Columbia, where the USPTO has not resided for decades.

\139\See 35 U.S.C. Sec. 1(b).

Discussion of changes

Since the USPTO no longer resides in the District of Columbia, the sections that authorized venue for litigation against the USPTO are changed to reflect the venue where the USPTO currently resides.

SECTION 9: PATENT AND TRADEMARK OFFICE REGULATORY AUTHORITY

pillsbury

On August 3, 2006, in the 109th Congress, Senator Hatch introduced the Patent Reform Act of 2006 (S. 3818) with Senator Leahy. It was referred to the Committee on the Judiciary, where it stayed until the end of the session.

On April 18, 2007, in the 110th Congress, Senator Leahy, along with Senator Hatch, introduced the Patent Reform Act of 2007. Senator Schumer, Senator Whitehouse, and Senator Cornyn were original cosponsors of the bill; Senator Craig, Senator Crapo, Senator Bennett, Senator Salazar, and Senator Smith later joined as cosponsors. The bill was referred to the Committee on the Judiciary, and was first placed on the Committee's agenda on June 14, 2007.

## B. HEARINGS

The Senate Committee on the Judiciary held six hearings on patent reform from 2005 through 2007.

On April 25, 2005, the Senate Committee on the Judiciary Subcommittee on Intellectual Property held a hearing on "Perspectives on Patents." This first hearing was attended by Chairman Hatch, Ranking Member Leahy, Senator Cornyn, and Senator Feinstein. Testifying on Panel I was the Honorable Jon W. Dudas, Under Secretary of Commerce for Intellectual Property, and Director, U.S. Patent and Trademark Office.

Testifying on Panel II were Richard C. Levin, President, Yale University, and Co-Chair, Committee on Intellectual Property Rights in the Knowledge-Based Economy, Board on Science, Technology, and Economic Policy, National Research Council; and Mark B. Myers, Visiting Executive Professor, Management Department, Wharton Business School, University of Pennsylvania, and Co-Chair, Committee on Intellectual Property Rights in the Knowledge-Based Economy, Board on Science, Technology, and Economic Policy, National Research Council.

Testifying on Panel III were William Parker, Chief Executive Office and Director of Research, Diffraction, Ltd.; Joel L. Poppen, Deputy General Counsel, Micron Technology, Inc.; David Simon, Chief Patent Counsel, Intel Corporation; Dean Kamen, President, DEKA Research and Development Corp.; Robert A. Armitage, Senior Vice President and General Counsel, Eli Lilly and Company; and Michael K. Kirk, Executive Director, American Intellectual Property Law Association (AIPLA). The following materials were submitted for the record: Comments of the National Association of Patent Practitioners on the Proposed Patent Act of 2005, submitted by Tony Venturino, President, on May 6, 2005; prepared statement of Jon W. Dudas; prepared statement of Richard C. Levin; prepared statement of Mark B. Myers; prepared statement of William Parker; prepared statement of Joel L. Poppen; prepared statement of David Simon; prepared statement of Dean Kamen; prepared statement of Robert A. Armitage; and prepared statement of Michael K. Kirk.

On June 14, 2005, the Senate Committee on the Judiciary Subcommittee on Intellectual Property held a hearing on "Patent Law Reform: Injunctions and Damages." This second hearing was attended by Chairman Hatch, Ranking Member Leahy, and Senator Kennedy. The following witnesses testified: Carl Gulbrandsen, Managing Director, Wisconsin Alumni Research Foundation (WARF); Jonathan Band, Counsel on behalf of Visa and the Financial Services Roundtable; Mark A. Lemley, Professor of Law, Stanford Law School; Jeffrey P. Kushan, Sidley

pillsbury

Austin Brown and Wood, LLP; Chuck Fish, Vice President and Chief Patent Counsel, Time Warner, Inc.; and J. Jeffrey Hawley, President, Intellectual Property Owners Association, and Vice President and Director, Patent Legal Staff, Eastman Kodak Company. The following materials were submitted for the record: prepared statement of Carl Gulbrandsen; the prepared statement of Jonathan Band; the prepared statement of Mark A. Lemley; the prepared statement of Jeffrey P. Kushan; the prepared statement of Chuck Fish; and the prepared statement of J. Jeffrey Hawley.

On July 26, 2005, the Senate Committee on the Judiciary Subcommittee on Intellectual Property held a hearing on "Perspectives on Patents: Harmonization and Other Matters."

Chairman Hatch attended this hearing and Ranking Member Leahy submitted a statement for the record. The following witnesses testified: The Honorable Gerald J. Mossinghoff, former Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, and Senior Counsel, Oblon, Spivak, McClelland, Maier & Neustadt; The Honorable Q. Todd Dickinson, former Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office, and Vice President and Chief Intellectual Property Counsel, General Electric Company; Marshall C. Phelps, Corporate Vice President and Deputy General Counsel for Intellectual Property, Microsoft Corporation; Christine Siwik, Partner, Rakoczy Molino Mazzochi Siwik, LLP; Charles E. Phelps, Provost, University of Rochester, on behalf of the Association of American Universities, American Council on Education, Association of American Medical Colleges and Council on Governmental Relations; and David Beier, Senior Vice President for Global Government Affairs, Amgen. The following materials were submitted for the record: prepared statement of David Beier; article, Bureau of National Affairs, Inc., Patent, Trademark & Copyright Journal, C. Boyden Gray, former White House Counsel and Partner, Wilmer Cutler Pickering Hale and Dorr; prepared statement of Q. Todd Dickinson; prepared statement of Gerald J. Mossinghoff; prepared statement of Charles E. Phelps; prepared statement of Marshall C. Phelps; prepared statement of Christine J. Siwik; and prepared statement of Teva North America, Steven J. Lee, Partner, Kenyon & Kenyon, Thomas L. Creel, Partner, Goodwin Procter LLP, Outside Patent Counsel.

On May 23, 2006, the Senate Committee on the Judiciary Subcommittee on Intellectual Property held a hearing on "Perspectives on Patents: Post-Grant Review Procedures and Other Litigation Reforms."  Chairman Hatch and Ranking Member Leahy attended, and the following witnesses testified: Mark Chandler, Senior Vice President and General Counsel, Cisco Systems, Inc.; Philip S. Johnson, Chief Patent Counsel, Johnson & Johnson; Nathan P. Myhrvold, Chief Executive Officer, Intellectual Ventures; John R. Thomas, Professor of Law, Georgetown University Law Center; and Andrew Cadel, Managing Director, Associate General Counsel, and Chief Intellectual Property Counsel, JP Morgan Chase. The following materials were submitted for the record: prepared statement of Andrew Cadel; prepared statement of Mark Chandler; prepared statement of Jack Haken, Vice President, Intellectual Property & Standards, U.S. Phillips Corporation; prepared statement of Philip S. Johnson; prepared statement of Nathan P. Myhrvold; and prepared statement of John R. Thomas.

