**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

VERIFY SMART CORP.,

*Plaintiff,*

v.

BANK OF AMERICA, N.A., BANK OF
AMERICA CORP., WELLS FARGO BANK,
N.A., WELLS FARGO & CO., THE CLEARING
HOUSE PAYMENTS COMPANY LLC, THE
CLEARING HOUSE ASSOCIATION, and
ASKELADDEN LLC,

*Defendants.*

Civil Action No. 17-4248 (JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This case alleges a variety of wrongdoings arising from a challenge to a patent. Through an inter partes review, Defendant Askeladden LLC challenged Plaintiff Verify Smart Corp.'s patent, U.S. Patent No. 8,285,648 (the "Patent"). Besides Askeladden, Plaintiff also sues Bank of America, N.A.; Bank of America Corp. (collectively "BoA"); Wells Fargo Bank, N.A.; Wells Fargo & Co. (collectively "WF"); The Clearing House Payments Company LLC ("CHP"); and The Clearing House Association ("CHA") (all collectively "Defendants"). The gist of Plaintiff's claims is an overarching, nefarious scheme by Defendants to challenge patents in retribution for Plaintiff having previously sued certain Defendant banks as to the Patent. To this end, Plaintiff argues that both BoA and WF breached settlement agreements with Plaintiff by causing Askeladden to challenge the Patent. Plaintiff alleges breach of contract; tortious interference; fraud; deceptive business practices; violations of the Racketeer Influenced and Corrupt

Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*; and violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. D.E. 58.

Currently pending before this Court are Defendants' motions to dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(6) for failure to state a claim. D.E. 68, 70. The Court reviewed all submissions[1] and considered this motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the following reasons, Defendants' motions to dismiss are granted.

## I.  BACKGROUND[2] & PROCEDURAL HISTORY

Plaintiff is a Nevada corporation with headquarters in New Jersey, that engages in wireless security solutions. D.E. 58 ("Am Compl.") ¶¶ 1, 121, 131. Bank of America, N.A., and Bank of America Corp. are related national banking organizations. *Id.* ¶¶ 2-3. Bank of America, N.A. was formed under the laws of the United States and has its principal place of business in Charlotte, North Carolina. *Id.* ¶ 2. Bank of America Corp. is a Delaware corporation. *Id.* ¶ 3. Wells Fargo

---

[1] Defendants BoA, CHP, CHA, and Askelladen's brief in support of their motion to dismiss is referred to as "BoA Br." D.E. 70-1. Defendant WF's brief in support of its motion to dismiss is referred to as "WF Br." D.E. 69. Plaintiff's opposition is referred to as "Pl. Opp'n." D.E. 72. Defendants' reply is referred to as "Def. Reply." D.E. 73. The parties also submitted a litany of letters of supplemental authority, primarily regarding *Askelladen LLC v. Verify Smart Corp.*, No. 17-IPR-726 (July 23, 2018), D.E. 71-1, Ex. A. D.E. 74, 75, 76, 77, 79, 80, 82, 83 (collectively "Supp. Auth. Letters").

[2] The facts are taken from Plaintiff's Amended Complaint. When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Additionally, a district court may consider "exhibits attached to the complaint and matters of public record" as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Bank, N.A., and Wells Fargo & Co. are also related national banking organizations. *Id.* ¶¶ 4-5. Wells Fargo Bank, N.A., was formed under the laws of the United States and has a principal place of business in San Francisco, California. *Id.* ¶ 4. Wells Fargo & Co. is a Delaware corporation. *Id.* ¶ 5.

Both CHP and CHA are wholly owned by 25 of the world's largest commercial banks (the "owner banks"), including BoA and WF. *Id.* ¶ 7, 9. CHP and CHA share a common board of directors and senior officers. *Id.* ¶ 11. CHA provides "thought leadership" to the owner banks and, in part, engineered the "Patent Quality Initiative" that produced Askeladden. *Id.* ¶¶ 42, 48. CHP operates payment systems within the banking industry and works with commercial banks to create new capabilities for the next generation of payments. *Id.* ¶ 98. CHP is a Delaware corporation that has its principal place of business in New York. *Id.* ¶¶ 6, 361. CHA is a sister company of CHP and is a Delaware not-for-profit limited liability company. *Id.* ¶ 8, 10, 106. Askeladden is a wholly-owned subsidiary of CHP and is "an education, information and advocacy organization, which, thought its Patent Quality Initiative, is dedicated to improving the understanding, use and reliability of patents in financial services and elsewhere." *Id.* ¶ 15, 111. Askeladden is a Delaware limited liability company with its principal place of business in New York. *Id.* ¶¶ 14, 361.

