**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VERIFY SMART CORP., | |
| *Plaintiff*, | |
| v. | Civil Action No. 17-4248 (JMV) (JBC) |
| BANK OF AMERICA, N.A., BANK OF AMERICA CORP., WELLS FARGO BANK, N.A., WELLS FARGO & CO., DAVID LEITCH, GARY LYNCH, JAMES STROTHER, JIM HOWARD, and SEAN REILLY, | **OPINION** |
| *Defendants*. | |

**John Michael Vazquez, U.S.D.J.**

This matter concerns a variety of alleged wrongdoings arising from a challenge to a patent. In the Third Amended Complaint ("TAC"), Plaintiff Verify Smart Corp. sues Bank of America, N.A. and Bank of America Corp. (collectively "BoA"), Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "WF"), and five individuals who held executive positions at BoA, WF, The Clearing House LLC (TCH), and/or Askeladden LLC.  The gist of Plaintiff's claims is an overarching, nefarious scheme by Defendants to challenge patents in retribution for Plaintiff's earlier lawsuits against the BoA and WF (the "Defendant Banks") as to Plaintiff's "System and Method for Verifying a User's Identity In Electronic Transactions" patent (the "Patent" or the "'648 Patent").  Following Plaintiff's lawsuits against the Defendant Banks for infringement of the Patent, each bank entered into a settlement agreement with Plaintiff.  Plaintiff alleges that these agreements were breached when the Defendant Banks caused Askeladden to challenge the Patent through an *inter partes* review (IPR).

Two motions are currently pending before the Court: (1) Defendants' joint motion to dismiss Plaintiff's Third Amended Complaint ("TAC") for failure to state a claim; and (2) Defendants David Leitch, Gary Lynch, James Strother, and Jim Howard's motion to dismiss the TAC for lack of personal jurisdiction.  The Court reviewed all the submissions in support and in opposition[1] and considered the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).  For the reasons discussed below, Defendants' motion to dismiss for failure to state a claim is **GRANTED** and Defendants Leitch, Lynch, Strother, and Howard's (the "PJ Defendants") motion to dismiss for lack of personal jurisdiction is **GRANTED in part and DENIED in part**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Plaintiff's initial Complaint in this matter was filed on June 12, 2017, D.E. 1, and Plaintiff filed a First Amended Complaint ("FAC") on March 20, 2018, D.E. 54.  The FAC named BoA, WF, the Clearing House Payments Company LLC, the Clearing House Association LLC, and Askeladden LLC as Defendants.  Those Defendants moved to dismiss the FAC, D.E. 68, which the Court granted, D.E. 84, 85.  Plaintiff filed a Second Amended Complaint ("SAC") on June 14, 2019, D.E. 87.  The SAC named only BoA and WF as Defendants.  BoA and WF moved to dismiss the SAC, D.E. 98, which this Court granted, D.E. 111, 112.

---

[1] The PJ Defendants' brief in support of their motion to dismiss for lack of personal jurisdiction will be referred to as "PJ Br.," D.E. 125-1.  Plaintiff's opposition brief to the motion to dismiss for lack of personal jurisdiction will be referred to as "PJ Opp.," D.E. 134.  The PJ Defendants' reply brief for their motion to dismiss for lack of personal jurisdiction will be referred to as "PJ Reply," D.E. 136.  Defendants' brief in support of their joint motion to dismiss will be referred to as "Defs. Br.," D.E. 126-1.  Plaintiff's brief in opposition to the joint motion to dismiss will be referred to as "Pl. Opp.," D.E. 135.  And Defendants' reply brief in further support of their joint motion to dismiss will be referred to as "Reply," D.E. 137.

The TAC was filed on July 30, 2020.  D.E. 113.  The TAC adds the following individuals (collectively, the "Individual Defendants"), who were not named as parties in the FAC or the SAC: (1) David Leitch, who served as the 2016-2017 Global General Counsel of BoA and a member of the supervisory board of TCH; (2) Gary Lynch, who was Vice Chairman and General Counsel of BoA in 2015 and a member of the supervisory board of TCH; (3) James Strother, who was the Senior Executive Vice President and General Counsel of WF in 2016-2017 and a member of TCH's supervisory board; (4) Jim Howard, who is the Executive Vice President and Assistant General Counsel of TCH and the Associate General Counsel of Askeladden LLC; and (5) Sean Reilly, who serves both as TCH's Senior Vice President and Associate General Counsel and Askeladden's General Counsel.  TAC ¶¶ 6-10.  The TAC also raises three new claims that were not alleged in the FAC or SAC: (1) common law fraud/settlement fraud (Count Four); (2) New Jersey Fraud, N.J. Stat. Ann. § 2C:21-16 (Count Six); and (3) New Jersey RICO, N.J. Stat. Ann. § 2C:41-2(e) (Count Eight).  *Id.* ¶¶ 60-218.

For purposes of the pending motions, the Court does not recount the full factual background and procedural history of this matter.  Instead, the Court incorporates by reference the detailed background provided in its April 15, 2019 Opinion ("First Opinion"), D.E. 84, and its June 29, 2020 Opinion ("Second Opinion"), D.E. 111, and briefly reviews the new allegations in the TAC that are relevant to the pending motions.

The following factual allegations are found in the TAC.  "TCH is an association of major commercial banks that has a supervisory board that includes the general counsels of its member banks, which bring together a small group of peer executives to exchange information and promote the interest of its member banks."  *Id.* ¶ 13.  TCH is controlled by "a common supervisory board," comprised of the general counsels of its member banks and TCH's CEO, James Ameranda.  *Id.* ¶

12.  Askeladden was formed by TCH on June 17, 2014; it "has no employees or revenues, and receives all of its funding from TCH's owner banks." *Id.* ¶¶ 11, 14.  TCH is Askeladden's sole member, and cannot resign.  *Id.* ¶¶ 11, 22.  Askeladden's management was comprised of TCH officers, "who were designated and removable by TCH's management, controlled by the member banks." *Id.* ¶ 24.  Because Askeladden's profits and losses are allocated to TCH, and TCH's profits and losses are allocated to member banks, "the executives of TCH and Askeladden, respectively, operate for the benefit of the managing member banks." *Id.* ¶ 21.

In an unrelated prior matter before the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office, TCH was found to be a real party in interest of Askeladden, however, the matter settled "before the PTAB could decide whether TCH's member banks should also be added as real parties in interest." *Id.* ¶ 15.  Following the settlement, "TCH . . . reformulated Askeladden and publicly promoted the change to avoid TCH or its member banks being perceived to be real parties in interest in future IPRs." *Id.*  The statutes governing IPR in the PTAB "prohibit IPRs from being filed in certain factual circumstances, e.g. failure to identify a real party in interest . . . or inability to file an IPR against a patent owner more than one year after they were sued for patent infringement in a district court." *Id.* ¶ 36.  "By using Askeladden to file the IPR against Verify, and having Askeladden deliberately avoid identify either of them as real parties in interest, " WF and BoA "sought to avoid [these] statutory bars and estoppels that would have precluded them from filing the IPR in their own names or would have limited any future defenses that could be asserted on their behalf." *Id.*

Along with the TAC, Plaintiff submitted excerpts of the "Amended and Restated Limited Liability Company Agreement of Askeladden L.L.C." (the "LLC Agreement").[2]  D.E. 113-1.  The agreement became effective March 1, 2016.  *Id.* ¶ 16.  Plaintiff alleges that this document "was drafted and implemented under the direction of TCH's member banks because TCH is a member-managed LLC.  *Id.* ¶ 17.  Pursuant to the agreement, "patents are to be selected for challenge by Askeladden's Patent Challenge Committee ("PCC") using Patent Challenge Guidelines ("PCGs").  *Id.* ¶ 16.  Within the LLC agreement, Plaintiff points to a provision which states that Askeladden "shall not directly or indirectly carry on any activity that would prohibit a national bank or a member bank of the Federal Reserve System from being a member of [TCH]."  TAC ¶ 19.  Plaintiff asserts that based on this language, "TCH and its management, including members of its supervisory board, knew that Askeladden's actions could and would be attributed to the member banks as their agent."  *Id.* ¶ 17.