On May 1, 2007, the Senate Committee on the Judiciary held a hearing on "Process Patents." This hearing was attended by Chairman Leahy, Ranking Member Specter, Senator Cardin, Senator Whitehouse, Senator Graham, and Senator Coburn. Senator Feinstein submitted a

statement for the record. The following witnesses testified: Wayne Herrington, Assistant General Counsel, United States International Trade Commission; John R. Thomas, Professor of Law, Georgetown University Law Center; Mike Kirk, Executive Director, American Intellectual Property Law Association; and Christopher A. Cotropia, Professor of Law, Richmond School of Law. The following materials were submitted for the record: prepared statement of Wayne Herrington; prepared statement of John R. Thomas; prepared statement of Mike Kirk; prepared statement of Christopher A. Cotropia; letter from the United Steel Workers to Senator Leahy and Senator Specter dated February 6, 2007; letter from the AFL-CIO to Senator Leahy and Senator Specter dated February 21, 2007; and an article by Mickey Kantor and Theodore B. Olsen titled "Pet Food and Pool Cues," published May 13, 2006.

On June 6, 2007, the Senate Committee on the Judiciary held its sixth and final hearing on patent reform, entitled "Patent Reform: The Future of American Innovation."  Senator Leahy, Senator Specter, Senator Cardin, Senator Whitehouse, Senator Hatch, and Senator Coburn attended the hearing. Testifying on Panel I was the Honorable Jon W. Dudas, Undersecretary of Commerce for Intellectual Property, Director of the U.S. Patent and Trademark Office. Testifying on Panel II were Bruce G. Bernstein, Chief Intellectual Property and Licensing Officer, InterDigital Communications Corporation; Mary Doyle, Senior Vice President, General Counsel and Secretary, Palm, Inc.; John A. Squires, Chief Intellectual Property Counsel, Goldman, Sachs & Co.; and Kathryn L. Biberstein, Senior Vice President, General Counsel and Secretary, and Chief Compliance Officer, Alkermes, Inc. The following materials were submitted for the record: letter from the Department of Commerce to Senator Leahy and Senator Specter dated May 18, 2007; letter from BIO to Senator Leahy and Senator Specter dated May 29, 2007; letter from Chief Judge Paul R. Michel of the Federal Circuit to Congressman Conyers dated May 21, 2007; letter from the National Association of Manufacturers to Congressman Conyers and Congressman Smith dated May 18, 2007; letter from Chief Judge Paul R. Michel of the Federal Circuit to Senator Leahy and Senator Specter dated May 3, 2007; the prepared statement of Jon W. Dudas; the prepared statement of Bruce G. Bernstein; prepared statement of Mary Doyle; prepared statement of John A. Squires; and prepared statement of Kathryn L. Biberstein.

## C. LEGISLATIVE HISTORY

On June 21, 2007, the Senate Judiciary Committee first considered S. 1145. Senator Leahy offered a Manager's Amendment, which was adopted by unanimous consent. This Manager's Amendment made several changes including eliminating inter partes reexamination; making denials of PGR petitions discretionary and not reviewable; raising the standard for initiating PGR to requiring both a showing of likely economic harm and notice of infringement; making technical changes regarding USPTO venue from the District of Columbia to the Eastern District of Virginia; limiting the venue choices against foreign defendants; clarifying that the apportionment language does not apply to lost profits calculations; providing that false substitute statements in 115 are subject to the same criminal penalties as false inventor oaths; eliminating the requirement that to request a derivation proceeding, the inventor had to have filed a patent application prior to the publication of the allegedly derived application; clarifying the one a year grace period set forth in 102; eliminating the DC-area residency requirement for Federal Circuit judges; establishing a new "micro-entity" status for truly small inventors; eliminating the provision in the Act that would have expanded the prior user rights defense to apply to all patents; and providing that a report on prior user rights be provided to Congress.

pillsbury

CBO ESTIMATE OF THE STATUTORY PAY-AS-YOU-GO EFFECTS FOR S. 23, THE AMERICA INVENTS ACT, WITH AMENDMENTS APPROVED BY THE SENATE THROUGH MARCH 8, 2010

| | By fiscal year, in millions of dollars— | | | | | | | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2011–2016 | 2011–2021 |
| NET DECREASE (−) IN THE DEFICIT | | | | | | | | | | | | | |
| Statutory Pay-As-You-Go Impact | 0 | −420 | −90 | −30 | −20 | −30 | −30 | −30 | −30 | −40 | −30 | −590 | −750 |
| Memorandum: | | | | | | | | | | | | | |
| Changes in Outlays | 0 | 2,060 | 2,600 | 2,800 | 2,940 | 3,070 | 3,200 | 3,320 | 3,450 | 3,570 | 3,700 | 13,470 | 30,710 |
| Changes in Revenues | 0 | 2,480 | 2,690 | 2,830 | 2,960 | 3,100 | 3,230 | 3,350 | 3,480 | 3,610 | 3,730 | 14,060 | 31,460 |

Notes: Components may not sum to totals because of rounding.
The legislation would give the Patent and Trademark Office permanent authority to collect and spend fees.
Sources: Congressional Budget Office.

[[Page S1381]]

The PRESIDING OFFICER. The bill having been read the third time, the question is, Shall the bill, as amended, pass?

The yeas and nays have been ordered.

The clerk will call the roll.

The bill clerk called the roll.

The result was announced--yeas 95, nays 5, as follows:

[Text of Votes and S. 23 Bill omitted]

Mr. LEAHY. Mr. President, it has been many years getting to this point. I cannot tell you the amount of pride I have in my fellow Senators, both Republicans and Democrats. I thank the Senator from Iowa who has been here with me and so many others I mentioned earlier. It is nice to finally have this bill through the Senate.

Mr. KYL. Mr. President, I rise today to recognize and thank the patent lawyers and Senate staff who have played a critical role in the drafting and enactment of the present bill.

Among the Senate staff who have played a role with regard to this bill are Chip Roy, Holt Lackey, and Zina Bash of Senator Cornyn's staff, David Barlow and Rob Porter of Senator Lee's staff, Walt Kuhn of Senator Graham's staff, and Danielle Cutrona and Bradley Hayes of Senator Sessions's staff. Special mention is merited for Matt Sandgren of Senator Hatch's staff, who fought tenaciously for the bill's supplemental examination provision, and who worked hard to defeat the amendment to strip the bill of its adoption of the first-to-file system, and Sarah Beth Groshart of Senator Coburn's staff, who helped draft the Coburn amendment, which will create a revolving fund for the PTO and put an end to fee diversion. Past staff who played an important role include Jennifer Duck of Senator Feinstein's staff, and Ryan Triplette, who managed the bill for Senator Hatch while he was chairman and for Senator Specter while he was the lead Republican on the committee. Miss Duck and Miss Triplette negotiated the managers' amendment that was adopted during the bill's 2009 committee mark up, and which represented a major breakthrough on this bill, resolving the contentious issues of damages and venue. In the House of Representatives, key staff include Blaine Merritt and Vishal Amin of Chairman Lamar Smith's staff, and Christal Sheppard of Mr. Conyers's staff. Bob Schiff of Senator Feingold's staff worked with my staff to develop minority views for the bill's 2009 committee report--I

pillsbury

believe that this is the only time that Senator Feingold and I ever submitted a minority report together. I should also acknowledge Tim Molino of Senator Klobuchar's staff, Rebecca Kelly of Senator Schumer's staff, Caroline Holland of Senator Kohl's staff, and Galen Roehl, who worked in past Congresses for Senator Brownback, and who currently staffs Senator Toomey. Much of S. 3600 was drafted in Senator Brownback's conference room. Let me also recognize the work of Rob Grant of Senate Legislative Counsel, who has drafted literally hundreds of versions of and amendments to this bill. And finally, I must acknowledge Rita Lari, who managed this bill for Senator Grassley on the Senate floor this past week, and the indispensable Aaron Cooper, who has managed the bill for the chairman since the beginning of 2009.