Plaintiff owns the Patent, which encompasses a form of multi-factor authentication for verifying a user's identity in electronic transactions. *Id.* ¶ 121, 131. The Patent has been the subject of prior litigation between the Plaintiff and certain Defendants. *See id.* ¶¶ 121-130. Plaintiff previously sued BoA, and the case resulted in a settlement agreement on November 2, 2015 (the "BoA Settlement"). As part of the settlement, BoA agreed "not to challenge or knowingly assist or cause any third party to challenge the validity of [the Patent] before any court,

agency, or other tribunal." *Id.* ¶ 121-25. Plaintiff also previously sued WF, and that matter also resulted in a settlement agreement on November 22, 2016 (the "WF Settlement"). Pursuant to the settlement, Plaintiff granted WF a license to use the Patent and WF released all claims it had against Plaintiff regarding the Patent. *Id.* ¶¶ 37, 126-130.

On January 18, 2017, Askeladden filed a petition (the "Petition") for an inter partes review ("IPR") in the Patent Trial and Appeal Board of the of the United States Patent and Trademark Office ("PTO") seeking to invalidate Plaintiff's Patent (the "IPR Proceeding"). *Id.* ¶ 136. Plaintiff alleges that the Petition violates the BoA Settlement and WF Settlement. *Id.* ¶ 57. Plaintiff also alleges that Askeladden has no business revenues and is essentially a non-practicing entity, also referred to as a "patent troll," that is funded by CHP for the purpose of harassing and intimidating patent owners and to cause them to incur significant legal fees. *Id.* ¶ 52, 108, 114. Plaintiff adds that Askeladden accomplishes this through challenging patents, by way of IPRs, that pose a threat to the financial serves industry. *Id.* ¶ 112. Plaintiff continues that the owner banks do not wish to be considered "patent trolls" but nevertheless wish to benefit from the work of a "patent troll," so they created Askeladden to perform this task for them. *Id.* ¶ 53. Plaintiff claims that Askeladden actually functions as part of a larger scheme to exert retribution on patent owners that litigated their patents against the owner banks. *Id.* ¶ 56. Essentially, Plaintiff argues that CHP and CHA, acting as agents of BoA and WF, directed Askeladden to challenge Plaintiff's Patent, which violates the BoA Settlement and WF Settlement. *Id.* ¶ 57.

Plaintiff filed its Complaint against Defendants on June 12, 2017. D.E. 1. Following a consent order, D.E. 50., Plaintiff filed an Amended Complaint on March 20, 2018, which it then corrected on March 22, 2019. D.E. 54, 58. Plaintiff asserts six counts: (I) breach of contract against BoA; (II) breach of contract against WF; (III) tortious interference with prospective

economic benefit against all Defendants; (IV) common law fraud against all Defendants; (V) deceptive business practices against all Defendants; (VI) a substantive Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), claim against all Defendants; (VII) a RICO conspiracy, 18 U.S.C. § 1962(d), claim against all Defendants; and (VIII) Section 1 and Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, claims against all Defendants. Am. Compl. ¶¶ 160-537.

Defendants moved to dismiss the Amended Complaint on May 14, 2018. D.E. 68, 70. Plaintiff opposed this motion, D.E. 72, and Defendants replied, D.E. 73. The parties thereafter submitted several letters of supplemental authority, D.E. 74, 75, 76, 77, 79, 80, 82, 83, primarily regarding the IPR Proceeding where Administrative Patent Judge Haapala ultimately invalidated Plaintiff's Patent, D.E. 74-1 at 51.

## II. STANDARD OF REVIEW

Rule 12(b)(1)

In deciding a Rule 12(b)(1) motion for lack of subject-matter jurisdiction, a court must first determine whether the party presents a facial or factual attack because the distinction determines how the pleading is reviewed.[3] A facial attack "contests the sufficiency of the complaint because of a defect on its face," whereas a factual attack "asserts that the factual underpinnings of the basis for jurisdiction fails to comport with the jurisdictional prerequisites." *Elbeco Inc. v. Nat'l Ret. Fund*, 128 F. Supp. 3d 849, 854 (E.D. Pa. 2015) (citing *Moore v. Angie's List, Inc.*, 118 F. Supp. 3d 802, 806 (E.D. Pa. 2015)). When a party moves to dismiss prior to answering the complaint,

---

[3] This Court also has an independent obligation to establish that it has subject-matter jurisdiction. *Morel v. INS*, 144 F.3d 248, 251 (3d Cir. 1998).

5

as is the case here, the motion is generally considered a facial attack. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

For a facial attack, "the Court must consider the allegations of the complaint as true," much like a Rule 12(b)(6) motion to dismiss. *Bd. of Trs. of Trucking Emps of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, No. 09-6447, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006)). The burden is on the Plaintiff to prove the Court has jurisdiction. *Id.* (citing *Petruska*, 462 F.3d at 302).

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). One key aspect of this case-or-controversy requirement is standing. *See id.* "The standing inquiry focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa.*, 757 F.3d at 360. To establish standing, a plaintiff must satisfy a three-part test, showing: "(1) an 'injury in fact,' *i.e.,* an actual or imminently threatened injury that is 'concrete and particularized' to the plaintiff; (2) causation, *i.e.,* traceability of the injury to the actions of the defendant; and (3) redressability of the injury by a favorable decision by the Court." *Nat'l Collegiate Athletic Ass'n v. Gov. of N.J.*, 730 F.3d 208, 218 (3d. Cir. 2013).