Plaintiff also attaches as an exhibit to the LLC Agreement excerpts of Askeladden's Patent Challenge Guidelines ("PCGs").  D.E. 113-1 at 18-20.[3]  The TAC alleges that the "PCGs provide that in selecting a patent for challenge Askeladden should consider 'whether the patent owner is engaged in, or threatening to engage in, patent litigation with [BofA, Wells Fargo or TCH's other owner banks who are all members of] the financial services industry, or is a Person that may have an interest in targeting [BofA, Wells Fargo or TCH's other owner banks] with patent suits in the near future.'"  TAC ¶ 20 (alterations in original) (quoting D.E. 113-1 at 18).  Plaintiff alleges that

---

[2] "In addition to the facts alleged in the pleadings, the Court may also consider on a motion under Rule 12(b)(6) the documents attached to the pleadings as exhibits and matters of public record." *Barnes v. Vibra Healthcare, LLC*, No. 14-5678, 2015 WL 3382666, at *3 (D.N.J. May 26, 2015) (citing *Guidotti v. Legal Helpers Debt Resolution*, 716 F.3d 764, 772 (3d Cir. 2013)).

[3] The page numbers referenced in this Opinion for D.E. 113-1 refer to the "Page [#] of 20" label at the bottom of the exhibit.

the PCGs "serve as an express written agency agreement by TCH's member banks instructing Askeladden and its functionaries to serve the member banks' interests." *Id.* ¶ 21.

The following allegations are also derived from the TAC. With respect to patent challenges, a TCH officer authorized or recommended all the patent challenges that Askeladden undertook, and TCH – allegedly acting on behalf of its member banks – had veto power over any patent challenge proposed by Askeladden. *Id.* ¶¶ 25-26. TCH's member banks "empowered" Askeladden to consider "the affiliation of inventors and assignees of patents to be considered for challenge." *Id.* ¶ 28. "In practice, this advanced the self-interest of TCH's member banks, whose patents, regardless of any other consideration, would not be and have never been challenged by Askeladden." *Id.* Askeladden was "expressly instructed to monitor pending litigation" that involved TCH or its affiliates, and was also "expressly instructed," with respect to such patents, to determine if a court had already entered a final judgment of infringement and validity against TCH or its member banks, and to file its challenge after the settlement was complete. *Id.* ¶ 30. The PCGs therefore provided that Askeladden should not initiate PTAB proceedings (a) "against patents that are the subject or pending or imminent litigation against [TCH] or [its] members of the financial services industry"; and (b) when the patent "is already (or will imminently be) the subject of pending patent litigation involving" TCH or any of its affiliates. *Id.* ¶ 31 (alterations in original). The TAC alleges that the PCGs "do not advance, let alone consider whether, Askeladden's own interest are advanced by a patent challenge" but instead "are employed to advance the interests of TCH's member banks." *Id.* ¶ 35. Askeladden's Patent Challenge Committee (PCC) "was established to insulate TCH's owner banks from liability for Askeladden's actions, while enabling them to benefit directly from Askeladden's actions." *Id.* ¶ 32.

The TAC further includes the following allegations as to the Individual Defendants. "Howard advises Askeladden on its patent challenge activities, including developing invalidity strategies." *Id.* ¶ 37. Because Howard "directly communicat[ed] directives from the banks, at least in the form of 'suggested' patents to challenge," Plaintiffs allege that he "bypasses any nominal insulation of Askeladden's patent challenge actions from TCH's owner banks." *Id.* ¶ 33. On information and belief, the PCC "never questioned the parties to, or the content of, communications Howard had with representatives of TCH's member banks, that Howard passed on to Askeladden's PCC as directives to be followed." *Id.* ¶ 34. In his roles as TCH's Assistant General Counsel and Askeladden's Associate General Counsel, "Howard monitored the pendency" of both the BoA and WF district court litigation. *Id.* ¶ 43. Howard "looks out for and seeks to protect the interests of TCH's owner banks." *Id.* ¶ 44. "Howard admitted that he consults with and follows the directions of TCH's owner banks." *Id.* ¶ 45.

Reilly directly communicates and coordinates with TCH's owner banks "in 'collecting prior art' from them to use in and support invalidating the patents that Askeladden challenges in the IPRs it files." *Id.* ¶ 38. Reilly, in his roles as TCH's Associate General Counsel and Askeladden's General Counsel, also monitored the pendency of the BoA and WF district court litigation. *Id.* ¶ 46. Reilly "looks out for and seeks to protect the interests of TCH's owner banks." *Id.* ¶ 47.

Through Howard and Reilly, "TCH's owner banks direct and participate in the affairs of Askeladden." *Id.* ¶ 39. Howard and Reilly, along with TCH's Executive Managing Director and Deputy General Counsel, Robert Hunter, constitute the executive board of Askeladden. *Id.* ¶ 39. Hunter "confers with payment executives of [BoA], [WF] and TCH's other owner banks regarding initiatives of benefit to them such as their Real Time Payments ("RTP") system." *Id.*

7

On information and belief, Lynch, Leitch, and Strother "acted to direct individuals having dual executive management roles at TCH and Askeladden, i.e., Howard and Reilly, to guide and have Askeladden" file the IPR against the Patent "because of, and after both the" WF and BoA district court litigation. *Id.* ¶ 58.  In support of  its "information and belief," Plaintiffs allege the following facts:

> (a) the language of the PCG in Askeladden's LLC Agreement explicitly recites that Askeladden acts and files patent challenges for the benefit of BofA, WF and TCH's other owner banks; (b) McKelvie[4] testified that the PCC was established to publicly insulate TCH's owner banks from responsibility for Askeladden's patent challenges; (c) Howard selected and presented the '648 Patent for challenge by Askeladden; (d) Askeladden's PCGs specif[y] that no challenge is to be filed against a patent while a litigation involving that patent is pending against any of TCH's owner banks; (e) the IPR was not filed until after Verify's litigations against BofA and Wells Fargo, respectively, were terminated as per the PCGs; (f) Lynch and Strother were members of TCH's supervisory board, and representatives of TCH's managing member banks in control over TCH and Askeladden, when BofA and Wells Fargo were sued by Verify, respectively, and they were involved in the settlement of Verify's claims in those respective suits[;] (g) Leitch, as successor to Lynch, and Strother, were members of TCH's supervisory board, and representatives of TCH's managing member banks in control over TCH and Askeladden, when Askeladden filed the Verify IPR against Verify's '648 patent, contravening the prior settlements to which BofA and Wells Fargo were respectively bound[;] (h) Howard's admission that he consults with and follows the directions of TCH's owner banks[; and] (i) Askeladden's admission that Reilly communicates and coordinates directly with TCH's owner banks in "collecting prior art" to assist Askeladden in its patent challenge activities.