[[Page S1394]]

Among those outside the Senate, I recognize and thank Hayden Gregory of the American Bar Association, Laurie Self and Rod McKelvie of Covington & Burling, and Hans Sauer, Mike Schiffer, Bruce Burton, Matt Rainey, David Korn, Carl Horton, Steve Miller, Doug Norman, and Stan Fendley. The Wisconsin Alumni Research Foundation has played an important role, particularly with regard to the bill's enhanced grace period. I thank Carl Gulbrandsen, Howard Bremmer, Andy Cohn, and Mike Remington. I thank Todd Dickinson and Vince Garlock of AIPLA, and Jim Crowne, who was willing to come to the Senate to double check the draft enrolled bill. I should also mention Herb Wamsley of Intellectual Property Owners, as well as Dana Colarulli, who has worn two hats during the course of his work on this bill, first with IPO, and subsequently as the head of legislative affairs at the PTO. Key participants at the PTO have also included Mike Fleming, John Love, Jim Toupin, and Rob Clarke. And of course I must mention the current Director, David Kappos, without whose effort and dedication the passage of the present bill would not have been possible.

Finally, allow me to acknowledge the key members of the 21st Century Coalition for Patent Reform, who have devoted countless hours to this bill, and stuck with it through thick and thin. They have also formed an important "kitchen cabinet" that has been indispensable to the committee's drafting of this bill and to the resolution of difficult technical questions. I thus acknowledge and thank Phil Johnson, Gary Griswold, Bob Armitage, and Mike Kirk for their key role in the creation of the America Invents Act.

I yield the floor. I suggest the absence of a quorum.

The PRESIDING OFFICER (Mr. Bennet). The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. LEAHY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

pillsbury

Leahy-Hatch – 157 Cong. Rec. S1496-S1497

[Congressional Record Volume 157, Number 35 (Wednesday, March 9, 2011)]

[Senate]

[Pages S1496-S1497]

From the Congressional Record Online through the Government Printing Office [www.gpo.gov]

AMERICA INVENTS ACT

Mr. LEAHY. Mr. President, Congress has been working on the America Invents Act going back many years. It has gone through numerous iterations and changes have been made over time. Accordingly, I want to take a few minutes to discuss some important legislative history of a critical piece of this bill—section 2 of the legislation, which amends section 102 of title 35 of the United States Code. There has been a great deal of attention paid to subsections 102(a) and (b) and how those two subsections will work together. Senator Bennet and others have asked about this issue in particular.Mr. HATCH. I thank the Senator. I agree with the chairman that it is important that we set down a definitive legislative history of those subsections, which will be important for each and every patent application.

Mr. LEAHY. One key issue on which people have asked for clarification is the interplay between patent-defeating disclosures under subsection 102(a) and the situations where those disclosures are excepted and have no patent-defeating effect under the grace period provided in subsection 102(b).

In particular, some in the small inventor community have been concerned that a disclosure by an inventor might qualify as patent-defeating prior art under subsection 102(a) because, for example, the inventor's public disclosure and by a "public disclosure" I mean one that results in the claimed invention being "described in a printed publication, or in public use, on sale, or otherwise available to the public"—might in some situation not be excluded as prior art under section 102(b)'s grace period. There is absolutely no situation in which this could happen given the interplay between subsections 102(a) and 102(b) as these subsections are drafted.

We intend that if an inventor's actions are such as to constitute prior art under subsection 102(a), then those actions necessarily trigger subsection 102(b)'s protections for the inventor and, what would otherwise have been section 102(a) prior art, would be excluded as prior art by the grace period provided by subsection 102(b). Indeed, as an example of this, subsection 102(b)(1)(A), as written, was deliberately couched in broader terms than subsection 102(a)(1). This means that any disclosure by the inventor whatsoever, whether or not in a form that resulted in the disclosure being available to the public, is wholly disregarded as prior art. A simple way of looking at new subsection 102(a) is that no aspect of the protections under current law for inventors who disclose their inventions before filing is in any way changed.

Mr. HATCH. The Senator from Vermont is correct. For the purposes of grace-period protection, the legislation intends parallelism between the treatment of an inventor's actions under subsection 102(a) that might create prior art and the treatment of those actions that negate any

Pillsbury

prior-art effect under subsection 102(b). Accordingly, small inventors and others will not accidentally create a patent-defeating bar by their prefiling actions that would otherwise be prior art under subsection 102(a) as long as they file their patent applications within the grace period provided by subsection 102(b). But, the important point is that if an inventor's disclosure triggers the 102(a) bar with respect to an invention, which can only be done by a disclosure that is both made available to the public and enabled, then he or she has thereby also triggered the grace period under 102(b). If a disclosure resulting from the inventor's actions is not one that is enabled, or is not made available to the public, then such a disclosure would not constitute patent-defeating prior art under 102(a) in the first place. But even if the disclosure was enabled and available to the public so that it did qualify as prior art under subsection 102(a), subsection 102(b) would require that the disclosure be disregarded if it occurred during the 1-year grace period before the patent was sought. Indeed, a disclosure that does not satisfy the requirements to be prior art under subsection 102(a), nonetheless constitutes a disclosure that is fully protected under the more inclusive language of subsection 102(b). This relationship between these subsections will fully protect the inventor and, together with the provisions of subsection 101 limiting patenting to inventors, prevent others from obtaining a patent on the inventor's creation.

Mr. LEAHY. I agree. One of the implications of the point we are making is that subsection 102(a) was drafted in part to do away with precedent under current law that private offers for sale or private uses or secret processes practiced in the United States that result in a product or service that is then made public may be deemed patent-defeating prior art. That will no longer be the case. In effect, the new paragraph 102(a)(1) imposes an overarching requirement for availability to the public, that is a public disclosure, which will limit paragraph 102(a)(1) prior art to subject matter meeting the public accessibility standard that is well-settled in current law, especially case law of the Federal Circuit.

Mr. HATCH. An additional clarification we have been asked about deals

[[Page S1497]]

with subparagraph 102(b)(1)(B). There has been some confusion over how this provision will work. It is my understanding that this provision ensures that an inventor who has made a public disclosure--that is, a disclosure made available to the public by any means--is fully protected during the grace period. The inventor is protected not only from the inventor's own disclosure being prior art against the inventor's claimed invention, but also against the disclosures of any of the same subject matter in disclosures made by others being prior art against the inventor's claimed invention under section 102(a) or section 103--so long as the prior art disclosures from others came after the public disclosure by the inventor. Is that the Senators' understanding of this provision?

Mr. LEAHY. That is correct. Subparagraph 102(b)(1)(B) is designed to work in tandem with subparagraph 102(b)(1)(A) to make a very strong grace period for inventors that have made a public disclosure before seeking a patent. Inventors who have made such disclosures are protected during the grace period, not only from their own disclosure, but also from disclosures by others that are made after their disclosure. This is an important protection we offer in our bill that will benefit independent and university inventors in particular.