Rule12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

Rule 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294,

307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### III. ANALYSIS

Choice of Law

The Court must determine which state law to apply to the non-federal claims. Plaintiff asserts that the Court has jurisdiction over the state law claims both through supplemental and diversity jurisdiction.[4] Am. Compl. ¶ 27. A court sitting in diversity must resolve choice of law questions by applying the choice of law analysis adopted by the forum state. *Pollock v. Barrickman*, 610 F. Supp. 878, 879 (D.N.J. 1985) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). Similarly, "[i]n a case based on federal question jurisdiction where a court is exercising supplemental jurisdiction over state law claims, the federal court applies the choice of law rules of the forum state." *Carlton v. Choicepoint, Inc.*, No. 08-5779, 2009 WL 4127546, at

---

[4] The Court has not been provided the citizenship of the members of Defendant Askeladden LLC; therefore, the Court is unable to determine whether complete diversity exists at this juncture. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) ("the citizenship of an LLC is determined by the citizenship of its members [and] [f]or complete diversity to exist, all of the LLC's members must be diverse from all parties on the opposing side." (internal quotations omitted)).

*5 (D.N.J. Nov. 23, 2009) (citing *MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co.*, 197 F.3d 1276, 1282 (9th Cir.1999)). Therefore, the Court applies New Jersey choice of law rules.

"Choice of law questions under New Jersey law require a court to apply the two-step 'governmental-interests analysis.'" *Id.* (quoting *Rowe v. Hoffman–La Roche, Inc.*, 189 N.J. 615 (N.J. 2007)). "The first step in the analysis is to determine whether a conflict exists between the laws of the interested states." *Rowe*, 189 N.J. at 621 (quoting *Veazey v. Doremus*, 103 N.J. 244 (1986)). "Any such conflict is to be determined on an issue-by-issue basis." *Id.* "If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." *Id.* Conversely, "[i]f there is an actual conflict, the second step seeks to determine the interest that each state has in resolving the specific issue in dispute." *Id.* at 621-22 (internal quotations omitted). The court must "identify the governmental policies underlying the law of each state and determine whether those policies are affected by each state's contacts to the litigation and to the parties." *Id.* (internal citations omitted). The court then applies "the law of the state with the greatest interest in governing the particular issue." *Id.* (internal quotations omitted).

The parties cite to both New Jersey and New York law for the state law claims. The Court will conduct an appropriate choice of law analysis prior to analyzing each state law claim.

Breach of Contract (Counts I & II)

Plaintiff brings Counts I and II for breach of contract. Am. Compl. ¶¶ 160-94. "No conflict of law exists" between New Jersey and New York breach of contract law. *U.S. Small Bus. Admin. v. Azarel Inc.*, No. 14-888, 2014 WL 4211269, at *4 (D.N.J. Aug. 25, 2014). Therefore, the Court applies New Jersey substantive law to this claim.

9

In Count I, Plaintiff alleges that "[b]y virtue of the IPR filing challenging the validity of the [Patent] by its agent Askeladden, [BoA] has committed a wrongful act which contravenes and thus breaches the aforementioned contractual agreement between [BoA] and [Plaintiff]." Am. Compl. ¶ 177. Likewise, in Count II, Plaintiff alleges that "[b]y virtue of the IPR filing challenging the validity of the [Patent] by its agent Askeladden, [WF] has committed a wrongful act which contravenes and thus breaches the aforementioned contractual agreement between [WF] and [Plaintiff]." *Id.* ¶ 193.

Under New Jersey law, a breach of contract claim has three elements: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 199 N.J. Super. 212 (App. Div. 1985)). Here, Askeladden was not a party to the agreements that Plaintiff alleges were breached. Therefore, the threshold issue is whether BoA and WF can be held liable for the actions of Askeladden by virtue of their relationship. *See* BoA Br. at 2; WF Br. at 33.

Plaintiff proposes three legal theories to justify liability: (1) agency, (2) director liability, and (3) associational standing. Pl. Opp'n at 5-8. First, Plaintiff argues that under principals of agency – specifically, actual authority and apparent authority – BoA and WF are liable for the actions of Askeladden, their agent. *Id.* at 5-6. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 337 (1993) (citing Restatement (Second) of Agency § 1 (1958)). This consent to act on the principal's behalf, or grant of "authority," may be "actual" or "apparent." *Id.*

10

"Actual authority (express or implied) may 'be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Jennings v. Reed*, 381 N.J. Super. 217, 231 (App. Div. 2005) (citing Restatement (Second) of Agency § 26). Alternatively, apparent authority "is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* (citing Restatement (Second) of Agency § 27). In other words, apparent authority "imposes liability, not as the result of an actual contractual relationship, but because of actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist." *Id.*