*Id.* ¶ 59.

Finally, the TAC includes additional allegations concerning the challenge of the Patent. Howard – not the PCC – selected the Patent for challenge.  *Id.* ¶ 50.  In addition, "Howard and/or Reilly" retained a law firm to prepare a written proposal to challenge the Patent; Howard then

---

[4] Robert McKelvie served as the Chairman of Askeladden's PCC.  TAC ¶ 32.

presented this proposal to the PCC. *Id.* ¶ 51. The PCC accepted and followed this proposal, but it did not identify, investigate, or select the Patent to be challenged. *Id.* Howard and Reilly, moreover, knew of Verify's settlements with BoA and WF before the IPR was filed. *Id.* ¶¶ 53-56.

## II.   STANDARD OF REVIEW

### A.  Lack of Personal Jurisdiction

Rule 12(b)(2) permits a party to move to dismiss a case for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). In such a motion to dismiss, the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). When a court "resolves the jurisdictional issue in the absence of an evidentiary hearing and without the benefit of discovery, the plaintiff need only establish a prima facie case of personal jurisdiction." *Otsuka Pharm. Co. v. Mylan Inc.*, 106 F. Supp. 3d 456, 461 (D.N.J. 2015). In such cases, a court "take[s] the allegations of the complaint as true." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

However, once a defendant raises a jurisdictional defense, "a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Id.* In other words, court looks beyond the pleadings to all relevant evidence and construes all disputed facts in favor of the plaintiff. *See Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). In addition, a court "may always revisit the issue of personal jurisdiction if later revelations reveal that the facts alleged in support of jurisdiction remain in dispute." *Otsuka*, 106 F. Supp. 3d at 462 n.5 (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 331 (3d Cir.2009)).

"Personal, or in personam, jurisdiction, [generally] divides into two groups: 'specific jurisdiction' and 'general jurisdiction.'" *Display Works*, 182 F. Supp. 3d at 172 (citing *Burger King*, 471 U.S. at 472 n.14 (1985)). Specific jurisdiction "depends on an affiliatio[n] between the

forum and the underlying controversy (i.e., an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation)." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 n.6 (2014)).   General jurisdiction "permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Id.* (quoting *Walden*, 571 U.S. at 284 n.6).   Personal jurisdiction can also be obtained through consent, waiver, or in-state service on an individual defendant. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 590-97 (1991) (regarding consent via a forum selection clause); *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 628 (1990) (regarding in-state service); *In re Asbestos Products Liability Litigation (No. VI)*, 921 F.3d 98, 104-05 (3d Cir. 2019) (regarding waiver); *Jasper v. Bexar Cty. Adult Detention Center*, 332 F. App'x. 718, 719 (3d Cir. 1999) (regarding consent).

Here, Plaintiff does not argue that this Court has general personal jurisdiction over the Individual Defendants; the parties' dispute centers on specific personal jurisdiction.  As to specific personal jurisdiction, a federal court "engages in a two-step inquiry to determine whether it may exercise personal jurisdiction": (1) "whether the relevant state long-arm statute permits the exercise of jurisdiction," and (2) "if so, [whether] the exercise of jurisdiction comports with due process" under the Fourteenth Amendment. *Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 172 (D.N.J. 2016) (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998)); *see also* Fed. R. Civ. P. 4(k)(1)(A) (indicating that service "establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction[5] in the state where the district court is located.").   "New Jersey's long-arm statute extends the state's jurisdictional reach as far as the United States Constitution permits, so the analysis turns on the

---

[5] General jurisdiction as used in Rule 4(k) refers to subject-matter jurisdiction rather than personal jurisdiction.

federal constitutional standard for personal jurisdiction." *Id.* (citing *IMO Industries*, 155 F.3d at 259). Accordingly, the two steps are collapsed into one and "we ask whether, under the Due Process Clause, the defendant has certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (internal quotation marks omitted). In other words, to establish specific personal jurisdiction, the Due Process Clause requires (1) minimum contacts between the defendant and the forum; and (2) that jurisdiction over the defendant comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

The "constitutional touchstone remains whether the defendant purposefully established 'minimum' contacts in the forum State." *Id.* at 474 (citing *Int'l Shoe*, 326 U.S. at 316). A defendant must have "fair warning" that its conduct will subject it to the jurisdiction of a foreign court. *Id.* at 472. A defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "Specific jurisdiction requires that the defendant 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 384 (D.N.J. 2016) (citing *Burger King*, 471 U.S. at 472). "The minimum contacts analysis depends upon 'the relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Yet, actual "[p]hysical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant." *Id.* (quoting *IMO Industries*, 155 F.3d at 259).

The Third Circuit has laid out a three-part test to determine whether specific jurisdiction exists as to a particular defendant.  *O'Connor*, 496 F.3d at 317.  First, the defendant must have "purposefully directed [its] activities at the forum."  *Id.* (internal quotation marks omitted).[6] Second, the litigation must "arise out of or relate to at least one of those activities."  *Id.* (internal quotation marks omitted).  Third, if the first two requirements are met, the exercise of jurisdiction must "otherwise comport with fair play and substantial justice."  *Id.* (internal quotation marks omitted).

When an intentional tort is alleged, a slight variation from the *O'Connor* three-part test applies, known as the *Calder* effects test, *O'Connor*, 496 F.3d at 317 n.2, stemming from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984).  The *Calder* effects test "can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone . . . are far too small to comport with the requirements of due process under our traditional analysis."  *Marten*, 499 F.3d at 297 (alteration in original) (internal quotation marks omitted).  Under *Calder*, "an intentional tort directed at the plaintiff and having sufficient impact upon [the plaintiff] in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied."  *IMO Indus., Inc.*, 155 F.3d at 260.

---

[6] This factor has also been characterized as "purposeful availment."  *Burger King*, 471 U.S. at 475. The factor focuses on contact that the defendant itself created with the forum State.  *Id.*  The "purposefully directed" or "purposeful availment" requirement is designed to prevent a person from being haled into a jurisdiction "solely as the result of random, fortuitous, or attenuated contacts" or due to the "unilateral activity of another party or third person."  *Id.* (internal quotation marks omitted) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *World-Wide Volkswagen Corp.*, 44 U.S. at 299; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).

In *IMO Industries*, the Third Circuit held that the *Calder* effects test requires a plaintiff to show that:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity[.]

*Id.* at 265-66 (footnote omitted).  As to the third prong, "the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."  *Id.* at 266.  The *Calder* effects test, as interpreted by the Third Circuit, requires that a defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  *Marten*, 499 F.3d at 297 (quoting *World-Wide Volkswagen Corp.,* 444 U.S. at 297).