House Report 112-98 – 112th Congress – To Accompany HR 1249

[From the U.S. Government Printing Office]

112th Congress
Rept. 112-98

HOUSE OF REPRESENTATIVES
1st Session
Part 1

## AMERICA INVENTS ACT

June 1, 2011.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed Mr. Smith of Texas, from the Committee on the Judiciary, submitted the following

R E P O R T

together with
DISSENTING VIEWS AND ADDITIONAL VIEWS
[To accompany H.R. 1249]
[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 1249) to amend title 35, United States Code, to provide for patent reform, having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

CONTENTS

Page
The Amendment........................................................................1
Purpose and Summary.............................................................38
Background and Need for the Legislation..................................40
Hearings................................................................................57
Committee Consideration.........................................................58
Committee Votes.....................................................................58
Committee Oversight Findings..................................................63
New Budget Authority and Tax Expenditures...........................63
Congressional Budget Office Cost Estimate..............................63
Performance Goals and Objectives...........................................73
Advisory on Earmarks..............................................................73
Section-by-Section Analysis.....................................................73
Agency Views.........................................................................85
Changes in Existing Law Made by the Bill, as Reported...........89
Dissenting Views.....................................................................162
Additional Views.....................................................................163

pillsbury

[Text of Bill, Agency Views, and Mark-up omitted from Report]

Purpose and Summary

The Constitution explicitly grants Congress the power to "promote the progress of science and useful arts, by securing for limited times to . . . inventors the exclusive right to their respective . . . discoveries."\1\ Congress has responded by authorizing patents to issue to inventors of new and useful inventions or improvements on inventions.\2\ The patent law thus accomplishes two objectives, consistent with the authorization granted by the Constitution: first, it encourages inventors by granting them limited, but exclusive rights to their inventions; second, in exchange for the grant of those exclusive rights, the patent law requires disclosure of the invention and terminates the monopoly after a period of years.\3\ This disclosure and limited time benefits both society and future inventors by making the details of the invention available to the public immediately, and the right to make use of that invention after the expiration of 20 years from the date the patent application was filed.

\1\U.S. Const. Art. 1, Sec. 8.

\2\See 35 U.S.C. Sec. 101.

\3\See Perspectives on Patents: Post-Grant Review Procedures and

Other Litigation Reforms: Hearing before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2006) (statement of Nathan P. Myhrvold, Chief Executive Officer, Intellectual Ventures); Perspectives on Patents: Hearing before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong.  (2005) (statement of Dean Kamen, President, DEKA Research and Development Corp.).

Congress has not enacted comprehensive patent law reform in nearly 60 years.\4\ The object of the patent law today must remain true to the constitutional command, but its form needs to change, both to correct flaws in the system that have become unbearable, and to accommodate changes in the economy and the litigation practices in the patent realm. The need to update our patent laws has been meticulously documented in 15 hearings before the Committee or its Subcommittee on Courts, the Internet, and Intellectual Property, as well as eight hearings before the United States Senate Committee on the Judiciary. In addition, these legislative findings are augmented by the Federal Trade Commission and the National Academy of Sciences,\5\ both of which published authoritative reports on patent reform, and a plethora of academic commentary.\6\

\4\The last major revision of the patent laws was the Patent Act of 1952, P.L. 82-593.

\5\The National Academy of Sciences (NAS), and the Federal Trade Commission (FTC) conducted multi-year studies on the patent system and its need for reform. See National Research Council of the National Academies, A Patent System for the 21st Century (2004) (hereinafter "NAS Report"); and Federal Trade Comm'n, To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy (2003) (hereinafter "FTC Report").

pillsbury

\6\See, e.g., Mark A. Lemley and Carl Shapiro, Patent Holdup and Royalty Stacking, 85 Tex. L. Rev. 1991 (2007); Donald S. Chisum, Reforming Patent Law Reform, 4 J. Marshall Rev. Intell. Prop. L. 336 (2005); Gerald J. Mossinghoff, The First-to-Invent Rule in the U.S.  Patent System has Provided no Advantage to Small Entities, 87 JPTOS 514 (2005); Joseph Farrell & Robert P. Merges, Incentives to Challenge and Defend Patents: Why Litigation Won't Reliably Fix Patent Office Errors and Why Administrative Patent Review Might Help, 19 Berkeley Tech. L.J.  943, 958 (2004); see also Adam B. Jaffe & Josh Lerner, Innovation and Its Discontents: How Our Broken Patent System is Endangering Innovation and Progress, and What to Do About It (2004); Kevin G. Rivette & David Kline, Rembrandts in the Attic, Unlocking the Hidden Value of Patents (2000).

While Congress has considered patent reform legislation over the last four Congresses, the need to modernize our patent laws has found expression in the courts, as well. The Supreme Court has reversed the Federal Circuit in six of the patent-related cases that it has heard since the beginning of the 109th Congress.\7\ The Court's decisions have moved in the direction of improving patent quality and making the determination of patent validity more efficient. The decisions reflect a growing sense that questionable patents are too easily obtained and are too difficult to challenge.\8\ Recent decisions by the Federal Circuit reflect a similar trend in response to these concerns.\9\ But the courts are constrained in their decisions by the text of the statutes at issue. It is time for Congress to act.

\7\See Bilski v. Kappos,___ U.S. __, 130 S.Ct. 3218 (2010) (reversing the Federal Circuit and holding that the machine-or-transformation test is not the sole test for determining the patent eligibility of a process); Quanta Computer, Inc. v. LG Elecs. Inc., 553 U.S. 617 (2008) (reversing the Federal Circuit and holding that patent exhaustion applies to method patents when the essential or inventive feature of the invention is embodied in the product); Microsoft Corp.  v. AT&T Corp., 550 U.S. 437 (2007) (reversing the Federal Circuit and limiting the extraterritorial reach of section 271(f), which imposes liability on a party which supplies from the U.S. components of a patented invention for combination outside the U.S.); KSR Int'l Co. v.  Teleflex Inc., 550 U.S. 398 (2007) (reversing the Federal Circuit and strengthening the standard for determining when an invention is obvious under section 103); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007) (reversing the Federal Circuit and holding that the threat of a private enforcement action is sufficient to confirm standing under the Constitution); eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006) (reversing the Federal Circuit and holding that the generally applicable four-factor test for injunctive relief applies to disputes in patent cases).

\8\See generally Patent Reform in the 111th Congress: Legislation and Recent Court Decisions, Senate Judiciary Committee, 111th Cong.  (2009) (statement of Professor Mark A. Lemley, Stanford Law School).

\9\See, e.g., In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir.  2007) (holding that willful infringement requires at least a demonstration of objectively reckless behavior and removing any affirmative obligation to obtain an opinion of counsel letter to combat an allegation of willful infringement).

The voices heard during the debate over changes to the patent law have been diverse and their proposals have been far from uniform. They have focused the Committee's attention on the value

of harmonizing our system for granting patents with the best parts of other major patent systems throughout the industrialized world for the benefit of U.S. patent holders; improving patent quality and providing a more efficient system for challenging patents that should not have issued; and reducing unwarranted litigation costs and inconsistent damage awards.