Here, Plaintiff fails to plausibly plead both actual and apparent authority. First, Plaintiff does not plausibly allege facts demonstrating that BoA or WF (or an agent thereof) expressly or implicitly directed Askeladden to challenge Plaintiff's Patent in the IPR Proceeding. Plaintiff alleges only that CHP "is owned by 25 of the world's largest commercial banks, including [BoA] and [WF]," *Am. Compl.* ¶ 7; that "Askeladden is a wholly-owned subsidiary of [CHP]," *id.* ¶ 15; and that CHP "conceived . . . [Askeladden] as a vehicle that could file IPRs without risk of involving [CHP] or its owner banks as parties to the proceedings," *id.* ¶ 49. These allegations do not plausibly reflect actual authority. Similarly, Plaintiff's conclusory allegations that "[CHP] is an agent of [BoA and WF], and acts on [their] behalf," *id.* ¶¶ 166, 185 and that "Askeladden is an agent and proxy for [CHP], and acts under its direction and control," *id.* ¶¶ 167, 186 are insufficient. Plaintiff is missing the crucial factual allegation that an appropriate employee or representative from BoA or WF directed Askeladden to challenge Plaintiff's Patent. Of course,

Plaintiff would also have to sufficiently allege that any BoA or WF representative had the ability to direct Askeladden to act.

Second, Plaintiff does not plausibly allege any actions on behalf of BoA or WF – the alleged *principals* – that created the appearance of authority, other than being one of the 25 major banks with ownership in Askeladden's parent company CHP. Instead, Plaintiff relies on the statements of Askeladden, the *agent*, stating that "Askeladden admits that it acts on behalf of its principals [CHP] and its owner banks, including BoA and WF, to challenge patents that threaten its owner banks in the financial services market." Pl. Opp'n at 3; *see also id.* at 5 ("[CHP] and Askeladden hold *themselves* out to the public as being agents and representatives of the owner banks, including BoA and WF." (emphasis added)). More importantly, even if Askeladden's comments could be attributed to BoA and WF, the remaining allegations do no plausibly support an apparent authority finding. In general, apparent authority arises when a plaintiff relies on the putative agent with the apparent authority. *See Sears Mortg. Corp.*, 134 N.J. at 338 ("Of particular importance is whether [the injured party] has relied on the agent's apparent authority to act for a principal."). Plaintiff does not allege that it relied on an apparent authority when Askeladden filed the IPR. Nor could Plaintiff. The transaction at issue is the IPR Proceeding – an action that does not involve Plaintiff's assent. Therefore, the requisite reliance is not present.

Plaintiff next argues director liability. Pl. Opp'n at 6-7. Specifically, Plaintiff alleges that "officers of BoA and WF are directors of [CHP]," and Askeladden is a "wholly owned subsidiary" of CHP, therefore "[t]here is no doubt that BoA and WF . . . established, supervised, and controlled a vehicle for causing patents of interest to [their] business[es] to be challenged" by Askeladden. Pl. Opp'n at 6-7. In other words, Plaintiff argues that directors (BoA and WF) of the parent company (CHP) should be held liable for the acts of its subsidiary (Askeladden). This argument

requires two separate piercings of the corporate veil: (1) piercing the corporate veil of the subsidiary (Askeladden) to hold the parent (CHP) liable; and (2) piercing the corporate veil of the parent (CHP) to hold the directors (BoA and WF) liable.

First, in the parent-subsidiary context,

> the corporate veil may be pierced only where (1) the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent and (2) the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.

*Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988)[5] (quoting *State Dep't of Environ. Protection v. Ventron Corp.*, 94 N.J. 473, 501 (1983)) (internal quotations omitted). The first element requires "more than mere majority or complete stock control," but instead "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Id.* at 150 (internal quotations omitted). Factors to consider in this analysis are as follows:

> [G]ross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Id.* (quoting *American Bell Inc. v. Federation of Telephone Workers*, 736 F.2d 879, 886 (3d Cir. 1984)) (internal quotations omitted).

---

[5] To the extent that federal cases are cited, the cases are reviewing New Jersey law where applicable.

Second, in the director-parent context, "personal liability will only be imposed if it is demonstrated that the officer or director disregarded the corporate form and utilized the corporation as a vehicle for committing equitable or legal fraud" or "defeat[ing] the ends of justice, . . . or otherwise evad[ing] the law." *Rowen Petroleum Properties, LLC v. Hollywood Tanning Sys., Inc.*, 899 F. Supp. 2d 303, 308 (D.N.J. 2012) (quoting *Marascio v. Campanella*, 298 N.J. Super. 491, 502 (App. Div. 1997) and *Ventron*, 94 N.J. 473) (internal quotations and alterations omitted). This is often referred to as the "alter ego" theory of liability, where a director "abus[es] the corporate form in order to advance his personal interests." *Id.* (quoting *Sean Wood, LLC v. Hegarty Grp., Inc.*, 422 N.J. Super. 500, 517 (App. Div. 2011)). The same factors apply as in the parent-subsidiary context. *Id.* at 309.