Finally, specific jurisdiction determinations are "claim specific."  *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).  "[A] conclusion that the District Court has personal jurisdiction over one of the defendants as to a particular claim asserted by [the plaintiff] does not necessarily mean that it has personal jurisdiction over that same defendant as to [the plaintiff]'s other claims."  *Id.*  The Third Circuit has recognized that although it "may not be necessary" to "conduct a claim-specific analysis" in "every multiple claim case, . . . because there are different considerations in analyzing jurisdiction over contract claims and over certain tort claims," such differentiation is required in certain circumstances.  *Id.*

### B.  Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a motion to dismiss

under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

### C.  Pleading Standard for Allegations of Fraud

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances

14

constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).  Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'"  *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).  This heightened pleading standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud."  *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### III.   ANALYSIS[7]

#### A.  Breach of Contract Claims (Counts One and Two)

Count One alleges that, as a result of Askeladden's IPR filing challenging the Patent, BoA "committed a wrongful act which contravenes and thus breaches" the contract between BoA and

---

[7] The Court conducted a choice-of-law analysis and determined that New Jersey law applies to the non-federal claims alleged in the FAC.  First Opinion at 8-10, 16, 18.  In the Second Opinion, the Court reiterated that New Jersey law applies to the non-federal claims.  Second Opinion at 6, n.4. The TAC adds three non-federal claims: common law fraud/settlement fraud (Count Four); New Jersey Fraud, N.J. Stat. Ann. § 2C:21-16 (Count Six); and New Jersey RICO, N.J. Stat. Ann. § 2C:41-2(e) (Count Eight).  New Jersey law clearly applies to the New Jersey statutory claims.  A court sitting in diversity must resolve choice of law questions by applying the choice of law analysis adopted by the forum state.  *Pollock v. Barrickman*, 610 F. Supp. 878, 879 (D.N.J. 1985) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)).  Therefore, the Court applies New Jersey choice of law rules.  Neither party contests that New Jersey's choice of law rules result in the application of New Jersey substantive law to the common law fraud claim, which the Court applies.

Plaintiff.  TAC ¶ 86.  Count Two asserts the same as to WF.  *Id.* ¶ 99.  To state a claim for breach of contract under New Jersey law, a plaintiff must allege four elements: (1) "that 'the parties entered into a contract containing certain terms'"; (2) "that 'plaintiffs did what the contract required them to do'"; (3) "that 'defendants did not do what the contract required them to do'"; and (4) "that 'defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs.'"  *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)).  Because Askeladden was not a party to the agreements that Plaintiff alleges were breached, the threshold issue is whether BoA and WF can be held liable for the actions of Askeladden.

Like the FAC and the SAC, the TAC alleges that Askeladden was an agent of BoA and WF.  TAC ¶ 18.  "An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'"  *N.J. Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.*, 1 A.3d 632, 639 (N.J. 2010) (quoting Restatement (Third) of Agency § 1.01 (2006)).  This consent to act on the principal's behalf, or grant of "authority," may be "actual" or "apparent."  *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79-80 (N.J. 1993).  "Actual authority occurs 'when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'"  *N.J. Lawyers' Fund*, 1 A.3d at 639 (quoting Restatement (Third) of Agency § 2.01).  "Apparent authority arises 'when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'"  *Id.* (quoting Restatement (Third) of Agency § 2.03).

The Court rejected Plaintiff's assertion of agency theory based on actual authority in the FAC and the SAC.  In the FAC, Plaintiff's allegations fell short because (a) Plaintiff failed to plausibly allege facts demonstrating actual authority – *i.e.*, that BoA, WF, or one of their agents expressly or implicitly directed Askeladden to challenge the Patent; and (b) Plaintiff failed to allege any actions undertaken by BoA or WF that created apparent authority.  First Opinion 11-12.  The Court found that "Plaintiff [was] missing the crucial factual allegation that an appropriate employee or representative from BoA or WF directed Askeladden to challenge Plaintiff's Patent." *Id.*  In response to this deficiency, the SAC added allegations that Leitch and Strother directed Askeladden to file the IPR.  Second Opinion at 7-8.  However, the Court determined that these new allegations, which were offered on information and belief, were insufficient.  Second Opinion at 8-9.  The Court explained as follows:

> As to the allegations "upon information and belief" that BoA Global General Counsel David Leitch and WF Senior Executive Vice President and General Counsel James M. Strother were "involved in directing Askeladden to file the Verify IPR," Plaintiff failed to include necessary factual allegations that would make these claims plausible.  For example, Plaintiff failed to allege that Leitch's position as Global General Counsel for BoA includes any duties related to directing Askeladden to file IPRs (and the same applies to Strother and his role).  Plaintiff also failed to allege *why*, perhaps based on timing or past, similar instances, the claims upon information and belief would be plausible.  Instead, Plaintiff vaguely alleged that Leitch and Strother were "involved" in directing Askeladden.  The word "involved" is also insufficient.  It can mean anything from being copied on an email to active participation and direction.  As the Court stated in its [First Opinion] and Order, in addition to pleading that "an appropriate employee or representative from BoA or WF directed Askeladden to challenge Plaintiff's Patent," Plaintiff needed to also "sufficiently allege that any BoA or WF representative had the ability to direct Askeladden to act." [First Opinion] at 11-12.  Plaintiff failed to allege that Leitch and Strother either "had the ability to direct Askeladden to act" or exercised that ability.

*Id.* at 9.

The TAC adds new allegations that an agency relationship was created by the Askeladden LLC Agreement, the PCGs, and through actions of the Individual Defendants. Defendants argue that Plaintiff has failed to plausibly plead that BoA or WF had the ability to direct Askeladden to act, or that BoA or WF exercised its ability and directed Askeladden to act. The Court agrees.

### 1.   Askeladden LLC Agreement and PCGs

The TAC alleges that the Askeladden LLC Agreement reflects an agency agreement "under which the managing member banks of TCH created a set of explicit instructions and powers for its agents, as well as a means for funding those agents to carry out those instructions . . . to challenge patents that had been previously asserted against the member banks." *Id.* ¶ 67. Plaintiff points to paragraph 12 of the agreement, which provides that Askeladden "shall not directly or indirectly carry on any activity that would prohibit a national bank or a member bank of the Federal Reserve System from being a member of [TCH]." D.E. 113-1 at 12. According to Plaintiff, this language indicates that Askeladden, TCH, and the Defendant Banks "knew that Askeladden's actions could and would be attributed to TCH's owner banks as their agent when scrutinized." Opp. Br. at 5.

Reviewing the portions of LLC Agreement on which Plaintiff relies, the Court finds no language demonstrating that BoA and WF granted authority to Askeladden to act on their behalf. In fact, there are several provisions within the LLC Agreement that suggest the opposite. For example, the LLC Agreement mandates that Askeladden "shall have a Patent Challenge Committee" whose purpose "shall be to *independently* implement, manage and conduct that aspect of the Company's Patent Quality Initiative directed to challenging the validity of low-quality patents as specified in the Patent Challenge Guidelines." D.E. 113-1 at 10 (emphasis added). Further, the PCC "shall operate *independently* of the Executive Committee, [TCH] and any other

Person that is affiliated with or otherwise related to [TCH]." *Id.* (emphasis added).  And while TCH could appoint individuals "to assist and support the activities of the [PCC]," these individuals "*shall have no authority* to direct, bind or otherwise control the activities of the [PCC]." *Id.*  The LLC Agreement further provides that the PCC "*shall not accept any request or suggestion* that the [PCC] institute review of any specific patent (or the patents of a particular patent owner) or any direction or suggestion . . . from the Executive Committee, [TCH] or any other Person that is affiliated with or otherwise related to [TCH]." *Id.* at 12 (emphases added).