The purpose of the "America Invents Act," as reported by the Committee on the Judiciary, is to ensure that the patent system in the 21st century reflects the constitutional imperative. Congress must promote innovation by granting inventors temporally limited monopolies on their inventions in a manner that ultimately benefits the public through the disclosure of the invention to the public. The legislation is designed to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.

If the United States is to maintain its competitive edge in the global economy, it needs a system that will support and reward all innovators with high quality patents. The Committee has taken testimony from and its members have held meetings with interested parties that have different and often conflicting perspectives on the patent system. The Committee has taken all of those views into consideration, and drafted and then amended the "America Invents Act" to balance the competing interests. The legislation ordered reported by the Committee on a vote of 32-3 is a consensus approach that will modernize the United States patent system in significant respects.

Background and Need for the Legislation

First Inventor to File

The "America Invents Act" creates a new "first-inventor-to-file" system. Every industrialized nation other than the United States uses a patent priority system commonly referred to as "first-to-file." In a first-to-file system, when more than one application claiming the same invention is filed, the priority of a right to a patent is based on the earlier-filed application. The United States, by contrast, currently uses a "first-to-invent" system, in which priority is established through a proceeding to determine which applicant actually invented the claimed invention first. Differences between the two systems arise in large part from the date that is most relevant to each respective system. In a first-to-file system, the filing date of the application is most relevant;\10\ the filing date of an application is an objective date, simple to determine, for it is listed on the face of the patent. In contrast, in a first-to-invent system, the date the invention claimed in the application was actually invented is the determinative date. Unlike the objective date of filing, the date someone invents something is often uncertain, and, when disputed, typically requires corroborating evidence as part of an adjudication.

\10\When the term "filing date" is used herein, it is also meant to include, when appropriate, the effective filing date, i.e., the earliest date the claim in an application-claims priority.

There are significant, practical differences between the two systems. Among them is the ease of determining the right to a claimed invention in the instance in which two different people file patent applications for the same invention. In a first-to-file system, the application with the earlier filing date prevails and will be awarded the patent, if one issues. In the first-to-invent system, a lengthy, complex and costly administrative proceeding (called an "interference

pillsbury

proceeding") must be conducted at the United States Patent and Trademark Office ("USPTO") to determine who actually invented first.\11\ Interference proceedings can take years to complete (even if there is no appeal to the United States Court of Appeals for the Federal Circuit), cost hundreds of thousands of dollars, and require extensive discovery.\12\ In addition, because it is always possible that an applicant could be involved in an interference proceeding, companies must maintain extensive recording and document retention systems in case they are later required to prove the date they invented the claimed invention.

\11\See 35 U.S.C. Sec. 135.

\12\See, e.g., Robert W. Pritchard, The Future is Now—The Case for Patent Harmonization, 20 N.C. J. Int'l L. & Com. Reg. 291, 313 (1995).

Another important difference between the two systems is that in some first-to-file systems, prior art can include the inventor's own disclosure of his invention prior to the filing date of his application. Such systems do not provide the inventor any grace period during which time he is allowed to publish his invention without fear of its later being used against him as prior art. The Committee heard from universities and small inventors, in particular, about the importance of maintaining that grace period in our system.\13\ They argued that the grace period affords the necessary time to prepare and file applications, and in some instances, to obtain the necessary funding that enables the inventor to prepare adequately the application. In addition, the grace period benefits the public by encouraging early disclosure of new inventions, regardless of whether an application may later be filed for a patent on it.

\13\See, e.g., Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Charles E. Phelps, Provost, University of Rochester, on behalf of the Association of American Universities); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Carl Gulbrandsen, Managing Director, Wisconsin Alumni Research Foundation (WARF)); Perspective on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong.  (2005) (statement of William Parker, Diffraction, Ltd.).

Numerous organizations, institutions, and companies have advocated that the U.S. adopt a first-to-file system similar to those used in the rest of the world.\14\ The National Academy of Sciences made a similar recommendation after an extensive study of the patent system.\15\ When the United States patent system was first adopted, inventors did not typically file in other countries. It is now common for inventors and companies to file for protection in several countries at the same time.\16\ Thus, United States applicants, who also want to file abroad, are forced to follow and comply with two different filing systems. Maintaining a filing system so different from the rest of the world disadvantages United States applicants who, in most instances, also file in other countries.\17\ A change is long overdue.\18\

\14\See, e.g., Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Gerald J. Mossinghoff, Former Assistant Secretary of Commerce and

pillsbury

Commissioner of Patents and Trademarks); Perspectives on Patents: Harmonization and Other Matters: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Q. Todd Dickinson, Former Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Jeffrey P. Kushan, Partner, Sidley Austin Brown & Wood, LLP); Patent Law Reform: Injunctions and Damages: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Mark A. Lemley, Professor, Stanford Law School); Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Robert A. Armitage, Senior Vice President and General Patent Counsel, Eli Lilly and Company);

Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Michael K. Kirk, Executive Director, American Intellectual Property Law Association).

\15\See NAS Report at 124; see also Perspectives on Patents:

Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Richard C. Levin, Yale University).

\16\See Perspectives on Patents: Harmonization and Other Matters:

Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Gerald J. Mossinghoff, Former Assistant Secretary of Commerce and Commissioner of Patents and Trademarks) .

\17\See Perspectives on Patents: Hearing Before the Subcomm. on Intellectual Prop. of the Senate Comm. on the Judiciary, 109th Cong. (2005) (statement of Richard C. Levin, President, Yale University, and Mark B. Meyers, Visiting Executive Professor, Management Department at the Wharton Business School, University of Pennsylvania), estimating that it costs as much as $750,000 to $1 million to obtain worldwide patent protection on an important invention, and the lack of harmonization regarding filing systems adds unnecessary cost and delay.

\18\The NAS recommended changing the U.S. to a first-to-file system, while maintaining a grace period. See NAS Report at 124-27. See also Patent Reform in the 111th Congress: Legislation and Recent Court Decisions: Hearing Before the Senate Comm. on the Judiciary, 111th Cong. (2009) (statement of Steven Appleton, Chairman and Chief Executive Officer, Micron Technologies, Inc.); Patent Reform in the 111th Congress: Legislation and Recent Court Decisions: Hearing Before the Senate Comm. on the Judiciary, 111th Cong. (2009) (statement of Philip S. Johnson, Chief Patent Counsel, Johnson & Johnson); Patent Reform in the 111th Congress: Legislation and Recent Court Decisions:

Hearing Before the Senate Comm. on the Judiciary, 111th Cong. (2009) (statement of Herbert C. Wamsley, Executive Director, Intellectual Property Owners Association); Patent Reform in the 111th Congress:

pillsbury

Legislation and Recent Court Decisions: Hearing Before the Senate Comm. on the Judiciary, 111th Cong. (2009) (statement of Mark A. Lemley, Professor, Stanford Law School).