Here, the Court forgoes the first piercing of the corporate veil analysis in the parent-subsidiary (CHP-Askeladden) context because director-parent (BoA/WF-CHP) issue is dispositive. Plaintiff has not plausibly pled facts warranting a piercing of the corporate veil. Applying the aforementioned factors, Plaintiff admits that CHP is "likely adequately capitalized," that CHP "appear[s] to adhere to corporate formalities," that "BoA and WF do not appear to have voting control over [CHP]." Pl. Opp'n at 8. Plaintiff then argues that these factors should be overlooked because

> the specific and affirmative actions of BoA and WF, the relationship of the parties, including their agency, BoA's agreement with [Plaintiff] not to challenge the '648 Patent, WF's settlement with [Plaintiff], and the fact that Askeladden is funded solely by [CHP], necessitate that the corporate veils of [CHP] and Askeladden be disregarded and pierced to prevent an injustice from being done to [Plaintiff].

*Id.* These allegations are insufficient. Indeed, in light of Plaintiff's frank admissions, Plaintiff's allegations are further undercut. Plaintiff has not plausibly pled directory liability as to BoA and WF for Askeladden's action in challenging the Patent.

Finally, Plaintiff argues associational standing. Pl. Opp'n at 7-8. The doctrine of associational standing allows an association to bring suit when its members are suffering harm, even if the association is not suffering harm directly. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343(1977); *Crescent Park Tenants Ass'n v. Realty Equities Corp. of New York*, 58 N.J. 98, 109 (1971). Defendants argue that associational standing is inapplicable to Plaintiff's claims. Def. Reply at 4. The Court agrees. Plaintiff alleges that it is suffering harm directly; it does not allege to be suing on behalf of its members. This argument is inapposite in establishing the requisite relationship between BoA, WF, and Askeladden.

The Court finds that Plaintiff has failed to plausibly allege the requisite relationship between both BoA and Askeladden, and WF and Askeladden, to impose liability on BoA or WF for Askeladden's actions in challenging Plaintiff's Patent. As a result, Plaintiff has not plausibly pled any breach of the settlement agreements. The Court dismisses Plaintiff's breach of contract claims against BoA (Count I) and WF (Count II).[6]

---

[6] Defendants argue that the Court should dismiss the remaining counts (Counts III-VIII) pursuant to Rule 12(b)(1) for lack of jurisdiction. BoA Br. at 3. Defendants assert that Plaintiff lacks standing to sue on these counts because Plaintiff had not yet suffered an injury-in-fact, as Plaintiff's injury depended on the PTO's decision regarding the validity of the Patent. *Id.* Both parties agree that the PTO has since invalidated the Patent. D.E. 74; D.E. 75; *see also* D.E. 74-1 at 51 (the PTO decision). Given that the Court is allowing Plaintiff to amend its pleading, and given that the Patent has now been invalidated, the standing argument may now be moot if and when the amended pleading is filed.

Fraud (Count IV)

Plaintiff alleges that Askeladden committed fraud in its IPR petition challenging Plaintiff's Patent by only identifying itself as the "real party in interest" ("RPI") under 37 C.F.R. § 42.8(b)(1). Am. Compl. ¶¶ 216-29. There is "no actual conflict" between a New Jersey and New York fraudulent misrepresentation claim. *Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 225 (S.D.N.Y. 2017). Therefore, New Jersey law applies. In New Jersey, a fraudulent misrepresentation claim requires: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Hoffman v. Liquid Health Inc.*, No. 14-01838, 2014 WL 2999280, at *10 (D.N.J. July 2, 2014) (quoting *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005)).

Defendant argues that Plaintiff's common law fraud claim fails the fourth element, because *Plaintiff* did not rely on Askeladden's statements as to the RPI (even though the PTO, a third-party, may have relied on them). BoA Br. at 20-21. For the fourth element, both New Jersey and New York require a *plaintiff* to have relied on a defendant's fraudulent statements in order to recover for fraud. *See Kaufman v. i-Stat Corp.*, 165 N.J. 94, 111 (2000) (explaining that the plaintiff "failed to establish that *she* relied, however indirectly, on the misstatements of [defendant, and] [t]herefore, under our traditional standard for proof of reliance, even indirect reliance, plaintiff fails to show reliance." (emphasis added)); *see also Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 829 (2016) ("We, therefore, decline to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff.").

Additionally, for satisfaction of the third element, the Court recognizes that both New Jersey and New York require that *plaintiff* be the intended recipient of the defendant's fraudulent

statements to induce reliance. *See Port Liberte Homeowners Ass'n, Inc. v. Sordoni Const. Co.,* 393 N.J. Super. 492, 508 (App. Div. 2007) ("Where false representations are made to one person with the intent that they be communicated to others for the purpose of inducing the others to rely upon them, they may form the basis of an action for fraud by those others . . . [h]owever, a plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations."); *see also New York Tile Wholesale Corp. v. Thomas Fatato Realty Corp*, 61 N.Y.S.3d 136, 140 (App. Div. 2017) (holding that the plaintiff "could not state a cause of action sounding in fraud based on its allegation that [a third-party] relied upon the [defendant]'s misrepresentations, as . . . there is no allegation that the [third-party] acted as a conduit to relay the alleged misrepresentations to [plaintiff].").  Thus, these two elements require (1) that the *plaintiff* rely on defendant's misrepresentations, and (2) that the defendant intended the *plaintiff* to rely on its misrepresentations.