Plaintiff also alleges that "[t]he existence of an agency relationship between TCH's member banks and Askeladden is explicit in the PCG." *Id.* ¶ 70.  The PCGs provide a list of factors that the PCC may consider – in addition to anything else it deems important or relevant – when deciding whether to file a petition for IPR or PGR.  D.E. 113-1 at 18.  Plaintiff highlights two factors from this list: (1) "whether the patent owner is engaged in, or threatening to engage in, patent litigation with the financial services industry, or is a Person that may have an interest in targeting the financial services industry with patent suits in the near future"; and (2) "the degree to which claims of the patent could be alleged to cover products or services used throughout the financial services industry." *Id.* at 18-19; Opp. Br. at 5-6.  Plaintiff additionally argues that the PCGs "expressly recite that Askeladden acts and files patent challenges for the benefit of the Defendant Banks and TCH's other owner banks," and that "Askeladden only challenges patents that threaten or may threaten the 'financial services industry' . . . or have value to them." Opp. Br. at 5.  The relevant provision provides that the PCC "should avoid, if prudent under the circumstances, initiating PTAB proceedings against patents that are the subject of pending or imminent litigation against [TCH] or members of the financial services industry." D.E. 113-1 at 19.

The TAC fails to plausibly plead that language in the PCGs created or were evidence of an agency relationship between the Defendant Banks and Askeladden.  There are no allegations that WF or BoA had the power to direct the PCC to challenge specific patents or that they ever did direct the PCC to challenge specific patents.  While the PCGs unsurprisingly focus on patents in the financial services industry (actually the entire financial industry), they do not establish the necessary agency relationship alleged by Plaintiff.

Plaintiff does not sufficiently allege that an agency relationship existed between the Defendant Banks and Askeladden based on the text of LLC Agreement or the PCGs.

## 2. Actions of the Individual Defendants

The TAC further alleges that the Defendant Banks used the Individual Defendants to control Askeladden.  Plaintiff alleges that the Defendant Banks used Howard to "bypass[] any nominal insulation of Askeladden's patent challenge actions from TCH's owner banks, by directly communicating directives from the banks, at least in the form of 'suggested' patents to challenge, for Askeladden to follow."  TAC ¶ 33.  The TAC asserts that upon information and belief, "Lynch, Leitch and Strother acted to direct individuals having dual executive management roles at TCH and Askeladden, i.e., Howard and Reilly, to guide and have Askeladden file the Verify IPR against the '648 Patent because of, and after both the" WF and BoA district court litigation."  *Id.* ¶ 58. While the TAC adds facts to support "a good faith basis for [Plaintiff's] belief," these allegations fail to cure the deficiencies noted in the Second Opinion.

The TAC alleges that (1) Lynch and Strother were members of TCH's supervisory board at the time WF and BoA were sued by Plaintiff; (2) Leitch was a member of the TCH supervisory board at the time Askeladden filed the Verify IPR; (3) Howard "consults with and follows the directions of TCH's owner banks; and (4) Reilly "communicates and coordinates directly with

TCH's owner banks." None of these allegations sufficiently demonstrate why – by virtue of their positions with WF, BoA, and/or TCH – Lynch, Strother, and Leitch possessed any authority to direct Askeladden to challenge patents. Moreover, the TAC is also devoid of any allegation that Lynch, Strother, and Leitch's roles with the Defendant Banks reflects that they were the individuals with whom Howard "consults" and Reilly "communicates and coordinates." The TAC fails to plausibly allege that Strother, Leitch, and Lynch had the authority to direct Askeladden to act or that they exercised that ability.

The TAC fails to plausibly allege an agency relationship between the Defendant Banks and Askeladden. As a result, Plaintiff has not sufficiently pled breach of the BoA and WF settlement agreements. Counts One and Two are dismissed.

### B. Intentional Tort Claims (Counts Three, Four, Five, and Six)

Counts Three, Four, Five, and Six allege that some or all Defendants committed intentional torts. These claims are challenged on two grounds. First, the PJ Defendants argue that this Court lacks personal jurisdiction over them. Second, Defendants collectively assert that the counts fail to state a claim.

#### 1. Personal Jurisdiction

Count Three alleges that Defendants tortiously interfered with Plaintiff's prospective economic benefit by challenging the Patent in an IPR. TAC ¶¶ 101-122. With respect to the PJ, the TAC alleges that they knew of Plaintiff's expectation of prospective economic benefit and "intentionally and without proper justification or legitimate excuse" interfered with that expectancy. *Id.* ¶¶ 112, 117. Count Three makes vague references to Defendants' conduct, *e.g. id.* ¶ 117, 118, 120, 122, however, the only specific conduct referenced is that Askeladden, upon Howard and Reilly's direction "target[ed] the '648 Patent by filing the Verify IPR," *id.* ¶ 114.

While Count Three incorporates by reference "each of the allegations contained in paragraphs 1 through 100," *id.* ¶ 101, the only conduct that is apparently relevant to the tortious interference claim is the following: "Howard . . . directly communicat[es] directives from the banks. . . for Askeladden to follow, *id.* ¶ 33; "Howard . . . advises Askeladden on its patent challenge activities," *id.* ¶ 37; "Howard . . . selected the [] Patent for challenge," *id.* ¶ 50; "Howard had a management role and personally guided Askeladden's filing of the Verify IPR," *id.* ¶ 54; and "[u]pon information and belief, Lynch, Leitch and Strother acted to direct . . . Howard . . . to guide and have Askeladden file the Verify IPR against the [] Patent," *id.* ¶ 58.

As discussed above, the *Calder* effects test requires Plaintiff to show that (1) the defendant "committed an intentional tort"; (2) that Plaintiff "felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort"; and (3) that the defendant "expressly aimed [their] tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *IMO Indus.*, 155 F.3d at 265-66. Here, the TAC fails to allege any facts relevant to the second and third elements, other than the statement that Plaintiff is headquartered in New Jersey, TAC ¶ 1. But the Third Circuit has made clear that "the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *IMO Indus.* 155 F.3d at 265. Critically, the Circuit cautioned that "[s]imply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum [is] insufficient in itself to meet this requirement." *Id.* No allegations in the TAC connect the alleged tortious conduct or its effects to New Jersey. Based on other allegations in the TAC, it appears that Askeladden's conduct related

to the IPR was performed in New York and directed at Virginia. *Id.* ¶ 147. The TAC's allegations do not sufficiently establish personal jurisdiction as to the PJ Defendants for Count Three.

Count Four alleges that before BoA and WF entered into their respective settlement agreements with Plaintiff, both banks "secretly . . . engaged their agent, Askeladden, to challenge [the] Patent after the settlements had been concluded." TAC ¶ 125. As to the Individual Defendants, the TAC alleges that Lynch, Leitch, and Strother directed Howard to use Askeladden to challenge the Patent through IPR. *Id.* ¶ 127. Further, Plaintiff alleges that "preparation for the IPR was already in progress at the time of the settlement." *Id.* Lynch and Strother knew, as TCH supervisory board members, "that the settlement agreements falsely promised to release all claims" that BoA and WF had against the Patent at the time the settlement agreements were executed. *Id.* ¶ 128. With respect to personal jurisdiction over the PJ Defendants, Count Four suffers from the same defects as Count Three – there are insufficient allegations that they aimed their allegedly tortious conduct at New Jersey.

Count Five alleges that Askeladden, acting on behalf of BoA and WF, filed the IPR and failed to identify the Defendant Banks and TCH as real parties in interest. *Id.* ¶¶ 132-159. As for the PJ Defendants against whom this Count is brought – Howard, Leitch, and Strother – Plaintiff makes the following allegations: Howard directed Askeladden to submit a fraudulent certification to the PTAB stating that Askeladden was the sole real party in interest; at the time, Howard knew the certification was false; Howard intended Plaintiff to rely upon the false assertion; and Leitch and Strother knew about "TCH's secret Askeladden LLC Agreement" which provided that Howard could suggest to Askeladden any patent for challenge; *Id.* ¶¶ 136, 138, 141, 152. Like Counts Three and Four, Count Five fails to allege that Howard, Leitch, and Strother aimed their conduct at New Jersey. In fact, allegations in the TAC suggest that their tortious conduct was

aimed at the PTAB, which is located in Virginia.  *See Id.* ¶¶ 143-44, 147.  Count Five fails to sufficiently allege personal jurisdiction as to the relevant PJ Defendants.