Drawing on the best aspects of the two existing systems, the America Invents Act creates a new "first-inventor-to-file" system. This new system provides patent applicants in the United States the efficiency benefits of the first-to-file systems used in the rest of the world by moving the U.S. system much closer to a first-to-file system and making the filing date that which is most relevant in determining whether an application is patentable. The new system continues, however, to provide inventors the benefit of the 1-year grace period. As part of the transition to a simpler, more efficient first-inventor-to-file system, this provision eliminates costly, complex interference proceedings, because priority will be based on the first application. A new administrative proceeding—called a "derivation" proceeding—is created to ensure that the first person to file the application is actually a true inventor. This new proceeding will ensure that a person will not be able to obtain a patent for the invention that he did not actually invent. If a dispute arises as to which of two applicants is a true inventor (as opposed to who invented it first), it will be resolved through an administrative proceeding by the Patent Board. The Act also simplifies how prior art is determined, provides more certainty, and reduces the cost associated with filing and litigating patents.

The Act maintains a 1-year grace period for U.S. applicants. Applicants' own publication or disclosure that occurs within 1 year prior to filing will not act as prior art against their applications. Similarly, disclosure by others during that time based on information obtained (directly or indirectly) from the inventor will not constitute prior art. This 1-year grace period should continue to give U.S. applicants the time they need to prepare and file their applications.

This provision also, and necessarily, modifies the prior-art sections of the patent law. Prior art will be measured from the filing date of the application and will typically include all art that publicly exists prior to the filing date, other than disclosures by the inventor within 1 year of filing. Prior art also will no longer have any geographic limitations. Thus, in section 102 the "in this country" limitation as applied to "public use" and "on sale" is removed, and the phrase "available to the public" is added to clarify the broad scope of relevant prior art, as well as to emphasize the fact that it must be publicly accessible. Prior art based on earlier-filed United States applications is maintained,\19\ as is current law's grace period, which will apply to all actions by the patent owner during the year prior to filing that would otherwise create Sec. 102(a) prior art.\20\ Sections (and subsections) of the existing statute are renumbered, modified, or deleted consistent with converting to a first-inventor-to-file system.\21\ Finally, the intent behind the CREATE Act to promote joint research activities is preserved by including a prior art exception for subject matter invented by parties to a joint research agreement. The Act also provides that its enactment of new section 102© of title 35 is done with the same intent to promote joint research activities that was expressed in the Cooperative Research and Technology Enhancement Act of 2004 (Public Law 108-453), and that section 102© shall be administered in a manner consistent with such intent.

\19\Compare current Sec. 102(e) with new Sec. 102(a)(2).

\20\See generally 157 Cong. Rec. S.1496-97 (daily ed. March 9, 2011), S. 1370-71 (daily ed. March 8, 2011).

pillsbury

must ensure that American inventors are not disadvantaged. Small American inventors and universities are disadvantaged abroad in those nations where there is no grace period.

The grace period provision within H.R. 1249 would grant an inventor a one-year period between the time he first publishes his invention to the time when he is required to file a patent.

During this time, this would prohibit anyone else from seeing this publication, stealing the idea, and quickly filing a patent behind the inventor's back.

Yet, the only way for American inventors to benefit from the grace period provision contained in H.R. 1249 is to ensure that foreign countries adopt a grace period, as well.

Small American inventors and universities are disadvantaged abroad in those nations where there is no grace period. As a result, they often lose the right to patent because these other countries do not care about protecting small business and university research.  The United States needs to do more to protect the small inventor and universities not just here but abroad.

Unfortunately, other countries will not do it on their own even though they want the United States to convert to a "first-to-file" system.

If H.R. 1249 passes without my Amendment, we will be giving away a critical bargaining chip that we can use to encourage other countries to follow our lead.

My Amendment ensures that the only way to benefit from the grace period in H.R. 1249 is to have foreign countries adopt a grace period.  Without this Amendment, we will be unilaterally transitioning the United States to a "first-to-file" system with a weak grace period without any incentive for foreign countries to adopt a grace period.  I should also note that identical language was included in H.R. 1908, the "Patent Reform Act of 2007," which the House passed on September 7, 2007.

Accordingly, I urge my colleagues to support this Amendment.

Mr. SMITH of Texas. I rise in opposition to the amendment.

The Acting CHAIR. The gentleman is recognized for 5 minutes.

Mr. SMITH of Texas. Madam Chair, the Conyers amendment to tie the changes proposed in the America Invents Act to future changes that would

[[Page H4482]]

be made in foreign law is unworkable. I oppose providing a trigger in U.S. law that leaves our patent system at the mercy of actions to be taken at a future date by the Chinese, Russians, French, or any other country. It is our constitutional duty to write the laws for this great land. We cannot delegate that responsibility to the whims of foreign powers.

pillsbury

I know that this idea has been floated in the past, but after working on several pieces of patent legislation over the past several Congresses, and particularly this year on H.R. 1249, it has become clear that this type of trigger idea is simply not workable and is counterproductive.

The move to a first-inventor-to-file system creates a more efficient and reliable patent system that benefits all inventors, including independent inventors. The bill provides a more transparent and certain grace period, a key feature of U.S. law, and a more definite filing date that enables inventors to promote, fund, and market their technology, while making them less vulnerable to costly patent challenges that disadvantage independent inventors.  Under first-inventor-to-file, an inventor submits an application to the Patent Office that describes their invention and how to make it.  That, along with a $110 fee, gets them a provisional application and preserves their filing date. This allows the inventor an entire year to complete the application, while retaining the earlier filing date. By contrast, the cost of an interference proceeding before the PTO often runs to $500,000.

The current first-to-invent system harms small businesses and independent inventors. Former PTO Commissioner Gerald Mossinghoff conducted a study that proves smaller entities are disadvantaged in PTO interference proceedings that arise from disputes over patent ownership under the current system. Independent inventors and small companies lose more often than they win in these disputes, plus bigger companies are better able to absorb the cost of participating in these protracted proceedings.

In addition, many inventors also want protection for their patents outside the United States. If you plan on selling your product overseas, you need to secure an early filing date. If you don't have a clear filing date, you can be shut off from the overseas market. A change to first-inventor-to-file will help our businesses grow and ensure that American goods and services will be available in markets across the globe.

In the last 7 years, only one independent inventor out of 3 million patent applications filed has prevailed over the inventor who filed first. One out of 3 million. So there is no need for this amendment.  Independent inventors lose to other applicants with deeper pockets that are better equipped to exploit the current complex legal environment.  So the first-to-file change makes it easier and less complicated for U.S. inventors to get patent protection around the world. And it eliminates the legal bills that come with the interference proceedings under the current system. It is a key provision of this bill that should not be contingent upon actions by foreign powers and delay what would be positive reforms for independent inventors and our patent system.

The first-inventor-to-file provision is necessary for U.S.  competitiveness and innovation. It makes our patent system stronger, increases patent certainty, and reduces the cost of frivolous litigation.

However, if you support the U.N. having military control over our troops, or if you support the concept of an international court at The Hague, then you would support this amendment's proposal of a trigger that subjects U.S. domestic law to the whims of governments in Europe, China, or Russia.

**pillsbury**

It really would be unprecedented to hold U.S. law hostage to legal changes made overseas, and would completely go against what this great country stands for and what our Founders fought for: the independent rights and liberties we have today.

For these reasons, Madam Chair, I am strongly opposed to the amendment.

I yield back the balance of my time.

Mr. CONYERS. I yield the balance of my time to the gentleman from California (Mr. Rohrabacher).

The Acting CHAIR. The gentleman from California is recognized for 2\1/2\ minutes.