Here, both elements are not pled with the requisite particularity.[7]  Plaintiff did not plead with particularity its own reliance on Askeladden's statement.  Plaintiff's allegation that "Verify reasonably relied on Askeladden's misrepresentation of the real parties in interest in the IPR, at least until it made a determination that is identification seemed improper," Am. Compl. ¶ 227, is conclusory.  Plaintiff does not describe with any particularity how it, specifically, relied on the statement to its detriment.  For example, Plaintiff does not allege that it entered into a transaction with Askeladden in reliance on this statement that resulted in harm or that it waived legal rights in reliance on this statement that resulted in harm.[8]

---

[7] As noted above, the Court applies the heightened pleading standard of Rule 9(b) to Plaintiff's fraud claim.

[8] To the contrary, Plaintiff appears not to have relied on this statement, as it filed this present lawsuit soon after the statement was made alleging that the RPI disclosure was not accurate.

Additionally, Plaintiff does not allege that Askeladden intended to induce *Plaintiff's* reliance. Instead, Plaintiff alleges only that "[u]pon information and belief, Defendants intended *that persons viewing the petition* would rely on the misrepresentation." *Id.* ¶ 226. The "persons viewing the petition" were within PTO; Askeladden petitioned to the PTO for IPR and the PTO had the power to grant the IPR and invalidate the Patent. *Id.* ¶ 218. Therefore, Plaintiff's pleadings seem to admit that Askeladden was attempting to induce the *PTO* to rely on its statement, not Plaintiff. For these reasons, the Court dismisses Plaintiff's common law fraud claim (Count IV).[9]

<u>Tortious Interference (Count III)</u>

Plaintiff next alleges tortious interference with prospective economic benefit against all Defendants. Am. Compl. ¶¶ 195-215. New Jersey and New York tortious interference law "are in accord." *Marks v. Struble*, 347 F. Supp. 2d 136, 142 (D.N.J. 2004). Therefore, the Court applies New Jersey law. Under New Jersey law, the five elements of a claim of tortious interference with a prospective economic benefit has five elements:

> (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir. 1992) (quoting *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739 (N.J. 1989) and Restatement (2d) of Torts § 766B). Plaintiff's tortious interference claim is premised on BoA and WF's agency relationship

---

[9] Because the Court dismisses Plaintiff's common law fraud claim on these grounds, the Court does not analyze BoA's argument as to an applicable litigation privileges bar.

with Askeladden. Pl. Opp'n at 10.[10]  The Court already found this relationship to be implausibly pled. Therefore, the Court dismisses Plaintiff's tortious interference claim (Count III).[11]

New York State Deceptive Business Practices (Count V)

Plaintiff brings a claim for "deceptive business practices" under New York State General Business Law § 349, for "deceptively failing to identify the real parties in interest in the petition for IPR and wrongfully opposing efforts to name parties subsequently so added." Am. Compl. ¶¶ 230-33. Section 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a) (2014).  Section 349(h) provides for a private right of action for violations of the statute. *See* § 349(h).

Defendants first argue that Section 349 does not redress the alleged deception because it was made before the PTO – located in Alexandria, Virginia – and Section 349 requires the alleged deception to have been in New York. BoA Br. at 24.  Plaintiff responds that the alleged deception

---

[10] Specifically, Plaintiff argues:

> If the Court accepts Verify's contention that Askeladden is an agent of TCH, and that TCH is an agent of both BoA and WF, then: as agents of BoA, TCH and Askeladden tortiously interfered with the prospective economic advantage or benefit Verify expected to receive from its settlement with WF in not having its patent challenged by WF; and as agents of WF, TCH and Askeladden tortiously interfered with the prospective economic advantage or benefit Verify expected to receive from its settlement with BoA in not having its patent challenged by BoA.

[11] Because the Court dismisses the claim on these grounds, it does not address Defendants' *Noerr-Pennington* doctrine argument. BoA Br. at 17-18. The Court does note, however, that Plaintiff's argument that the *Noerr-Pennington* doctrine is inapplicable because it does not protect fraud, Pl. Opp'n at 10, would seem inapposite with the Court having found that Plaintiff did not plead fraud with particularity.

did occur in New York, as (1) Askeladden is located in New York, therefore its business decisions (such as filing an IPR) are made there; and (2) Askeladden used a New York-based law firm to electronically file the IPR from New York. Pl. Opp'n at 12. Defendants also argue that the alleged conduct falls outside of the scope of Section 349 because it did not target consumers, as Section 349 requires. BoA Br. at 24-25. Plaintiff responds that the alleged deception was "directed to a government agency for public review, and thus was directed to the public." Pl. Opp'n at 12-13. Plaintiff does not cite to any case law in support of this position.