Count Six is brought against Lynch and Strother and alleges that in their management of BoA and WF, respectively, they violated N.J. Stat. Ann. § 2C:21-16, which makes it a crime to secure the execution of documents by deception.  *Id.* ¶¶ 160-163.  Plaintiff alleges that Lynch and Strother caused the Defendant Banks to fraudulently obtain Plaintiff's signature on the BoA and WF settlement agreements.  *Id.* ¶ 162.  Again, the TAC fails to allege that the relevant PJ Defendants' deception was targeted at New Jersey.  The only allegations as to New Jersey are that BoA's outside counsel in New York, and WF's in-house counsel in North Carolina, emailed executed copies of the respective settlement agreement to Plaintiff's counsel in New Jersey.  *Id.* ¶¶ 177, 184.  But this allegation is insufficient to show that Lynch or Strother had sufficient contacts with New Jersey to confer personal jurisdiction. These allegations suggest that any conduct directed at New Jersey was performed by the Defendant Banks' counsels and not Lynch or Strother.  Count Six fails to adequately assert personal jurisdiction as to the relevant PJ Defendants.

The Court finds that, with respect to Plaintiff's intentional tort claims, none of the allegations in the TAC connect the PJ Defendants to New Jersey so as to confer specific jurisdiction.  As a result, the Individual Defendants' motion to dismiss for lack of personal jurisdiction is granted as to Counts Three, Four, Five and Six.

### 2.  Sufficiency of TAC

Because the Court lacks personal jurisdiction over the PJ Defendants, the Court assesses the sufficiency of the allegations in Counts Three, Four, Five, and Six only as to Defendants BoA, WF, and Reilly.

24

### C.  Tortious Interference (Count Three)

Plaintiff alleges in Count Three that Defendants tortiously interfered with its prospective economic advantage by filing the Verify IPR.  Under New Jersey law, a claim of tortious interference consists of the following:

> (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir. 1992) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.3d 31, 37 (N.J. 1989) and Restatement (2d) of Torts § 766B).

 Turning first to the Defendant Banks, this claim fails for the same reasons it failed in the SAC: it is premised on the existence of an agency relationship, which Plaintiff has failed to plausibly allege.  Second Opinion at 9.  With respect to the third factor, Plaintiff argues that "by failing to interrupt the IPR to be filed and maintained *by their agent Askeladden*, and misleadingly failing to have themselves or TCH named as an RPI," "the Defendant Banks wrongfully and intentionally interfered with Verify's expectancy."  Opp. Br. at 15 (emphasis added).  Thus, this element hinges on the existence of an agency relationship and, as a result, Count Three is dismissed as to BoA and WF.

As for Reilly, Defendants assert that Plaintiff fails to "allege facts showing that they had an obligation to forego challenging the Patent."  Def. Br. at 16.  Even if it were true that Reilly was involved in Askeladden's decision to challenge the Patent, Defendants claim that "there was nothing 'wrongful' about that decision absent an agency relationship with [BoA] or [WF], which [Plaintiff] has failed to plausibly allege."  *Id.* at 16-17.  The Court agrees.  Plaintiff has failed to

allege what aspect of Reilly's conduct was wrongful – Reilly had management roles with both TCH and Askeladden, but the TAC fails to plausibly allege an agency relationship with WF or BoA under which Reilly had any obligation to Plaintiff pursuant to either the WF or BoA settlements. As a result, Plaintiff's tortious interference claim fails against Reilly, and Count Three is dismissed in its entirety.

### D.  Common Law Fraud (Counts Four and Five)

Plaintiff brings two claims for common law fraud: settlement fraud and fraudulent concealment of real parties in interest. Under New Jersey law, the elements of common law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 489 (D.N.J. 2018).

Turning first to Count Four, the TAC claims that Defendants fraudulently induced Plaintiff to sign the WF and BoA settlement agreements. Specifically, Plaintiff alleges that prior to entering into their respective settlement agreements, BoA and WF "secretly . . . engaged their agent, Askeladden, to challenge [the Patent] after the settlements had been concluded." TAC ¶ 125. Reilly is also alleged to have been an agent of the Defendant Banks. *Id.* ¶ 127.

Defendants argue that Plaintiff fails to state a claim for three reasons:  (1) Plaintiff has not plausibly pled the existence of an agency relationship between the banks (and their general counsels) and Askeladden; (2) Plaintiff fails to allege facts supporting the plausible inference that either bank intended to violate the settlement agreements at the time the agreements were executed; and (3) the TAC fails to plausibly allege Plaintiff's damages were proximately caused by the alleged misrepresentation. Def. Br. 21-24.

As to BoA and WF, Plaintiff's common law fraud claim for settlement inducement fails. Without plausible allegations supporting an agency relationship between the Defendant Banks and Askeladden, Plaintiff has not sufficiently pled that either Defendant Bank made a material misrepresentation at the time the settlements were executed.  The claim also fails against Reilly for the lack of a plausible agency relationship for the reasons stated above.  Although Plaintiff alleges that Askeladden, Reilly, and Howard were all agents of BoA and WF, TAC ¶ 127, this conclusory statement is insufficient to plausibly plead an agency relationship.  As a result, the Court dismisses Count Four.

In Count Five, Plaintiff alleges that "Askeladden's filing of the Verify IPR failed to comply with 35 U.S.C. § 312(a)(2) as it failed to identify either [BoA] or [WF], respectively, as a real party in interest and also did not name TCH, a subsequently admitted real party in interest."  *Id.* ¶ 133. The TAC alleges that Reilly and Howard – each acting as an agent for BoA and WF – directed Askeladden to submit a fraudulent certification to the PTAB.  *Id.* ¶ 136.  Defendant argues that "[w]ith respect to the banks . . . the claim must fail because the TAC alleges no plausible agency relationship between the banks and Askeladden."  Def. Br. at 25.  The Court agrees.  Without a plausible agency relationship, statements contained within Askeladden's Verify IPR cannot be attributed to the Defendant Banks.

As for Reilly, Defendants argue that this claim must fail against the Individual Defendants because "it fails to establish the 'tort participation theory of personal liability,' which is required when a plaintiff attempts to sue individuals acting within their corporate capacity."  Def. Br. at 26. Under the theory, "a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort."  *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 272 (N.J. 2002).  The theory has been applied "to hold corporate

officers personally responsible for their tortious conduct generally have involved intentional torts," the majority of which "have involved fraud and conversion." *Id.* "A predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct." *Id.*

The TAC falls short as to the participation theory. Because an agency relationship between the Defendant Banks and Askeladden was not plausibly pled, Plaintiffs have failed to sufficiently allege that Askeladden owed a duty of care to Plaintiff. Even if such a duty existed, there is the TAC does not indicate that Askeladden delegated such a duty to Reilly. Moreover, the TAC does not adequately plead that Reilly breached a duty.