Mr. ROHRABACHER. Let's just note that Ms. Lofgren last night presented a case to this body which I felt demonstrated the danger that we have in this law. A move to first-to-file system, which is what this bill would do, without a corresponding 1-year grace period in other countries dramatically undermines the patent protection of American inventors. Some of us believe that's the purpose of this bill because they want to harmonize American law with the weak systems overseas.  Well, without this amendment that we are talking about right now, without the Conyers-Rohrabacher amendment, if an inventor discloses his discoveries, perhaps to potential investors, his right to patent protection is essentially gone. It's not gone from just Americans. Yes, he would be protected under American law; but from all those people in foreign countries without a similar grace period to what we have here in our system, these people are not restricted. Thus, they could, once an American inventor discloses it, at any time they can go and file a patent and steal our inventors' discoveries.

The only way for American inventors to benefit from a grace period here, which this bill is all about, is to ensure that foreign countries adopt the same grace period. And that's what this amendment would do.  It would say our bill, which will make our inventors vulnerable to foreign theft, will not go into place until those foreign countries have put in place a similar grace period, which then would prevent them and their citizens from coming in and stealing our technology. Ms.  Lofgren detailed last night in great detail how that would work.  I call this bill basically the Unilateral Disclosure Act, if not the Patent Rip-Off Act, because we are disclosing to the world what we've got. And our people can't follow up on it because there's a grace period here, but overseas they don't have that same grace period. So what we're saying is, to prevent foreigners from stealing American technology, this will not go into effect until the President has issued a statement verifying that the other countries of the world have a similar grace period so they can't just at will rip off America's greatest entrepreneurs and inventors.

The Acting CHAIR. The question is on the amendment offered by the gentleman from Michigan (Mr. Conyers).

The question was taken; and the Acting Chair announced that the noes appeared to have it.

Mr. CONYERS. Madam Chair, I demand a recorded vote.  The Acting CHAIR. Pursuant to clause 6 of rule XVIII, further proceedings on the amendment offered by the gentleman from Michigan will be postponed.

pillsbury

Mr. SENSENBRENNER. I yield myself 1\1/2\ minutes.

Madam Chair, section 3 of this bill creates a first-to-file patent system. The sponsors believe that the United States should harmonize with other countries' first-to-file systems. There's no reason to do that.

Our patent system is the strongest in the world, and it's based upon the first recognition of the Constitution in any country that inventors should be protected. I think that the Constitution empowers Congress to give patents only to inventors. We had a significant constitutional argument on this issue yesterday. If the amendment is not adopted, the issue will be litigated all the way up to the Supreme Court.

The current first-to-invent system has been key in encouraging entrepreneurial innovation and evens the playing field for individual inventors who are not represented by a major industry. The first-inventor-to-file system violates the Constitution because it would award a patent to the winner of the race to the PTO and not the actual inventor who makes the first discovery.

If we change to a first-to-file system, inventors who believe they do not have sufficient resources to win the race to the PTO will not have any motivation at all to continue developing the new invention. This will stifle innovation, and given the current state of our economy, that's the last thing we need.

The Acting CHAIR. The time of the gentleman has expired.

Mr. SENSENBRENNER. I yield myself an additional 15 seconds.  First-to-file also invites excessive filing and will add to the burden of the USPTO by increasing the examiner's workload. We already have financing problems there. If this amendment is not adopted, it will be worse.

I reserve the balance of my time.

Mr. SMITH of Texas. I rise in opposition to the amendment.

The Acting CHAIR. The gentleman is recognized for 5 minutes.  Mr. SMITH of Texas. Madam Chair, the gentleman's amendment strikes the first-inventor-to-file provisions from the bill. I strongly oppose the amendment.

The move to a first-inventor-to-file system creates a more efficient and reliable patent system that benefits all inventors, including independent inventors. This provision provides a more transparent and certain grace period, a key feature of U.S. law, and a more definite filing date that enables inventors to promote, fund, and market their technology while making them less vulnerable to costly patent challenges that disadvantage independent inventors.

The first-inventor-to-file system is absolutely consistent with the Constitution's requirement that patents be awarded to the inventor.

Former Attorney General Michael Mukasey has stated that the "provision is constitutional and helps assure that the patent laws of this country accomplish the goal set forth in the Constitution: 'to promote the Progress of Science and useful Arts.' "

pillsbury

Under first-inventor-to-file, patent rights are reserved to someone who

[[Page H4492]]

independently conceived of an invention before it was in the public domain. And under the Constitution, that is what is required to be considered an "inventor."

In fact, early American patent law, that of our Founders' generation, did not concern itself with who was the first to invent. The U.S. operated under a first-inventor-to-register system for nearly half a century, starting in 1790. The first-inventor-to-register system is similar to first-inventor-to-file, a system that the Founders themselves supported early in our Nation's history. The courts did not even concern themselves with who was the first person to invent until 1870, with the creation of interference proceedings. Those proceedings are the ones that disadvantage independent inventors and small businesses. And over the years, and in subsequent revisions of the law, those proceedings have morphed into a costly litigation tactic.

Under first-inventor-to-file, an inventor submits an application to the Patent Office that describes their invention and how to make it. That, along with just a $110 fee, gets them a provisional application and preserves their filing date. This allows the inventor an entire year to complete the application, while retaining the earlier filing date. By contrast, the cost of an interference proceeding in today's law could run an inventor $500,000.

Accusations that the bill doesn't preserve the 1-year grace period are simply false. This bill provides a stronger, more transparent and certain 1-year grace period for disclosures. This enhances protection for inventors who have made a public or private disclosure of their invention during the grace period.

The grace period protects the ability of an inventor to discuss or write about their ideas for a patent up to 1 year before they file for patent protection. These simple requirements create a priority date that is fixed and public so that everyone in the world can measure the patent against competing applications and patents and relevant prior art.

In addition, many inventors also want protection for their patents outside of the United States. If you plan on selling your product overseas, you need to secure an early filing date. If you don't have a clear filing date, you can be shut out from the overseas market. A change to a first-inventor-to-file system will help our businesses grow and ensure that American goods and services will be available in markets across the globe.

The current first-to-invent system seriously disadvantages small businesses and independent inventors. Former PTO Commissioner Gerald Mossinghoff conducted a study that proved smaller entities are disadvantaged in PTO interference proceedings that arise from disputes over patent ownership under the current system.

In the last 7 years, only one independent inventor out of 3 million patent applications filed has proved an earlier date of invention than the inventor who filed first.

Madam Chair, let me repeat that: in the last 7 years, only one independent inventor out of 3 million patent applications filed has proved an earlier date of invention than the inventor who

pillsbury

filed first.  Independent inventors lose to other applicants with deeper pockets that are better equipped to exploit the current complex legal environment.  So the first-inventor-to-file change makes it easier and less complicated for U.S. inventors to secure their patent rights, and it protects their patents overseas. And it eliminates the legal bills that come with interference proceedings under the current system. It is a key provision of this bill.

Madam Chair, the amendment should not be approved, and I urge my colleagues to vote against it.

I yield back the balance of my time.

Mr. SENSENBRENNER. Madam Chair, I yield 1 minute to the gentleman from California (Mr. Schiff).