The Court of Appeals of New York defined the "the territorial reach" of Section 349 by stating that "the transaction in which the consumer is deceived must occur in New York." *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 324 (2002). The majority concluded that the "mere invention of a scheme or marketing strategy" in New York is insufficient. *Id.* at 325. Further, the territorial reach "does not turn on the residency of the parties." *Id.* Instead, the "actual misrepresentation or omission to a consumer" must occur in New York. *Id.* The Court declines to opine on the issue of whether electronically filing a document in New York fits within this territorial reach generally, because it finds that the alleged action was not meant to deceive a consumer. At best, by allegedly failing to state all RPIs in its IPR Petition, Askeladden meant to deceive the PTO. Plaintiff has cited no case law in support of its position that Section 349 was meant to protect against such alleged deception. The Court dismisses Plaintiff's Section 349 claim (Count V).

RICO (Counts VI & VII)

Plaintiff next brings two claims under RICO, alleging (1) a substantive violation of Section 1962(c); and (2) a conspiracy under Section 1962(d). Am. Compl. ¶¶ 234-402. "The civil RICO statute allows '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court.'" *Anderson*

*v. Ayling*, 396 F.3d 265, 268-69 (3d Cir. 2005) (quoting 18 U.S.C. § 1964(c)). "The elements predominant in a [Section 1962] subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997).

Defendants argue that Plaintiff failed to sufficiently plead a pattern of racketeering activity. BoA Br. at 27-29. Plaintiff responds that the predicate acts constituting a pattern of racketeering activity are "multiple acts of wire fraud in which Askeladden files IPRs in the [PTO] and amicus briefs in federal court such as the U.S. Courts of Appeals for [t]he Federal Circuit without identifying either [CHP] or any of its owner banks as a real party in interest." Am. Compl. ¶ 235. Defendants argue that "[t]hese acts do not establish wire fraud as a matter of law," as the filing of complaints and other litigation activity cannot be the basis of a wire fraud claim. BoA Br. at 27 (citing *Winters v. Jones*, No. 16-9020, 2018 WL 326518, at *9 (D.N.J. Jan. 8, 2018)). Plaintiff responds that "the issue here is not the filing of the IPR, but rather the unprivileged materially false certification (which is distinct from the merits of the IPR)." Pl. Opp'n at 13. Plaintiff cites no law in support of the position that a certification submitted in support of an IPR is not litigation activity and therefore subject to wire fraud.

"Courts have expressly found that, as a matter of law, litigation activities cannot be the basis of a wire fraud claim under the RICO statute." *Winters*, 2018 WL 326518, at *9. This is because litigation-related activity typically "constitute[s] legitimate conduct of attorneys acting on behalf of a client," and in instances where such conduct is inappropriate, alternate remedies exist, such as malicious prosecution, abuse of process, or Rule 11 sanctions. *Id.* (quoting *D'Orange v. Feely*, 877 F. Supp. 152, 156 (S.D.N.Y. 1995)). Here, Plaintiff has failed to provide any case law in support of its argument that a certification submitted in support of an IPR petition falls outside

this traditional rule. The Court dismisses Plaintiff's substantive RICO claim (Count VI) for failure to adequately plead a pattern of racketeering activity.[12]

Additionally, Plaintiff premises its RICO conspiracy claim on the alleged substantive RICO violations in Count VI. *See* Am. Compl. ¶ 399 (alleging a RICO conspiracy "by virtue of the Defendants' agreement that conspirators would conduct the affairs of the Enterprise through the commission of multiple acts of wire fraud"). Since the Court is dismissing Plaintiff's substantive RICO claim, Plaintiff's RICO conspiracy claim must also fail. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."). The Court dismisses Plaintiff's RICO conspiracy claim (Count VII).

## Sherman Act (Count VIII)

Lastly, Plaintiff alleges violations of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Am. Compl. ¶¶ 403-537.[13] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A Section 1 claim consists of two elements: (1) "the plaintiff must show that the defendant was a party to a contract, combination . . . or conspiracy," and (2) "the plaintiff must show that the

---

[12] Because the Court dismisses the claim on these grounds, the Court does not analyze Defendants' additional arguments as to Count VI.

[13] In both Plaintiff's Amended Complaint and opposition papers, Plaintiff seems to intermingle its Section 1 analysis with its Section 2 analysis, making it difficult at times for the Court to follow Plaintiff's allegations. The Court notes that while there are overlapping requirements within these claims, the two claims are distinct.

conspiracy . . . imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (internal quotations omitted).

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Monopolization is demonstrated through "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062 (3d Cir. 1978) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). For attempted monopolization, a plaintiff must show that a defendant "(1) had specific intent to monopolize the relevant market, (2) engaged in anti-competitive or exclusionary conduct, and (3) possessed sufficient market power to come dangerously close to success." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992); *see also Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir.), *cert. denied sub nom. Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211 (2018).