The TAC makes the following allegations about Reilly with respect to challenging the Patent: "[a] law firm ostensibly retained by Howard and/or Reilly . . . prepared a written proposal to challenge the [Patent]," *id.* ¶ 51; "[u]pon information and belief, Reilly had a management role and personally guided Askeladden's filing of the Verify IPR," *id.* ¶ 56; Reilly was directed by BoA and WF executives "to guide and have Askeladden file the Verify IPR," *id.* ¶ 58; "Askeladden, under Reilly and Howard, each as an agent for [BoA] and [WF], submitted a fraudulent certification to the PTAB, through its agent and attorney . . . stating that Askeladden was the sole real party in interest in the proceeding," *id.* ¶ 136; Reilly "knew that the certification was false," *id.* ¶ 138; and Reilly "intended for [Plaintiff] to rely upon the false assertion," *id.* ¶ 141. Most of these allegations are not plausible in light of Plaintiff's failure to sufficiently allege an agency relationship between the Defendant Banks and Askeladden. As for the allegation that "upon information and belief" Reilly "personally guided" Askeladden through filing the IPR, Plaintiff has failed to include factual allegations that would make this claim plausible. *See* Second Opinion at 8. Other allegations are conclusory in nature, such as Plaintiff's unsupported claim that Reilly

intended Plaintiff to rely on the IPR's assertion that Askeladden was the sole real party in interest. The remaining allegations merely show, at best, that Reilly may have hired a law firm to prepare a written proposal to challenge the Patent. Therefore, the TAC does not include sufficient facts to plausibly plead that Reilly was responsible for the alleged tortious conduct of Askeladden. As a result, Count Five is dismissed.

### E.   New Jersey Fraud (Count Six)

Plaintiff brings a third fraud claim in Count Six under N.J. Stat. Ann. § 2C:21-16 for securing the execution of documents by deception. That statute provides that "[a] person commits a crime of the fourth degree if by deception as to the contents of the instrument, he causes or induces another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person." N.J. Stat. Ann. § 2C:21-16. The TAC alleges that BoA and WF, under the management of Lynch and Strother, violated the statute by fraudulently obtaining Plaintiff's execution of the BoA and WF settlement agreements. TAC ¶ 162.

Defendants argue that this claim "is premised on the same alleged settlement fraud asserted in Count IV" and should be dismissed for the same reasons. The Court agrees. Without a plausibly alleged agency relationship, Count Six, as brought against the Defendant Banks, fails to state a claim. This claim does not appear to be brought against Defendant Reilly and, as a result, Count Six is dismissed in its entirety.

### F.   Federal RICO (Count Seven)

Plaintiff brings a Federal RICO claim under 18 U.S.C. § 1962(d) (conspiracy to violate § 1962 (c)) in Count Seven and alleges that Defendants BoA, WF, Leitch, Lynch and Strother "conspired to commit various wire fraud schemes involving settlement fraud, false promises to settle infringement cases." TAC ¶¶ 165-66. Defendants collectively move to dismiss Count

Seven for failure to state a claim, and the PJ Defendants also move to dismiss for lack of personal jurisdiction. Because the Court finds the failure to state a claim argument to be dispositive, it does not reach the personal jurisdiction question.

"The civil RICO statute allows '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court.'" *Anderson v. Ayling*, 396 F.3d 265, 268-69 (3d Cir. 2005) (quoting 18 U.S.C. § 1964(c)). "The elements predominant in a [Section 1962] subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997).

Plaintiff previously alleged a federal RICO claim in both the FAC and SAC. In the FAC, Plaintiff alleged that Askeladden committed wire fraud when it failed to identify TCH or any of its owner banks as real parties in interest when filing IPRs in the PTAB and amicus briefs in federal court. FAC ¶ 235. The Court dismissed the FAC's RICO claim because the challenged acts constituted litigation activities, which cannot serve as the basis of a wire fraud claim under RICO. First Opinion at 21. Because Plaintiff's substantive RICO claim failed, its RICO conspiracy claim was also dismissed. *Id.* at 22.

The SAC alleged that BoA and WF "conspired to commit various wire fraud schemes involving settlement fraud, false promises to settle infringement cases." SAC ¶ 101. Specifically, the SAC alleged that the Defendant Banks failed to tell Plaintiff that Askeladden would file an IPR against the Patent after the settlement. *Id.* The SAC identified BoA and WF's transmission of their respective settlement agreements via email as the predicate acts constituting wire fraud. *Id.* ¶¶ 108-109, 113-14. The Court dismissed the SAC's RICO claim because Plaintiff failed to plausibly allege an agency relationship between the Defendant Banks and Askeladden and, as a

30

result, Askeladden's actions challenging the Patent could not be imputed to BoA or WF.  Second Opinion at 12.  The Court further remarked that Plaintiff failed to comply with Rule 9(b)'s particularity requirement because the SAC provided no factual allegations to support its contention that either BoA or WF had already decided to challenge the Patent at the time it signed its respective settlement agreement.  *Id.*  Because a substantive RICO violation was not adequately pled in the SAC, the Court dismissed the conspiracy claim.  *Id.* at 12-13.

The TAC contains additional allegations.  The TAC's RICO claim is asserted against BoA, WF, Leitch, and Strother.  TAC ¶ 166.  The new allegations include the following.  "TCH is a RICO enterprise, pursuant to 18 U.S.C. § 1961(4)," and "TCH created Askeladden for the purpose of filing patent challenges to advance the interests of [BoA], [WF], and TCH's other owner banks." *Id.* ¶¶ 168-69.  When the Verify IPR was filed, Leitch and Strother were involved in the "operation or management" of Askeladden by way of their membership on TCH's supervisory board "and as operational representatives of TCH's managing member banks."  *Id.* ¶ 171.  Leitch and Strother also had control over Howard, who "instructed Askeladden's PCC" on which patents to challenge. *Id.* ¶ 172.  Leitch, acting on behalf of BoA, and Strother, acting on behalf of WF, "acted to direct Howard to guide and have Askeladden file the Verify IPR."  *Id.* ¶¶ 173-74.  "Lynch, Leitch, and Strother" acted on behalf of BoA and WF, to agree "to utilize Askeladden to carry out the fraudulent settlement scheme" and this agreement "has been ongoing between these entities for at least five years and continues to date"  *Id.* ¶ 175.

The TAC further alleges that, at the time of the BoA settlement agreement, "Lynch was aware of Askeladden's PCGs . . . and therefore knew that Askeladden would thereafter file the Verify IPR to challenge [the Patent] in violation of the agreement."  In support, the TAC notes that (1) Askeladden's funding came from the TCH member banks; (2) Lynch was "intimately

involved" in the management of Askeladden, TCH, BoA, the BoA settlement agreement; and (3) Lynch "was aware of and participated in the interactions between [BoA], TCH and Askeladden that resulted in the [BoA] Settlement Agreement and the subsequent filing of the Verify IPR." *Id.* ¶ 179.  Plaintiff adds that if had known that Askeladden intended to "turn around and sue to challenge [the Patent]," it would not have settled with BoA. *Id.* ¶ 180.  The TAC makes similar allegations as to Strother and the WF settlement. *Id.* ¶ 185.  The TAC continues that "[BoA]'s and [WF]'s wire fraud violations using Askeladden to challenge previously settled patent disputes are ongoing and will continue, which as detailed above, was created in part to induce fraudulent settlements in violation of 18 U.S.C. § 1962(c)," and that "these violations constitute both an open and closed ended pattern of racketeering required by 18 U.S.C. § 1961(5)." *Id.* ¶ 201.