Mr. SCHIFF. Madam Chair, I find myself in reluctant opposition to my colleague from Texas in support of the Sensenbrenner amendment. Section 3 shifts our patent system from the unique first-to-invent system to a first-to-file system.

As I speak to inventors, startups, venture capitalists and angel investors in California, I'm convinced that the proposed transition to first-to-file would be harmful to innovation and burdensome to the most dynamic and innovative sector of our economy.

With the shift to first-to-file, the rush to the Patent Office will lead to new costs for small businesses as they prepare applications for inventions that they may ultimately find impractical. For small startups, the cost of retaining outside counsel for this purpose will be a drain on their limited resources and mean less money for hiring and the actual act of innovation.

Supporters of first-to-file argue inventors can turn to provisional applications to protect their patent rights. But from talking to small inventors, I have learned that good provisional applications require substantial legal fees and time investment on the part of the inventor to make them sufficiently detailed to be of use.

The Acting CHAIR. The time of the gentleman has expired.

Mr. SENSENBRENNER. I yield the gentleman an additional 15 seconds.  Mr. SCHIFF. I appreciate the hard work that has gone into the bill by the gentleman from Texas. However, I remain deeply concerned that the shift to first-to-file will have lasting negative consequences for small investors, and I urge the House to improve the bill by adopting the Sensenbrenner amendment.

Madam Chair, following is my statement in its entirety: I rise in support of the Sensenbrenner amendment to strike Section 3 of the underlying legislation. Section 3 shifts our patent system from our unique First to Invent system to a First to File system. As I speak to inventors, startups, venture capitalists and angel investors in California, I am convinced that the proposed transition to First to File would be harmful to innovation and burdensome to the most dynamic and innovative sector of our economy.

636

pillsbury

There being no objection, the material was ordered to be printed in the Record, as follows:

List of Supporters of the America Invents Act 3M; Abbott Adobe Systems Incorporated; Advanced Micro Devices; Air Liquide; Air Products; American Bar Association; American Bankers Association; American Council of Life Insurers; American Council on Education; American Financial Services Association; American Institute of Certified Public Accountants; American Insurance Association; American Intellectual Property Law Association; American Trucking Association; Apple, Inc.; Applied Materials, Inc.; Aruba Networks, Inc.; Assoc. for Competitive Technology; Assoc. of American Medical Colleges.

Association of American Universities; Association of Public and Land-grant Universities; Association of University Technology Managers; AstraZeneca; Atheros Communications, Inc.; Autodesk, Inc.; Avaya Inc.; Avid Technology, Inc.; Bank of America; Baxter Healthcare Corporation; Beckman Coulter; Biotechnology Industry Organization; Borealis Ventures; Boston Scientific; BP; Bridgestone American Holdings, Inc.; Bristol-Meyers Squibb; Business Software Alliance; CA, Inc.; Cadence Design Systems, Inc.; California Healthcare Institute.

Capital One; Cardinal Intellectual Property; Cargill, Inc.; Caterpillar; Charter Communications; CheckFree; Cisco Systems Citigroup; The Clearing House Association; Coalition for Patent and Trademark Information Distribution; Collexis Holdings, Inc.; Computer & Communications Ind. Assoc.; Computing Technology Industry Association; Consumer Bankers Association; Corning; Council on Government Relations; Courion; Credit Union National Association; Cummins, Inc.; Dell; The Dow Chemical Company.

DuPont; Eastman Chemical Company; Eastman Kodak; eBay Inc.; Electronics for Imaging; Eli Lilly and Company; EMC Corporation; EnerNOC; ExxonMobil; Facebook; Fidelity Investments; Financial Planning Association; FotoTime; General Electric; General Mills; Genzyme; GlaxoSmithKline; Google Inc.; Hampton Roads Technology Council; Henkel Corporation.

Hoffman-LaRoche; HSBC North America; Huntington National Bank; IAC; IBM; Illinois Technology Association; Illinois Tool Works; Independent Community Bankers of America; Independent Inventors; Infineon Technologies; Information Technology Council; Integrated DNA Technologies; Intel; Intellectual Property Owners Association; International Trademark Association; International Intellectual Property Institute; Intuit, Inc.; Iron Mountain; Johnson & Johnson; Kalido.

Lexmark International, Inc. Logitech, Inc.; Massachusetts Technology Leadership Council; Medtronic; Merck & Co, Inc.; Micron Technology, Inc.; Microsoft; Millennium

[[Page S5425]]

Pharmaceuticals; Milliken and Company; Molecular; Monster.com; Motorola; Mortgage Bankers Association; National Association of Federal Credit Unions; National Association of Manufacturers; National Assoc. of Mutual Insurance Cos.; National Association of Realtors; National Semiconductor Corporation; National Retail Federation; National Treasury Employees Union; Native American IP Enterprise Council; Net Coalition; Netflix, Inc.; Network Appliance, Inc.; Newegg Inc.; News Corporation; Northrop Grumman; Novartis; Numenta, Inc.; Nvidia

pillsbury

OpenAir, Inc.; Oracle; Overstock.com; Partnership for New York City; Patent Cafe.com, Inc.; PepsiCo, Inc.; Pfizer; PhRMA; Procter & Gamble Company; Property Casualty Insurers Association of America; Red Hat.

Reed Elsevier Inc.; RIM; Salesforce.com, Inc.; SanDisk Corporation; San Jose Silicon Valley Chamber of Commerce; SAP America, Inc.; SAS Institute; Seagate Technology, LLC; Sebit, LLC; Securities Industry & Financial Markets Association; SkillSoft; Small Business and Entrepreneurship Council; Software Information and Industry Association; Sun Microsystems, Inc.; Symantec Corporation; Tax Justice Network USA; TECHQuest Pennsylvania; Teradata Corporation; Texas Instruments; Texas Society of CPAs.

The Financial Services Roundtable; Toyota Trimble Navigation Limited; The United Inventors Association of America; United Steelworkers; United Technologies; U.S. Chamber of Commerce; USG Corporation; VeriSign Inc.; Verizon; Visa Inc.; Visi-Trak Worldwide, LLC; VMware, Inc.; Vuze, Inc.; Western Digital Technologies, Inc.; Weyerhaeuser; Yahoo! Inc.; Ze-gen; Zimmer; ZSL, Inc.

Mr. LEAHY. I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER (Mrs. McCaskill). The clerk will call the roll.

The assistant bill clerk proceeded to call the roll.

Mr. KERRY. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. KERRY. Madam President, regarding the parliamentary situation, how much time remains for Senator Cantwell?

The PRESIDING OFFICER. Thirteen minutes remains.

Mr. KERRY. It is my understanding that Senator Cantwell wants to preserve a component of that, so I would, on behalf of Senator Cantwell, yield myself 5 minutes at this time.

The PRESIDING OFFICER. Without objection, it is so ordered.

Amendment No. 600

Mr. KERRY. Madam President, I appreciate the comments of our friend from Alabama, Senator Sessions, regarding his amendment to strike section 37 of the patent reform bill, but I disagree with him on substantive terms, and I ask our colleagues to look carefully at the substance of this amendment and the importance of this amendment with respect to precedent not for one company from Massachusetts or for one entity but for companies all over the country and for the application of patent law as it ought to be applied.