Although Sections 1 and 2 have different elements, "Sections 1 and 2 of the Sherman Act . . . each include an anticompetitive conduct element, although each statute articulates that element in a slightly different way." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012). Both sections also require an antitrust injury. *Id.* Therefore, "[i]n order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that the plaintiff suffered antitrust injury as a result." *Id.* "Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for [a court] is whether [the defendant] engaged in anticompetitive conduct." *Id.*

"Anticompetitive conduct may take a variety of forms, but it is generally . . . competition on some basis other than the merits." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003)). Importantly, "the Supreme Court has squarely rejected illegal conduct [alone] as a basis for antitrust injury." *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 345 (3d Cir*.), cert. denied sub nom. Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 139 S. Ct. 211 (2018). Only "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom Corp.*, 501 F.3d at 308 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985)). "Conduct that merely harms competitors . . . while not harming the competitive process itself, is not anticompetitive." *Id.* (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509.

Plaintiff's core allegation of anticompetitive conduct appears to be that "[t]he IPR filed by Askeladden, under the [Patent Challenge Guidelines] established by [CHP], and under the 'thought leadership' of [CHP], including [CHA], failed to properly disclose the real parties in interest to [the IPR Proceeding], as required by 35 U.S.C. § 213," and "[i]t is anticompetitive for a consortium or cartel to take actions, or collude to have others take actions, which themselves violate a law or a regulation in challenging the validity of a patent, regardless of the merits of the challenge." Am. Compl. ¶¶461-62. Plaintiff further contends that this allegedly anticompetitive action "seeks to fix the price of a license to [Plaintiff's] Patent at zero," and that "zero price valuation . . . as a result of improper action is anticompetitive, since it imposes a competitive disadvantage to those companies and institutions that have acquired a license for value." *Id.* ¶¶ 527-28.

Defendants argue that an IPR Petition is not anticompetitive, but procompetitive, as "[b]y seeking cancellation of the '648 Patent through an IPR, Askeladden seeks to permit use of the technology claimed in the '648 Patent by all of the owner banks, without payment of royalties to [Plaintiff]," and only results in less revenue for Plaintiff. BoA Br. at 33 (quoting Am. Compl. ¶ 537). Defendants contend that "[c]osts of technology that should not have been subject to a patent in the first instance would be lower and users of that technology could develop new products and services more efficiently without passing on higher costs to consumers." *Id.* Defendants conclude that they would not "fix the price" of a license to Plaintiff's Patent at zero if they win the Petition; instead, "'[z]ero' would in fact be the 'competitive price' for rights under the invalid patent." *Id.* at 35.

The Court agrees with Defendants. First, Plaintiff appears to be operating under the assumption that any unlawful conduct is necessarily anticompetitive conduct – a presumption that the lacks legal support, as explained above. Even if Askeladden improperly omitted RPIs in its IPR Petition, Plaintiff still must show that this omission harmed competition.

Second, Plaintiff's core theory of anticompetitive conduct does not align with its alleged antitrust injury. Plaintiff alleges that the anticompetitive conduct was omitting RPIs in the IPR Petition and that the antitrust injury is Plaintiff's Patent having no value if the IPR Petition invalidates the Patent. Yet, at another point in its opposition, Plaintiff admits that the alleged misrepresentation of RPIs actually occurred in a certification attached to the Petition – a certification that "is distinct from the merits of the IPR." Pl. Opp'n at 13. If the alleged misrepresentation (the anticompetitive conduct) has no bearing on the merits of the IPR (which will impose the antitrust injury), Plaintiff's alleged antitrust injury does not flow from the alleged anticompetitive conduct. This compromises Plaintiff's antirust claim. *See Atl. Richfield Co. v.*

25

*USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

Finally, Plaintiff has not provided, and the Court is unaware of, any case law indicating that the mere act of bringing an IPR Petition constitutes anticompetitive activity. This seems especially true when the IPR Petition potentially has merit. As noted, the IPR Petition here resulted in Administrative Patent Judge Haapala invalidating Plaintiff's Patent. D.E. 74-1 at 51.[14] It appears that this Petition only harms Plaintiff – a competitor – not competition, as the marketplace now has less restricted access to technology that was improperly patented. The Court finds that Plaintiff's core theory of antitrust liability is not plausibly pled.

Plaintiff also generally and sporadically refers to "price-fixing," "group boycotts," and "tax evasion" as separate theories of anticompetitive activity. Am. Compl. ¶¶ 471-74, 499, 502, 508, 516, 518. Plaintiff, however, fails to support these conclusory allegations with facts, and does not plausibly tie these allegations to a valid antitrust injury. The Court dismisses Plaintiff's antitrust claims (Count VIII).

---

[14] Plaintiff cannot argue that Askeladden's failure to name CHP as an RPI motivated Judge Haapala's decision because Askeladden amended its Petition to include CHP as an RPI before Judge Haapala invalidated the Patent. Am. Compl. ¶ 76.

## IV. CONCLUSION

In sum, the Court grants Defendants' motions to dismiss (D.E. 68, 70) without prejudice. Plaintiff has thirty days to file a second amended complaint, if it so chooses, consistent with this Opinion. If Plaintiff does not do so, this matter will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

Date: April 15, 2019

John Michael Vazquez, U.S.D.J.