Defendants move to dismiss this claim on several grounds.  Defendants first argue that Plaintiff failed to allege predicate acts or a pattern of racketeering activity.  Def. Br. at 28.  Defendants continue that because Plaintiff has failed to adequately allege that either BoA or WF challenged the Patent, Plaintiff has failed to allege that either Defendant Bank engaged in a fraudulent act. *Id.*  Defendants add that Plaintiff's fraud allegations fail to comport with Rule 9(b). *Id.* at 30.  Defendants also contend that Plaintiff has failed to allege a RICO injury because its alleged losses are not cognizable RICO injuries. *Id.* 32-33.  Defendants conclude that because Plaintiff has failed to allege a substantive RICO violation, its conspiracy claim must fail. *Id.* at 34.

"[W]ire fraud consists of (1) a scheme to defraud, (2) use of . . . interstate wires to further that scheme, and (3) fraudulent intent." *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n*, 751 F. App'x 293, 297 (3d Cir. 2018). "[A]llegations of . . . wire fraud which serve as a predicate for a RICO violation are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), which states that 'a party must state with particularity the circumstances

constituting fraud.'" *Id.* The fraudulent conduct on which Plaintiff bases its RICO claim is the wiring of WF and BoA's settlement agreements. But as the Court explained in the Second Opinion, without a plausibly pled agency relationship between BoA or WF and Askeladden, Askeladden's action of challenging the Patent cannot be imputed to BoA of WF. Second Opinion at 12.

Plaintiff relies heavily on the PCGs in an attempt to remedy deficiencies identified in the Second Opinion. These new arguments are unavailing. The TAC alleges that Lynch's awareness of the PCGs at the time of the BoA settlement agreement, and Strother's awareness of the PCGs at the time of the WF settlement agreement, demonstrate that both Defendant Banks knew that Askeladden would thereafter file the Verify IPR in violation of both settlement agreements. TAC ¶¶ 179, 185. Plaintiff argues that the PCGs "are significantly more than a mere recommendation to act" and instead are

> an integral part of a sophisticated scheme designed by the Defendant Banks to have Askeladden act under their control, and collectively benefit their long term businesses interests as co-owners of TCH, by fraudulently settling patent infringement suits filed against them them in the short term on favorable financial terms, and then after settlement, eliminating those patents that threaten their businesses in PTAB proceedings in contravention of releases given in the settlement agreements resolving those cases.

Opp. Br. at 25. But these allegations are not supported by the language used in the PCGs. As discussed previously, the PCGs provide "general guidelines" that the PCC "may consider" when determining whether to file an IPR. D.E. 113-1 at 18. And the sections of the Askeladden LLC Agreement that detail the PCC explicitly provide that the Committee is an independent body and neither TCH nor any of its affiliates have the authority to control, direct, or bind the PCC. *Id.* at 10. The plain language of the Askeladden LLC Agreement and the PCGs does not support

Plaintiff's allegations of a scheme to defraud or support an inference that either bank knew Askeladden planned to file the Verify IPR after the execution of the settlement agreements.

Because Plaintiff has failed to establish a substantive RICO claim, its RICO conspiracy also fails.  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").  For the above reasons, the Court finds that Plaintiff has not plausibly pled either a substantive RICO claim or a RICO conspiracy claim.  As a result, the Court dismisses Count Seven.

### G.  NJRICO (Count Eight)

Plaintiff's final claim is brought under New Jersey's RICO Act ("NJRICO"), N.J. Stat. Ann. § 2C:41-2(c).  Unlike the federal RICO claim, Plaintiff alleges in Count Eight that Askeladden is the "RICO enterprise" and that Askeladden's false certification to the PTAB was the relevant fraud.  TAC ¶¶ 208-09.  This claim does not appear to be raised against the Defendant Banks and, instead, points only to conduct of the Individual Defendants.  TAC ¶¶ 205-218.  Plaintiff alleges that Howard and Reilly "directed and managed Askeladden's affairs"; Lynch, Leitch, and Strother "directed and managed TCH's affairs, and in turn the affairs of Askeladden"; Howard and Reilly participated in TCH and Askeladden's "pattern of racketeering" by "secretly working" as agents of BoA and WF and the false certifications filed in the IPRs"; and Lynch, Leitch, and Strother participated in Askeladden's pattern of racketeering by concluding the settlements "while concurrently secretly undermining those settlements by promoting Askeladden to act as an agent" of BoA and WF."  *Id.* ¶¶ 210-14.

Under NJRICO, it is "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in

or control of any enterprise which is engaged in or activities of which affect trade or commerce."
N.J. Stat. Ann. § 2C:41-2(c); *State v. Ball*, 661 A.2d 251, 257-58 (N.J. 1995).  A NJRICO claim
is comprised of the following elements:

> (1) the existence of an enterprise; (2) that the enterprise engaged in
> or its activities affected trade or commerce; (3) that defendant was
> employed by, or associated with the enterprise; (4) that he or she
> participated in the conduct of the affairs of the enterprise; and (5)
> that he or she participated through a pattern of racketeering activity.

*State v. Ball*, 632 A.2d 1222, 1236 (N.J. Super. Ct. App. Div. 1993), *aff'd* 661 A.2d 251 (N.J.
1995).  A plaintiff must also satisfy a sixth element – a statutory standing requirement – by showing
that "plaintiff's harm was proximately caused by the RICO predicate acts alleged, *i.e.* that there
was a direct relationship between plaintiff's injury and defendant's conduct."  *Interchange State
Bank v. Veglia*, 668 A.2d 465, 472 (N.J. Super. Ct. App. Div. 1995) (quotation omitted); *see also
Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2017 WL 4392038, at *12 (D.N.J. Oct. 2,
2017).

Defendants argue[8] that this claim (1) "fails as a matter of law for the same reasons as
[Plaintiff]'s federal RICO claim" and (2) fails because the claim is not directed at conduct that
affects the trade or commerce of New Jersey, which is a requirement.  Def. Br. at 34.  Plaintiff
does not respond to either of these contentions in its opposition brief and instead merely states that
its "New Jersey RICO claim is plausible for substantially the same reasons set forth" in its
opposition briefing on the Federal RICO claim.  Opp. Br. at 26, n.17.  The Court agrees that the
TAC does not adequately allege New Jersey commerce requirement.  Count Eight is dismissed.[9]

---

[8] The PJ Defendants also move to dismiss for lack of personal jurisdiction.  The Court, however,
does not reach the issue because it finds Defendants' other argument dispositive.

[9] In light of the foregoing analyses, the Court does not reach the additional arguments raised by
Defendants.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for failure to state a claim is **GRANTED** and the Moving Defendants' motion to dismiss for lack of personal jurisdiction is **GRANTED in part and DENIED in part**.  If the dismissal was based solely on lack of personal jurisdiction, the Court would grant leave to amend.  Plaintiff, however, has had numerous attempts to assert sufficiently pleaded claims in this matter but has been unable to do so.  Accordingly, the Court concludes that providing Plaintiff with leave to file another amended pleading would be futile.[10]   The TAC, therefore, is dismissed with prejudice.  *See, e.g., TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, No. 12-3355, 2014 WL 3853900, at *9 (D.N.J. Aug. 5, 2014) (dismissing claims with prejudice where court already provided plaintiff with leave to amend and amended pleading "suffer[ed] from many of the same pleading deficiencies previously identified by the Court").

Date: June 17, 2021

John Michael Vazquez, U.S.D.J.

---

[10] The Court also indicated in the Second Opinion that it was affording Plaintiff "one additional opportunity to file an amended pleading."  Second Opinion at 15.

36